IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LOOP LLC d/b/a AUTOLOOP, on behalf of itself and
all others similarly situated,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION and ORDER |
| v. | | 24-cv-571-jdp |
| CDK GLOBAL, LLC, | | |
| | Defendant. | |

---

This class action for alleged antitrust violations is scheduled for trial on January 27, 2025. This order addresses motions in limine and other pending motions, ruling on some on them and identifying issues that require further discussion during the January 15 final pretrial conference.

ANALYSIS

A. Loop's motions

1. Legality of independent data integration services

CDK wishes to argue two related points at trial: (1) independent data integration services violate the Computer Fraud and Abuse Act (CFAA) or the Digital Millenium Copyright Act (DMCA) when an integrator accesses a dealer management system without authorization; and (2) CDK and Reynolds "understood" that independent data integration services can violate the CFAA and DMCA under those circumstances. CDK contends that the first point is relevant because there is no antitrust injury if the conduct being restrained is illegal, and the second point is relevant to show that CDK had legitimate reasons unrelated to a conspiracy for restricting access to its dealer management system. Loop moves to exclude evidence and

argument about both issues on the grounds that they are irrelevant and will lead to mini-trials about potential violations of the statutes.

The CFAA makes it unlawful to "intentionally access[] a computer without authorization or exceed[] authorized access, and thereby obtain[] . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(c). The DMCA states that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected [by copyright]." 17 U.S.C. § 1201(a)(1)(A). The MDL court considered the relevance of these laws in previous decisions.

In moving to dismiss Authenticom's complaint, CDK and Reynolds argued that Authenticom had not alleged an antitrust injury because it violated the CFAA and the DMCA by accessing CDK and Reynolds's dealer management systems without their authorization, and the Sherman Act does not protect a plaintiff's illegal conduct. The court rejected this argument for two reasons. First, "Authenticom's as-alleged practices are not illegal independent of Defendants' challenged conduct." *In re Dealer Management Systems Antitrust Litigation*, 313 F. Supp. 3d 931, 948 (N.D. Ill. 2018). In other words, Authenticom alleged that it "lack[ed] authorization or access to Defendants' DMSs . . . *because of* Defendants' anticompetitive conduct," and "Defendants are not free to withhold such approval pursuant to illegal arrangements." *Id.* Second, it was reasonable to infer from the complaint that Authenticom did have authorization because "CDK had long permitted, indeed encouraged, third-party integration on its DMS." *Id.* at 949.

At the summary judgment stage, CDK made a similar argument that none of the plaintiffs, including vendors like Loop, could establish an antitrust injury because their unauthorized access to the dealer management system violated laws like the CFAA and the

DMCA. The court rejected this argument because "there is a material factual dispute about whether Authenticom was authorized to access CDK's DMS at the time the alleged conspiracy began." *In re Dealer Management Systems Antitrust Litigation*, 680 F. Supp. 3d 919, 972–73 (N.D. Ill. 2023). The court cited evidence that, as late as 2015, CDK allowed dealers to decide who may access the dealer management systems and that CDK did not begin to restrict access until after the alleged conspiracy began. *Id.* at 973.

Thus, the MDL court's ruling was that the plaintiffs' antitrust injury hinged on when CDK denied third parties authorization to its dealer manager system, and, when it did so, *why* it did so. Neither side moves to reconsider the MDL court's ruling, so it provides the framework for considering the extent to which CDK may discuss the CFAA and the DMCA at trial.

As for whether CDK should be able to argue that independent data integrators violated the CFAA or the DMCA, the MDL court did not hold or imply that the jury would be making legal determinations about potential violations of any laws other than antitrust laws. Rather, the MDL court suggested that the jury would need to decide the factual question of why CDK denied permission. If it was part of an antitrust conspiracy with Reynolds, then the independent data integrators' failure to obtain authorization did not bar the vendors' antitrust claim. But if CDK denied permission for reasons unrelated to a conspiracy, then the vendors did not suffer an antitrust injury. So the question of whether Authenticom violated the CFAA or DMCA appears to rise and fall with the question whether there was a conspiracy. This means that the CFAA and the DMCA are irrelevant.

The court will grant Loop's motion to preclude CDK from arguing to the jury that independent data aggregators violated the CFAA or the DMCA or that compliance with those laws provided CDK with an independent reason for denying access to other aggregators.

CDK raises another issue in its brief: whether it may present evidence and argument that third-party access to its dealer management system was unauthorized under its agreements with dealers. That issue would appear to be relevant to the questions left open by the MDL court: when and why CDK restricted access to the dealer management system. But Loop did not raise this issue in its motion, so the court will not decide it here. If Loop objects to CDK's reliance on its dealer contracts to support an independent reason for restricting access, Loop may raise that objection during the final pretrial conference.

### 2.  Limitations on damages

Loop seeks to preclude CDK from offering evidence and making arguments for limiting class damages on three grounds: (1) vendors passed CDK's overcharges onto their own customers; (2) vendors should have mitigated their damages; (3) the vendors were profitable despite any overcharges. CDK disputes aspects of each of these requests, and the court will discuss each in turn.

### a.  Pass-on charges

The parties agree that the class is entitled to recover the full amount of any overcharges caused by an antitrust violation, even if class members passed some of those charges onto their own customers. *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968); *Paper Systems Inc. v. Nippon Paper Industries Co., Ltd.*, 281 F.3d 629, 631 (7th Cir. 2002). But CDK says that "the fact of" pass-on charges is relevant for another reason. Specifically, CDK says that, since 2019, it has given some dealers "waivers" of integration fees that vendors pass on to dealers. CDK contends that those waivers show that Reynolds and CDK are still competing with each other on integration fees, and the waivers explain why CDK's prices are different from Reynolds's prices.

Loop does not dispute that CDK is permitted to explain differences between Reynolds's and CDK's pricing. But Loop says that "CDK can address evidence bearing on . . . the competitive nature of the market without introducing evidence that suggests or implies that Vendors have the ability to or did pass on or recoup unlawful overcharges." Dkt. 130, at 8. But the fee waivers at issue relate directly to pass-on charges. Loop does not explain how CDK can discuss the fee waivers without at least some mention of what the fee waivers are for.

The court will grant this motion in part and deny it in part. CDK pay not present evidence of specific pass-on charges or argue that the class's damages should be reduced to account for those charges. But the court will not preclude CDK from discussing its fee-waiver program. The parties should be prepared during the final pretrial conference to discuss the following: (1) the specific evidence that CDK plans to offer about its fee-waiver program; (2) how the evidence can be presented without unfairly prejudicing the class; and (3) whether the jury should receive an instruction on this issue, and, if so, what that instruction should be.

### b. Mitigation

CDK seeks to argue during trial that the class should have mitigated its damages in two ways: (1) they could have obtained raw data directly from dealers rather than from CDK and Reynolds; and (2) they could have asked dealers to request waivers from CDK for integration fees. Loop moves to exclude evidence and argument about a duty to mitigate damages. In support of its motion, Loop cites district court cases holding that mitigation is not required in a horizontal price-fixing conspiracy case because that type of conspiracy increases the price for the whole market, so it is not reasonable to require mitigation. *See In re: Cathode Ray Tube (CRT) Antitrust Litigation,* No. C-07-5944, 2016 WL 6216664, at *11 (N.D. Cal. Oct. 25,

2016); *In re TFT-LCD (Flat Panel) Antitrust Litigation*, Nos. M 07–1827, 10–1064, 2012 WL 6000154, at *3 (N.D. Cal. Nov. 30, 2012).

CDK objects to Loop's motion on both procedural and substantive grounds. Procedurally, CDK contends that Loop's motion should be denied because it is essentially an untimely motion for summary judgment. On the merits, CDK contends that the cases Loop cites are limited to price-fixing cases, and this is not a price-fixing case.

The court will deny Loop's motion. The court of appeals has held that "the tort rules regarding mitigation of damages can have their place in the law of antitrust." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 556–57 (7th Cir.1986). Regardless of whether the Seventh Circuit would adopt the limitation on that principle discussed in *Cathode Ray Tube* and *TFT-LCD*, Loop does not explain why this case should be treated like a price-fixing case. In essence, Loop is contending that it would be unreasonable to require vendors to obtain data directly from dealers or to ask dealers to request fee waivers. But the reasonableness of mitigation (or the failure to mitigate) is generally a fact question for the jury. *See Smith v. Great Am. Restaurants, Inc.*, 969 F.2d 430, 439 (7th Cir. 1992); *Smith v. Rowe*, 761 F.2d 360, 367 (7th Cir. 1985). So Loop is free to argue to the jury that CDK's proposed mitigation efforts are unreasonable. If Loop believed that any requirement to mitigate in this case was unreasonable as a matter of law, it should have filed a motion for summary judgment on that issue.

### c.  Vendors' profitability

Loop moves to exclude evidence and argument about Loop's or any other class member's profitability, contending that it is not relevant to liability or damages. CDK's primary objection to this motion is simply that it is premature because Loop does not identify any specific evidence it wants to exclude. A common problem with many motions in limine

6

(including some of CDK's motions) is that they do not identify specific exhibits or testimony. But in this case, more specificity is not required because Loop is contending broadly that evidence about a vendor's profitability is irrelevant and should be excluded. So if CDK believes that certain evidence about a vendor's profitability is relevant, it should have identified that evidence and explained its relevance. CDK failed to do that.

CDK does contend generally that evidence about profitability could be relevant for impeachment or to show a vendor's "bargaining power." Dkt. 200, at 19–20. But almost any piece of evidence could be relevant for impeachment, depending on the testimony that the opposing party offers. CDK identifies no anticipated testimony that could be impeached by evidence of a vendor's profits. If Loop offers such testimony during trial, CDK may raise that issue with the court then. As for Loop's bargaining power, CDK neither explains why *that* issue is relevant nor why bargaining power would be shown through profits as opposed to size or market share.

The court will grant this motion.

### 3.  Sales of data by independent data integrators

CDK wishes to offer evidence that Authenticom sold customer data that Authenticom had obtained from dealers. CDK says that such evidence is relevant to showing that it had valid security concerns for restricting access to its system.

Loop objects on two grounds. First, it says that CDK's stated security concerns "have nothing to do with what independent data integrators do with the data that dealers agree to provide them." Dkt. 130, at 12. Second, Loop says that any probative value of the evidence is substantially outweighed by unfair prejudice because the evidence at issue relates to conduct that occurred "long before the conspiracy was formed." Dkt. 130, at 12.

The court will exclude this evidence under Rule 403. The court agrees with Loop that there is little connection between Authenticom's conduct and CDK's stated security concerns, which are about *unauthorized* access to dealer data. Dealers had freely given their data to Authenticom, so that is not a security issue. The sale of customer data in that scenario may be undesirable, but it does not necessarily implicate security concerns. Even if CDK had a legitimate interest in controlling how dealers share customer data, any probative value of this evidence is substantially outweighed by potential prejudice. The primary purpose of this evidence seems to be to depict Authenticom and the vendors as attempting to profit off customers at the expense of their privacy. But that is not what this case is about.

The court will grant Loop's motion to exclude evidence about Authenticom's sales of customer data.

### 4. Conflicts between the operative complaint and Vendors' alleged conspiracy to be proven at trial

The parties have stipulated that "CDK will not argue that allegations in filings by Vendors or other antitrust plaintiffs contradict Vendors' argument at trial that the conspiracy began in September 2013," Dkt. 179, and Loop acknowledges that the motion has been resolved, Dkt. 183. So the court will deny this motion as moot.

### 5. Deposition designations

The parties have filed competing motions about the presentation of deposition designations, so the court will consider them together.

Both sides have deposition designations for four witnesses.[1] CDK wants to play its designations for those witnesses during Loop's case in chief, while Loop is playing its designations. Loop objects and asks the court to preclude CDK from playing its designations until its own case. Loop says it would be unfair to play portions of depositions supporting CDK's case during Loop's case in chief. CDK says it is more efficient to play all testimony from the same witness at the same time.

The court's general practice is to allow both sides to present all testimony from the same witness at the same time because it is more efficient for both the witness and the jury. As Loop points out, the concerns about efficiency are less pronounced for deposition designations than for live witnesses. (Loop does not object to allowing CDK to conduct a full examination of any live witnesses during Loop's case in chief.) But presenting all of a witness's testimony would still likely make it easier for jurors to follow the testimony and alleviate the need for repetition, especially if the testimony relates to the same topics.

Loop objects only generally to three of the four witnesses. But it says that Bob Schaefer's testimony is particularly prejudicial because CDK has 40 minutes of initial designations for Schaefer and 32 of those minutes precede the portions of the deposition that Loop will play. But the only potential prejudice that Loop identifies is that "[a] jury has limited tolerance for video testimony," and the jury may "fail[] to understand that the bulk of the first hour of Mr. Schaefer's testimony is sponsored by CDK and not by Vendors." Dkt. 192, at 3. But that

---

[1] The parties also have deposition designations for Ron Workman because he is moving to quash Loop's subpoena. But the court is denying the motion, so it will be unnecessary to designate deposition testimony from Workman.

concern is easily addressed by an instruction to the jury about the process. In that situation, the jury will appreciate the steps that the parties have taken to streamline the presentation.

So the court will deny Loop's motion on this issue and grant CDK's. The court will allow all deposition designations from the same witness to be played at the same time.

### 6. Motion for sanctions and judicial notice.

This motion has two parts. First, Loop says that CDK failed to preserve a large number of emails from after December 2019, and Loop asks the court to sanction CDK under Federal Rule of Civil Procedure 37(e)(1). Second, Loop asks the court to take judicial notice of facts about Bob Brockman, Reynolds's former CEO. CDK asks for oral argument on both requests. Dkt. 150. Some of the issues were fairly presented in the briefs, and the court will rule on those issues. But the court will allow the parties to provide additional input during the final pretrial conference on the questions that remain unresolved.

### a. Sanctions

The parties agree about two key facts related to Loop's sanctions motion: (1) CDK did not preserve emails that it was obligated to preserve; and (2) CDK's failure was not intentional. As for the first point of agreement, CDK admits that it stopped saving emails for this case as of December 2019, so emails were deleted after 180 days, unless they were being saved for some other reason. As a result, emails for four agreed "custodians" are missing for the following time periods: December 2019 to April 2020 for Howard Gardner; December 2019 to June 2021 for Trey Gerlich; December 2019 to May 2023 for Leigh Ann Conver; and December 2019 to September 2023 for Bob Schacte. As for the second point of agreement, Loop does not allege that CDK destroyed emails to hide evidence. Rather, a CDK employee failed to take

affirmative steps to preserve those emails because he believed incorrectly that discovery had ended, and it was no longer necessary to preserve emails. Dkt. 89, at 5–6; Dkt. 99, at 14–15.

Sanctions for failing to preserve electronic evidence are governed by Rule 37. If the destruction of evidence is intentional, the court may direct the jury to infer that the missing evidence was unfavorable to the party or even enter judgment against the party. Fed. R. Civ. P. 37(e)(2). But if the failure to preserve is unintentional, sanctions are limited to those that are "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Loop concedes that it is limited to remedies under Rule 37(e)(1).

To determine an appropriate sanction, the court must first "determine the scope of the prejudice, and it cannot do so unless it has some idea about what the [missing evidence] contained." *Freidig v. Target Corporation*, 329 F.R.D. 199, 209 (W.D. Wis. 2018). In this case, Loop says that the missing emails could have been relevant to show six different things:

- CDK and Reynolds continued after 2019 to coordinate their data access policies;

- CDK and Reynolds continued to coordinate "on the exclusion of independent integrators";

- "no rival has sustained any serious challenges to [CDK and Reynolds's] market power";

- vendors are continuing to pay higher prices because of the conspiracy that began in 2013;

- CDK's investments in cybersecurity failed to prevent a ransomware attack in 2024;

- "blocking independent data integrators has nothing to do with this past summer's ransomware attack or any other cybersecurity threat CDK actually confronts."

Dkt. 89, at 15. Most of this appears to be speculation. Loop offers no basis to believe that the missing emails included any of that information.

Loop says that it cannot be expected to prove the contents of emails it does not have. In many cases, that would be a fair point. But in this case, it is undisputed that some of the custodians' emails from the relevant time *were* preserved (CDK says it recovered 240,000 emails from the relevant period), and that the preservation of only some emails was not strategic or otherwise intentional. Thus, if the missing emails included the type of evidence that Loop suggests they do, then it is likely that the existing emails from the period would include such evidence as well. But Loop does not identify *any* emails that support its position. And for some of the categories of information, it is not clear how they could include such evidence. For example, Loop does not explain why internal emails would provide evidence of a competitor's position in the market.

The court turns to Loop's requested sanctions. The first is for the court to instruct the jury that CDK did not preserve emails as it was required to, and the jury "may consider that fact, along with all the other evidence admitted at trial, in rendering its verdict." Loop cites two examples of courts that have approved a similar instruction. *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 626 (N.D. Ill. 2022); *Charlestown Capital Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 68 (S.D.N.Y. 2020).

The court does not object to informing the jury that emails related to certain witnesses and time periods do not exist because CDK failed to preserve them. Even without a strong

showing of prejudice, it is fair to let the jury know that there is a gap in the record, and why that gap exists. The court will allow the parties to argue during the final pretrial conference whether that notice should take the form of a stipulation from the parties read to the jury or a jury instruction from the court.

But the court is not persuaded that it should include Loop's requested language in any jury instruction. As an initial matter, neither of the cases Loop cites are useful. The instruction provided by the court in *Hollis* was premised on the jury's finding that the destruction of evidence was intentional. 603 F. Supp. 3d at 626. But in this case, there is no dispute that the failure to preserve was accidental. The court in *Charlestown Capital Advisors* never provided an instruction. Rather, the court stated in its summary judgment decision that the plaintiff "may seek an appropriate jury instruction," 337 F.R.D. at 68, but that did not happen because the case settled. Case no. 18-cv-4437 (S.D.N.Y. May 27, 2021), Dkt. 190.

One problem with Loop's proposed instruction is that it tells the jury that it "may consider" the failure to preserve, but it does not tell the jury how or in what way to do that. That risks jury confusion and invites questions from the jury during deliberations. It may be that Loop's proposal is vague because it knows that the court may not direct the jury to draw an adverse inference in the absence of evidence of intent. And the Rule 37 advisory committee notes instruct courts that "[c]are must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation." Loop's proposed instruction appears to be an attempt to get close to the line without going over it. But that is not a good reason for providing a vague instruction.

One possibility is to follow the approach of the court in *Covarrubias v. Wendy's Restaurant*, which simply provided the information to the jury about the failure to preserve, and then allowed the parties to argue to the jury what inferences they believed the jury should draw. No. 19-cv-4866, 2021 WL 4258701, at *4 (N.D. Ill. June 21, 2021). The court will reserve a ruling on this issue to allow the parties to discuss in what the form the information should be presented to the jury (instruction or stipulation), and what language should be used.

Loop's second proposed sanction is to "preclude CDK from contesting either liability or damages based on facts that postdate December 2, 2019." *Id.* at 17. But Loop does not explain what it means by this request. Its opening brief includes a single paragraph about this issue. Dkt. 89, at 17. If Loop is asking the court to preclude Loop from putting in any evidence that post-dates December 2019, it has not attempted to justify such a harsh sanction, which comes close to asking for a partial default judgment.

The cases Loop cites involved much narrower sanctions. In *Barbera v. Pearson Education, Inc.*, the court held that the defendant could not dispute the plaintiff's recollection of missing emails. 906 F.3d 621, 627 (7th Cir. 2018). That case is not helpful because the missing emails in this case were not directed to Loop, so Loop has no recollection of them. In *Bryant v. Gardner*, 587 F. Supp. 2d 951, 969 (N.D. Ill. 2008), and *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 982 (N.D. Ill. 2021), the court similarly precluded the offending party from disputing discrete issues that likely would have been addressed by the missing evidence. Loop's proposal goes far beyond this.

Loop also cites *Domanus v. Lewicki*, No. 08 C 4922, 2012 WL 3307364 (N.D. Ill. Aug. 13, 2012), which is more instructive. The defendants had inadvertently destroyed a hard drive after producing some electronic documents from the drive. The court held that the defendants

14

could not rely on documents they obtained from the hard drive prior to its destruction. *Id.* at *2. Applying *Domanus* to this case would preclude CDK from relying on emails from the four custodians at issue that CDK *did* preserve from after December 2, 2019. The court will reserve a ruling on this issue to allow the parties additional input during the final pretrial conference.

Loop's third and final proposed sanction is to preclude CDK from "contesting liability or damages based on any alleged insufficiency of Vendors' post-2019 proof." Loop does not explain what it means by this in its opening brief, but in its reply brief, it points to four passages from CDK's supplemental expert reports that it objects to:

- Whinston (CDK's liability expert) criticized Israel (Loop's expert) for failing to "evaluate how the increases in cybersecurity risks and the cost of hostile integration since 2019 would change CDK's and Reynolds' economic incentives to secure their systems from hostile integration." Dkt. 109, ¶ 22.

- Whinston stated that "Dr. Israel does not analyze how significant changes in the competitive landscape affected CDK's and Reynolds' economic incentives to engage in the alleged conduct since 2019." *Id.* ¶ 59.

- Stroz (CDK's security expert) devotes a section of his report to "cybersecurity threats to the automotive industry since 2019." Dkt. 108 at Part IV.

- Murphy (CDK's damages expert) criticized Israel for citing "no evidence" of "communications" or other activities "to support his claim that the equilibrium he claims Defendants conspired to achieve [from September 2013 through early 2015] could sustain itself through January 2025." Dkt. 107, ¶ 7.

As for the passages from Whinston and Stroz's reports, Loop does not explain, and it is not otherwise clear, why the missing emails would likely contain any evidence about "changes

in the competitive landscape" or "cybersecurity threats." Those are issues about events that would have occurred outside of CDK, so the court is not persuaded that Whinston and Stroz should be precluded from discussing those issues. But Murphy's statement about the lack of "communications" showing an ongoing conspiracy has a more apparent connection with the failure to preserve emails.

For its part, CDK proposes the following two remedies: (1) allow Loop to depose one or more of the four custodians at issue about "post-2019 issues"; and (2) direct CDK to search emails of five CDK employees "with whom the Custodians had the most correspondence with" during the relevant period. Dkt. 99, at 26. CDK says that the emails of those five employees were preserved "for another matter in September 2020, so their mailboxes had preservation settings enabled for most of the preservation issue time-period." Dkt. 90-5, at 5.

Loop objects to these suggestions, contending that the custodian's testimony and emails of other employees are not an adequate substitute for documentary evidence from the custodians themselves, and Loop should not have to sacrifice trial preparation time to conduct new discovery. The court agrees that a deposition would likely not provide the same insights as the lost emails, but the offer to produce additional emails is a closer question. If CDK is correct that these five employees were the most common correspondents with the four custodians, then it follows that many of the missing emails would be included in their files. On the other hand, the emails of the other employees would not necessarily include correspondence between the custodians and Reynolds. Loop's objection to spending time reviewing emails is another fair consideration; CDK says that there are "350,000 additional files" that would have to be collected and reviewed. Dkt. 99, at 26. But CDK made this offer on November 12, 2024, so Loop could have already had the additional information.

16

To sum up, the court will not preclude CDK from putting on any evidence about events after December 2019, and it will not preclude CDK's experts from discussing issues on which the missing emails would be unlikely to provide insight, such as changes in the market and cybersecurity threats. But the court will allow Loop to inform the jury about the missing emails, and it will consider the possibility of other sanctions. The parties should be prepared to discuss the following issues during the final pretrial conference:

- what basis there is to believe that the missing emails include information about the five issues that Loop identified in its motion (coordination between CDK and Reynolds after 2019, changes in CDK's market power after 2019, the reasons why customers are continuing to pay higher prices for integration services, CDK's 2024 cyberattack);

- whether the jury should be informed about CDK's failure to preserve evidence through a jury instruction or a stipulation and what the instruction or stipulation should say;

- whether the court should preclude CDK from relying on emails from Howard Gardner, Trey Gerlich, Leigh Ann Conver, or Bob Schacte from after December 2, 2019;

- whether the court should preclude CDK from relying on the lack of "communications" or other similar evidence after December 2019.

**b. Judicial notice**

Loop's request for judicial notice overlaps with CDK's motion in limine 5 to exclude evidence about financial misconduct by Bob Brockman (Reynolds's former CEO), Dkt. 115, so the court will consider these issues together. CDK also moved for leave to file a sur-reply

brief to respond to new arguments in Loop's reply brief, and it attached a copy of the proposed brief. Dkt. 148. The court will grant that motion and consider the brief.

In 2020, Brockman was indicted in federal court for financial crimes, including tax evasion and evidence tampering. Later the same year, the Federal Trade Commission (FTC) initiated an investigation into the same issues. But the government dropped these matters when Brockman died in 2022, and there was no finding by a jury or any other body regarding the misconduct.

CDK asks the court to exclude all evidence and argument "about the 2020 criminal indictment, and related civil litigations" against Brockman. Dkt. 115, at 1. Along with this general request, CDK seeks to exclude exhibits related to those issues, including the criminal indictment, Reynolds's responses to inquiries from the FTC, and a screenshot of the website called "Evidence Eliminator."[2] CDK contends that the exhibits are unauthenticated, hearsay, or both, and that they are irrelevant and unfairly prejudicial.

In response to CDK's motion, Loop says that it does not intend to put in any evidence about the criminal prosecution. Loop withdraws the indictment as an exhibit. Dkt. 191, at 2,6. Loop also says that it will "provisionally withdraw" a 2010 email in which Brockman discusses the Evidence Eliminator program and a screenshot of the Evidence Eliminator website. *Id.* at 6–7. But Loop says that it "reserves the right" to introduce those exhibits if CDK "opens the door" by mischaracterizing evidence. Dkt. 191, at 7.

In in its opening brief in support of its motion, Loop asks the court to take judicial notice of three facts: (1) Brockman "used" a program called "Evidence Eliminator" on his work

---

[2] Neither side provides the current exhibit numbers for any of these exhibits.

computer; (2) Brockman advised other employees at Reynolds to do the same thing; and (3) Reynolds did not produce Brockman's emails from before August 2016 because Brockman had used the program to destroy those emails. Dkt. 89, at 18. In response to objections raised by CDK in its opposition brief, Loop changed its request, instead asking the court to judicially notice three similar but different facts: (1) Brockman had a program called Evidence Eliminator "installed" on his work computer in 2018; (2) sometime after 2010, Brockman recommended that other Reynolds executives who are alleged to be involved the conspiracy install Evidence Eliminator on their computers; and (3) "Brockman's custodial email files generally lacked emails prior to August 2016," and "this was part of a purposeful document retention and deletion practice." Dkt. 110, at 6. In response to CDK's motion to exclude evidence about Brockman, Loop changed (3) to "Reynolds produced no emails from Brockman's custodial email files prior to August 2016." Dkt. 191, at 3.

Loop's request for judicial notice appears to be based on the following documents:

(1) a response to an inquiry from the FTC in which Reynolds stated that one of its IT employees knew in 2018 that "Brockman had software called Evidence Eliminator installed on, at least, his Reynolds laptop," Dkt. 90-7, at 18 n.5;

(2) a response to an inquiry from the FTC in which Reynolds stated that one of its employees, Bob Schaefer, "recalled that at some point after 2010, Mr. Brockman suggested that Mr. Schaefer install Evidence Eliminator on his computer" and that Schaefer "understood that Mr. Brockman suggested the same to Jon Strawsburg, another Reynolds executive, around the same time." Dkt. 90-14, at 4; and

19

(3) a brief that Reynolds filed in the MDL court stating that "Brockman's custodial email files generally lacked emails prior to August 2016" and "this was part of a purposeful personal document retention and deletion practice by Brockman," Dkt. 90-15, at 6.

Loop only briefly touches on the issue of why it wants the court to take judicial notice of the facts about Brockman's emails. In its motion, Loop says that the facts are relevant to rebut CDK's assertions that "Vendors have inadequate evidence of the conspiracy." Dkt. 89, at 18–19. The court understands Loop to be contending that it is reasonable to infer from the cited documents that Brockman and other Reynolds employees destroyed emails relevant to this case, and those emails could have contained evidence favorable to Loop.

It is reasonable to inform the jury that Loop does not have emails from Brockman before August 2016 because Reynolds failed to produce emails from that time period. CDK does not dispute that Reynolds failed to produce such emails. The court will allow the parties to provide input during the final pretrial conference regarding in what form the information should be presented to the jury (instruction or stipulation), and what language should be used.

As for the evidence about the Evidence Eliminator program, Loop does not explain why an admission about Brockman's use of the program in 2018 shows anything about the reason why emails from 2016 and earlier are missing. Loop does not contend that it has evidence that there are missing Brockman emails after 2018. Presumably, Loop intends to argue that it is reasonable to infer that Brockman: (1) Brockman had installed Evidence Eliminator on his computer long before 2018; and (2) Brockman used the program to delete his emails. But Reynolds did not admit in the brief Loop cites that Brockman destroyed emails to hide evidence. Rather, Reynolds stated that it did not issue a "litigation hold" on emails until January 2017 (after lawsuits were filed in the MDL court), and that Brockman had a general

practice of deleting all his emails after 6 to 12 months. Dkt. 90-15, at 11–12. The fact that Brockman at some point installed a program called Evidence Eliminator adds nothing except to invite the jury to infer that the missing pre-2016 emails were incriminating. But Loop does not cite any evidence of that. So the reference to the program is unfairly prejudicial. The court will not take judicial notice of this fact, and the court will exclude the document that discusses Brockman's use of the program.

The court will also exclude the document that discusses Brockman's recommendations to others to use the Evidence Eliminator program. Loop does not contend that it has any evidence that the other employees either installed the program or used it to destroy evidence relevant to this case. So the inference that Loop wishes the jury to draw from the document is speculative and unfairly prejudicial.

To sum up, the court will grant CDK's motion to exclude evidence about the criminal proceedings against Brockman and the FTC investigation. And the court will deny Loop's request for judicial notice, with one caveat. The court concludes that it is appropriate to issue an instruction or enter a stipulation into the record about Reynolds's failure to produce Brockman emails from before August 2016. The parties should confer on the wording of a stipulation or instruction and be prepared to discuss it during the final pretrial conference.

## B. CDK's motions

### 1. State "dealer data access" laws

Loop wants to put in evidence about laws in five states (Arizona, Montana, North Carolina, Oregon, and Utah) that give dealers certain rights over their data and place limits on entities like CDK from restricting access to that data. Loop cites a section in the expert report of Peter Swire called, "The Dealers Control Dealer Data." Dkt. 177, ¶¶ 25–49. Swire relies on

the five states' laws to support his opinion that dealers rather than entities like CDK should "have the ability—subject to any legal or regulatory restraints—to grant third parties access to the Dealer Data." *Id.*, ¶ 27. In a subsection called "State Laws Confirm Dealer Control Over their Data," Swire summarizes the Arizona law, states that the other four laws are similar, and offers the opinion that "[e]ach of these provisions reflect that Dealers control Dealer Data by providing Dealers with the exclusive right to control access to their Dealer Data." *Id.*, ¶¶ 42– 49. CDK moves to exclude discussion of these laws on the grounds that they are irrelevant and likely to confuse the issues and because Swire is not a legal expert.

The court largely agrees with each of CDK's objections. Loop does not explain why it matters what Swire or anyone else thinks about whether dealers or the owners of the dealer manager system should control dealer data. His opinion of that issue does not inform whether CDK entered into a conspiracy or whether CDK had legitimate security justifications for limiting access to the dealer manager system. But even if the laws have some relevance to the case, the court concludes that any probative value is substantially outweighed by the risk of confusing the issues. Discussing details of the laws will only raise questions about how the laws relate to the antitrust claims and whether and how the jury needs to apply the laws. They will only distract from the real issues that the jury must decide.

Loop says that the laws show that CDK could have allowed dealers to keep control over data while maintaining security. Loop cites the testimony of Dave Latham, CDK's vice president of products. Dkt. 83. Loop asked Latham whether CDK had suffered a data breach "as a result of needing to allow authorized data integrators to access CDK's DMS" in the states "like Arizona where regulations exist regarding access to the DMS . . . ." *Id.* at 148:8–12. Latham answered, "Not that I'm aware of." *Id.* at 148:14.

The point that Loop is making in its brief is not the point that Swire made in his report. But the parties agree that part of the jury's task will be to decide whether any security benefits obtained by restricting access to the dealer manager system "could have been reasonably achieved in a substantially less restrictive manner." Dkt. 180, at 3; Dkt. 195, at 2. If Loop has evidence that CDK did not suffer security lapses even in states that allowed dealers to share data with independent data integrators, that evidence could be relevant to undermining CDK's contention that restricting access was necessary to protect security. But at this point, Loop's only evidence is one statement from one witness that he was unaware of one type of security issue in the states with dealer data access laws. If that is the extent of Loop's evidence, it is questionable whether the probative value of that evidence justifies the potential confusion caused by a discussion about the details of several state laws.

The court will not allow Swire to offer an opinion that the dealer data access laws show that dealers should retain control over their data. But CDK did not anticipate Loop's argument that the laws and, more importantly, the effect of those laws show that less restrictive alternatives were available to CDK. So the court will reserve a ruling on that issue. During the final pretrial conference, the parties should be prepared to discuss the following three issues. First, what evidence does Loop have that dealer data access laws were effective in maintaining security the states where they were enacted? Second, if the court allows Loop to put in evidence that the laws did not undermine security in the states where they were enacted, what form should that evidence take? For example, is it necessary to describe the details of the laws, or is it enough to establish that five states allow dealers to share data with independent data integrators? Third, who is an appropriate witness to discuss the laws, and how can they discuss the laws without venturing into legal opinion?

2.  **Data portability laws**

Loop wants to put in evidence about what the parties call "data portability laws." CDK moves to exclude that evidence, and it points in particular to a section of Swire's supplemental report called "Other Legislative and Regulatory Developments." Dkt. 120, ¶¶ 18–32. In that section, Swire summarizes several laws that give consumers rights to access their data, including in the healthcare and financial industries. Swires says that the laws "show a significant national and global trend toward data portability and interoperability." *Id.*, ¶ 31. CDK moves to exclude discussion of these laws for reasons similar to those it asserted against "dealer data access" laws: they are irrelevant and will cause confusion.

Loop opposes CDK's motion on both procedural and substantive grounds. Procedurally, Loop says the motion is untimely because CDK could have raised it with the MDL court. Loop says that Swire's first report offered similar opinions, but CDK did not challenge them. Substantively, Loop says that the laws are relevant "to show that use of independent data integrators is common in other industries and can be done securely even where highly sensitive data is at issue, like healthcare or banking." Dkt. 188, at 7.

On the procedural question, a review of Swire's initial report shows that he did not rely on the laws that CDK is seeking to exclude. The section of the report that Loop cites is called "Delegated Consent Is A Common Arrangement Even For Sensitive Data," and it discussed the widespread use of "data-handling intermediaries" in the healthcare and banking industries. Dkt. 177, ¶¶ 60–71. As proof of common use, Swire discussed what he called the "HIPAA Privacy Rule" and a notice issued by the Consumer Financial Protection Board.

Even if there is some overlap in the two reports, the court declines to find waiver because any probative value these laws have is outweighed by a risk of juror confusion. The laws

themselves do not show industry practice and the fact that the laws exist does not show that the laws are effective at balancing access and security. And even if the laws provided some evidence of good security policy, the laws arise in a different context from this case, so allowing Swire or another witness to discuss them opens the door to challenges by CDK regarding the differences. The juice is not worth the squeeze, so the court will exclude any evidence or argument about the data portability laws.

### 3. Authenticom

Loop wishes to present evidence about three facts related to Authenticom: (1) Authenticom sued CDK and Reynolds for the same conspiracy that is at issue in this case; (2) CDK and Reyolds paid Authenticom a settlement to resolve that lawsuit; and (3) Authenticom "survives today" because it received the settlement. Dkt. 189, at 2. CDK moves to exclude this evidence as irrelevant and unfairly prejudicial.[3]

Loop acknowledges that evidence about another lawsuit is generally not admissible and that the evidence it wants to introduce creates the risk that "jurors will draw the inference that CDK and Reynolds must have conspired if they settled Authenticom's lawsuit." *Id.* at 1. But Loop says that the evidence is relevant to rebutting an inference that CDK's conduct did not cause competitive harm: the settlement explains why Authenticom is still in business despite the conspiracy. And Loop says that any prejudice to Authenticom can be cured with a jury instruction.

---

[3] CDK also says that the evidence violates Federal Rule of Evidence 408, which limits evidence about settlements. But Rule 408 only prohibits such evidence for the purpose of showing the validity or value of a claim. Loop wants to use the evidence for a different purpose—to rebut inferences about why Authenticom is still in business—so Rule 408 does not apply.

Both sides seem to understand that the importance of this evidence rests on whether CDK attempts to argue at trial that Authenticom's continuing existence is proof that CDK did not harm competition. Loop's concern is that the jury will infer that there was no conspiracy and no competitive harm simply because Authenticom is still in business. But if CDK does not discuss Authenticom's current financial status, then it is not clear why the jury would draw the inference.

CDK is coy about its trial plans. It says it "could open the door" to the evidence, but the evidence should be "presumptively inadmissible" until then. Dkt. 113, at 6. Loop contends that CDK has already signaled its intent to offer such evidence, pointing to a statement from the parties' September 2024 status report in which CDK made the following statement: "Vendors claim that the conspiracy continues to present day even though Reynolds has settled all claims against it and, contrary to its 2017 arguments that the conspiracy would result in its bankruptcy, Authenticom's business appears to be thriving." Dkt. 56, at 22.

The court will conditionally grant this motion. Loop may not put in any evidence of the Authenticom lawsuit or settlement if CDK does not put in evidence or make an argument that Authenticom's continued existence shows that there was no conspiracy or that any conspiracy did not cause competitive harm. But if CDK does make that argument, the court will allow Loop to put in evidence that Authenticom received a large amount of money unrelated to its success in the market.

During the final pretrial conference, CDK should be prepared to explain whether it plans to present evidence or argument at trial about Authenticom's current financial status. If it does, both sides should be prepared to discuss what level of detail Loop should be allowed to discuss the settlement that Authenticom received.

### 4. June 2024 cyberattack

In June 2024 a hacker broke into CDK's network and deployed ransomware that encrypted data on some of CDK's servers. Both sides want to discuss this cyberattack during trial, contending that it is relevant to the question whether CDK had legitimate security reasons for blocking independent data integrators from its system. But the parties disagree about the scope of permissible evidence.

Each side has its own theory for why the incident is relevant. CDK says that the incident is relevant to "demonstrating the [security] risks faced by CDK." Dkt. 114, at 5 n.3. Loop says that the incident is relevant to "undermine the credibility of CDK's cybersecurity justification for the conspiracy with Reynolds." Dkt. 206, at 2. Loop does not clearly articulate what it means by this. But the court's understanding of Loop's theory is that the 2024 incident had nothing to do with access by data integrators—it was CDK's failure to implement multi-factor authentication—so the incident is evidence that CDK was generally sloppy with its security and that its reliance on security as justification for restricting access by data integrators was pretextual.

CDK says that both sides' experts should be permitted to "reference the fact of the June 19, 2024 cyber incident as part of general discussions of cyber risks." Dkt. 114, at 1. CDK also does not object to Loop "putting on evidence that the incident was not caused by a third-party integrator." *Id.* But CDK says that Loop should not be allowed put in evidence about the specific cause of the breach, for four reasons: (1) CDK's dealer management system was not affected by the breach; (2) exploring the reasons for the breach would create mini-trials because CDK would have to put on evidence regarding everything that led up to the breach; (3) the evidence would be unfairly prejudicial because it would tend to cast CDK as "irresponsible";

and (4) the 2024 cyberattack is the subject of numerous lawsuits, and "[f]orcing CDK to litigate and create a haphazard record here will prejudice CDK" in the other lawsuits. *Id.* at 5–7.

Loop says that excluding evidence about the specific reason for the breach "risks the jury being misled into thinking there is a connection between the blocking of third-party access and the June 2024 incident." Dkt. 206, at 5. And Loop rejects CDK's reasons for excluding that evidence, stating that mini-trials are not needed because there is no genuine factual dispute about the cause of the incident, and, even if there were a dispute, the jury could resolve it; allowing the jury to draw an inference that CDK is irresponsible is not unfairly prejudicial because that is part of Loop's attempt to show pretext; and Rule 403 is not concerned with possible prejudice in other lawsuits.

Neither side makes a compelling case for the importance of including *any* evidence about the 2024 cyberattack. It occurred many years after most of the decisions at issue in this case were made, so the incident has questionable relevance for determining why CDK restricted access to its system. *Cf. DeLong Co., Inc. v. Syngenta AG,* No. 23-cv-321, 2024 WL 1343592, at *7 (W.D. Wis. Mar. 26, 2024) (in negligence case, precluding parties from proving reasonableness or unreasonableness with evidence that was not available to the defendant during the relevant time period). And it appears to be undisputed that the attack had nothing to do with independent integrators. So the incident is separated from the key issues in this case in both time and subject matter.

The general points that the parties wish to make are valid ones, but evidence about the 2024 cyberattack is more likely to confuse the issues rather than clarify them. If CDK wishes to show that it had genuine concerns about cybersecurity when it restricted access to its system,

28

that could be shown with evidence of breaches (either at CDK or elsewhere) that were occurring at the time CDK was making that decision. And if Loop wishes to show that CDK's stated security concerns were pretextual, that could be shown with evidence that CDK was disregarding similar security issues around the same time. The fact of the 2024 breach is weak evidence at best for making either point. And the court agrees with CDK that delving into the specifics of the breach could confuse the issues and waste time on a question that is not ultimately relevant to the jury's determination.

So here is where the court has landed. The court is inclined to exclude any reference to the 2024 cyberattack because the evidence is either irrelevant or substantially outweighed by the risk of confusing the issues and wasting time. But neither party asked the court to exclude all evidence about the incident, so the court will allow the parties to be heard on that question if they wish. If either party wishes to challenge the tentative ruling, they should be prepared to do so during the final pretrial conference, addressing each of the concerns with the evidence the court has raised.

If one or both sides persuades the court that some evidence about the 2024 cyber incident is admissible under Rule 401, Rule 402, and Rule 403, the court is inclined to adopt a middle path for discussing the cause of the breach. If CDK is permitted to point to the 2024 incident as evidence for why it was reasonable to block access to its system, then Loop should be permitted to establish that the incident was caused by issues that have little or nothing to do with third-party integrators. Simply telling the jury that the incident "was not caused by a third-party integrator," as CDK suggests, is potentially confusing and unfairly prejudicial. It would allow CDK to rely on the incident to justify its conduct while barring Loop from explaining why the incident did *not* justify CDK's conduct. At the same time, it seems

29

unnecessary to explore the technical details of the breach and CDK's policies and procedures related to the breach.[4] Loop should be allowed to present enough context about the breach to make its point that the 2024 breach does not help to justify CDK's decision to restrict access to its system. But Loop should be able to do that with a general description of the cause that both sides can agree on. The parties should be prepared to discuss that issue during the final pretrial conference as well.

### 5. Brockman's financial misconduct

CDK moves to exclude evidence about the criminal prosecution and FTC investigation against Reynolds's former CEO. The court addressed this motion in the context of discussing Loop's motion to take judicial notice.

### 6. CDK's acquisition

CDK moved to exclude evidence about its 2022 acquisition by a group of private equity funds managed by Brookfield Asset Management. The parties later entered into the following stipulation:

> Vendors will not introduce evidence or argument regarding Brookfield's acquisition or ownership of CDK. To the extent Vendors seek to introduce a document (for a purpose other than referencing Brookfield) that includes mention of Brookfield, the parties will meet and confer regarding whether it is possible to use

---

[4] CDK says that a full exploration of the reasons for the breach would require discussion of the following issues: "whether CDK's MFA policy was followed, why or why not, whether it contributed to the cyber incident, and how it relates (or does not) to the DMS claims at issue here, . . . how CDK's thousands of non-DMS servers connect, how its internal and external cyber defenses work, why certain non-DMS systems contain varied levels of defense, how that is appropriate under current cyber security guidelines, and why all of this is irrelevant to CDK's decisions regarding unauthorized third-party access to the DMS at issue here." Dkt. 114, at 5–6. Loop does not directly respond to CDK's assertion about the types of information that would become fair game if the court were to rule in its favor without limitation.

the document (including by, e.g., redacting the document to limit
potential prejudice).

Dkt. 179, at 3. As a result of the stipulation, CDK has withdrawn its motion, so the court will

deny it as moot.

### 7. Israel's opinions on the hypothetical monopolist test

CDK seeks to exclude Mark Israel's opinion that there are separate markets for data

integration services used to access CDK's dealer management system and Reynolds's dealer

management system. CDK contends that the opinion violates Federal Rule of Evidence 403

because it rests on Israel's application of the "hypothetical monopolist" test, which is incorrect

as a matter of law under *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).

Specifically, CDK contends that a single brand of a product can qualify as a relevant market

only if "consumers are 'locked in' to a specific brand by the nature of the product," but the

hypothetical monopolist test asks "whether a monopolist over those products could impose a

small but significant and non-transitory increase in price . . . without losing so many sales that

the [price increase] would not be profitable." Dkt. 127, at 5, 10–11 (alterations omitted).

Loop objects to this motion as untimely, contending that CDK should have brought the

motion in the MDL court as a motion to exclude expert testimony under Federal Rule of

Evidence 702. The court agrees. CDK already challenged Israel's reliance on the hypothetical

monopolist test in the context of a Rule 702 motion, and the MDL court rejected CDK's

argument. *See* Dkt. 57-3, at 27–29. CDK did not make an argument about *Eastman Kodak* in

its previous motion, but a party is not "entitled to dole out new arguments each time he receives

an adverse decision. It is unfair to the opposing parties and contrary to principles of judicial

economy." *Irish v. Barbee*, 08-cv-469-bbc, 2011 WL 13254571, at *4 (W.D. Wis. Jan. 6, 2011),

*aff'd* 674 F.3d 710 (7th Cir. 2012). This court made it clear in the scheduling order that it

31

would not consider challenges to the experts that a party could have raised with the MDL court. Dkt. 74, at 2. CDK identifies no reason why it did not raise this issue before, so the court will deny this motion.

### 8. Deposition designations

The court addressed this motion in the context of discussing Loop's motion on the same issue.

### 9. Tracy Kwiatkowski and Allan Stejskal

CDK seeks to exclude testimony of Tracy Kwiatkowski and exclude expert testimony from Allan Stejskal. CDK says that Kwiatkowski was not timely disclosed and Stejskal's expert testimony should be excluded under Rule 403 because Stejskal is also testifying as a fact witness.

#### a. Kwiatkowski

Tracy Kwiatkowski is the IT manager at Marquart Motors in Wisconsin. Loop says that Kwiatkowski will testify about topics such as how dealers use dealer management systems, her experience using CDK's system, the difficulties associated with switching systems, and the relationship that dealers have with vendors and data integrators.

CDK objects to Kwiatkowski because she did not appear on Loop's witness list until November 2024. Loop does not dispute that its disclosure was untimely, which means that the court must exclude her from trial under Federal Rule of Civil Procedure 37(c)(1) unless Loop shows that the untimely disclosure was justified or harmless. Loop does not contend that the late disclosure was justified, so the only question is about prejudice.

Loop says that Kwiatkowski's testimony is not unfairly prejudicial because her testimony will be "consistent with testimony provided by dealers from outside Wisconsin," so

32

"CDK has had years to prepare for and address the substance of her testimony." Dkt. 212, at 1, 6. Kwiatkowski has not been deposed, and Loop has not submitted a declaration from her summarizing her testimony, so it is not clear what the basis of Loop's representation is. Knowing what *topics* Kwiatkowski will cover does not give CDK notice of the content of her testimony. Regardless, Loop's representation is self-defeating. If Loop is correct that Kwiatkowski is not adding anything new to the case, then her testimony will be cumulative of the other dealer witnesses, and therefore may be excluded under Rule 403. And if Kwiatkowski offers new testimony, then CDK will not have an opportunity to prepare for it before trial.

Loop says that any prejudice can be cured by allowing CDK to depose Kwiatkowski now. But trial is imminent. As previously discussed in the context of Loop's motion for sanctions, a party should not be subjected to distractions from trial preparation to depose a witness who could have been disclosed years ago and who, by Loop's own assertion, has nothing novel to say.

The court will grant CDK's motion to exclude Kwiatkowski.

### b. Stejskal

Loop is offering Stejskal as an expert based on his experience in the automotive retail industry. He will testify about topics such as the dealer management system market, third-party vendor applications, and access to dealer data and data integration service providers. He will also be testifying as a fact witness because he is the CEO of a vendor in the class, but neither side identifies the topics that Stejskal will discuss as a fact witness.

CDK moves to exclude Stejskal's expert testimony on three grounds: (1) jurors will not be able to separate his fact testimony from his expert testimony; (2) he is biased because his

company is a member of the class; (3) his expert testimony is cumulative of other expert testimony in the case. CDK does not move to exclude Stejskal's testimony as a fact witness.

CDK has not shown that Stejskal's expert testimony should be excluded, but questions remain about how Loop plans to distinguish Stejskal's dual roles and how Stejskal's testimony will differ from other experts and witnesses. So the court will reserve a ruling on this motion to allow the parties to address the court's concerns during the final pretrial conference.

As Loop points out, there is no rule in this circuit against a witness testifying as both an expert and a fact witness. This occurs with some frequency in criminal cases, and the court of appeals has rejected arguments that it is necessarily confusing or unfairly prejudicial. Rather, a witness may serve a dual role when the party offering the witness "structure[s] [the] testimony to make clear when [the witness is] offering lay testimony and when he [is] offering expert opinions," and the judge "inform[s] the jury about the differences in the types of testimony [the witness] offer[s]." *U.S. v. Jett*, 908 F.3d 252, 268 (7th Cir. 2018). The opposing party also has a role to play through "rigorous cross-examination." *U.S. v. Garrett*, 757 F.3d 560, 570 (7th Cir. 2014).

CDK contends that it is "not practical or even possible" to separate Stejskal's expert testimony from his fact testimony. The court understands CDK's position to be that Stejskal's expert testimony is based on his experience rather than education or study, so his fact testimony will be similar to his expert testimony. That is a fair point, and Loop does not meaningfully respond to it. In fact, Loop does not explain in its brief what Stejskal's fact testimony will be, how it will differ from his expert testimony, and what specific steps Loop will take to distinguish the two types of testimony. So the court cannot determine now whether

or how Stejskal's expert testimony should be allowed. Loop should be prepared to address these concerns during the final pretrial conference.

As for Stejskal's status as an interested party, CDK is free to cross-examine Stejskal about potential bias. But potential bias—even when the expert is a party to the case—is not a basis for excluding his testimony. *Braun v. Lorillard Inc.*, 84 F.3d 230, 237 (7th Cir. 1996); *Tagatz v. Marquette University*, 861 F.2d 1040, 1042 (7th Cir. 1988); *see also Brown v. Phillips*, 801 F.3d 849, 854–55 (7th Cir. 2015) ("[A] party who is qualified may serve as an expert witness.").

As for CDK's contention that Stejskal's testimony is cumulative of other experts, CDK says that Stejskal offers the same opinions as Mark Israel regarding the nature of the markets in dealer management systems, data integration services, and vendor applications. CDK also says that several of Loop's fact witnesses have comparable experience to Stejskal, but CDK does not identify any specific witnesses or overlapping testimony.

In response, Loop does not identify any unique testimony that Stejskal will offer. Instead, Loop says that Stejskal has a different "perspective" than Israel because Israel's expertise is based on his knowledge of economics and Stejskal's experience is based on practical experience in the industry.

This court has previously recognized that experts who testify about similar topics but have different expertise are not necessarily cumulative because they may provide different perspectives and insights. *See Lacy v. McArdl*e, No. 20-cv-1014-jdp, 2023 WL 4581759, at *13 (W.D. Wis. Jul. 18, 2023). That being said, the court will not allow two experts to offer the same opinions and the same reasoning. *Id.* Loop should be prepared during the final pretrial

conference to explain how each expert's testimony will be different and how counsel will prevent the experts from providing cumulative testimony.

## C.  Witness's motion to quash Loop's subpoena

Ron Workman was CDK's vice president of business development from 2010 to 2018. He asserts three grounds for quashing Loop's subpoena for him to testify at trial: (1) service of the subpoena was defective because it was not accompanied with a witness fee; (2) Workman is outside the permitted area for serving subpoenas under Federal Rule of Civil Procedure 45; and (3) complying with the subpoena would impose an undue burden on him. Loop says that it cured any defect in service by reserving the subpoena with the requisite fees. Workman does not press that issue in his reply brief, so the court presumes that the improper service objection is withdrawn.

As for Workman's objection that he lives outside the area covered by the court's subpoena power, Workman lives in Barrington, Illinois, and he admits that the distance between his home and the courthouse is about 90 miles if that distance is measured in a straight line. But he says that the court should measure the distance using "the shortest ordinary course of travel," which he says is between 115 and 121 miles. Dkt. 169, at 7.

The court rejects Workman's position, for two reasons. First, it is inconsistent with the language of Rule 45, which allows a subpoena to command attendance at a trial "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). The phrase "within 100 miles" strongly suggests that the subpoena power extends to anything within a 100-mile radius of the courthouse. The rule says nothing about "the shortest ordinary course of travel." The question is about distance only, not method of transportation. Second, as Workman acknowledges, this court has already held that "the

court calculates the distance [under Rule 45] 'as the crow flies,' that is, by measuring a straight line between the relevant locations." *Maine Community Health Options v. Walgreen Co.*, No. 18-mc-9, 2018 WL 6696042, at *3 (W.D. Wis. Dec. 20, 2018) (Crocker, M.J.). Workman cites no authority undermining *Maine Community Health Options*.

As for Workman's objection that complying with the subpoena is unduly burdensome, he relies on Rule 45(d)(3)(A)(iv), which allows the court to quash a subpoena that "subjects a person to an undue burden." Workman says that testifying is an undue burden because he would have to spend a significant amount of preparing, which is unfair because he is not a party, and he has a business to run. He says it would not be unfairly prejudicial to Loop because he was already deposed.

Workman's argument is not persuasive. His description of his status as a nonparty is technically accurate, but it is misleading because he was a high-level CDK employee for several years during the alleged conspiracy. Loop says that he was one of two employees "directly responsible for conceiving of and negotiating the antitrust conspiracy at issue." Dkt. 199, at 1. The burdens he complains about are the type of burdens imposed on any witness who is central to a lawsuit. He does not identify any specific scheduling conflict that would prevent him from attending trial.

It is true that Workman sat for a deposition, but most trial witnesses are deposed before trial. Workman sat for a discovery deposition, so Loop would not necessarily have been preparing to use it for trial. In fact, Loop says that that the deposition did not cover some of the key topics it plans to explore during trial. Workman may be correct that his memory of relevant events would have been more reliable when he sat for his deposition a few years ago,

but that is a question of Loop's trial strategy; it does not relate to the degree of Workman's burden.

The court will deny Workman's motion to quash the trial subpoena.

ORDER

IT IS ORDERED that:

1. The court rules on plaintiff Loop, LLC's motions as follows:

   a. Loop's motion to exclude evidence and argument about the legality of independent data integration services, Dkt. 130, is GRANTED.

   b. Loop's motion to exclude evidence and argument about "pass-on" charges, Dkt. 130, is GRANTED in part and DENIED in part. CDK may not present evidence of specific pass-on charges or argue that the class's damages should be reduced to account for those charges. But the court will not preclude CDK from discussing its fee waiver program.

   c. Loop's motion to exclude evidence and argument that vendors failed to mitigate their damages, Dkt. 130, is DENIED.

   d. Loop's motion to exclude evidence and argument about vendors' profitability, Dkt. 130, is GRANTED.

   e. Loop's motion to exclude evidence and argument about independent data integrators' sales of data, Dkt. 130, is GRANTED.

   f. Loop's motion to exclude evidence and argument of conflicts between the operative complaint and Vendors' alleged conspiracy to be proven at trial, Dkt. 130, is DENIED as moot.

   g. Loop's motion to exclude all of CDK's initial deposition designations from the Loop's case-in-chief, Dkt. 130, is DENIED. CDK may play during Loop's case-in-chief CDK's designations for the following four witnesses: Bob Brockman, Robert Schaefer, Kevin Witt, and Steve Anenen.

   h. Loop's motion for sanctions under Rule 37(e)(1), Dkt. 89, is GRANTED in part and DENIED in part. The court will not preclude CDK from putting on any evidence about events after December 2019, and it will not preclude CDK's experts from discussing issues on which the missing emails would be unlikely to provide insight, such as changes in the

market and cybersecurity threats. The court will allow Loop to inform the jury about the missing emails. The court RESERVES a ruling on any additional sanctions.

i. Loop's motion for judicial notice, Dkt. 89, is GRANTED in part and DENIED in part. The court concludes that it is appropriate to issue an instruction or enter a stipulation into the record about Reynolds's failure to produce Brockman emails from before August 2016. The motion is otherwise denied.

2. The court rules on defendant CDK Global, LLC's motions as follows:

   a. CDK's motion to exclude evidence and argument about state "dealer data access" laws, Dkt. 125, is GRANTED in part. The court will not allow Swire to offer an opinion that the dealer data access laws show that dealers should retain control over their data. The court reserves a ruling on the question whether Loop may put in evidence regarding the effectiveness of the laws in maintaining security.

   b. CDK's motion to exclude evidence and argument about data portability laws, Dkt. 126, is GRANTED.

   c. CDK's motion to exclude references to the Authenticom lawsuit, Dkt. 113, is conditionally GRANTED. Loop may not discuss Authenticom's lawsuit or settlement if CDK does not argue during trial that Authenticom's continued existence is evidence that CDK did not enter a conspiracy or cause competitive harm.

   d. CDK's motion to limit evidence about the 2024 cyberattack, Dkt. 114, is GRANTED. The court's tentative ruling is that neither side may put in evidence about the cyberattack. If either side wishes to challenge that ruling, they will have to do so during the final pretrial conference, addressing all of the court's concerns about this evidence.

   e. CDK's motion to exclude evidence about the criminal proceedings against Brockman and the FTC investigation, Dkt. 115, is GRANTED.

   f. CDK's motion to exclude evidence about CDK's 2022 acquisition, Dkt. 116, is DENIED as moot.

   g. CDK's motion to preclude Mark Israel from relying on the hypothetical monopolist test to define the product market, Dkt. 127, is DENIED.

   h. CDK's motion to play initial deposition designations for some witnesses during the Loop's case-in-chief, Dkt. 128, is GRANTED. CDK may play during Loop's case-in-chief CDK's designations for the following four

witnesses: Bob Brockman, Robert Schaefer, Kevin Witt, and Steve Anenen.

i.   CDK's motion to exclude Tracy Kwiatkowski from trial, Dkt. 134, is GRANTED

j.   The court RESERVES a ruling on the motion to exclude Allan Stejskal's expert testimony, Dkt. 134.

k.   CDK's motion to file a sur-reply brief in opposition to Loop's motion for judicial notice, Dkt. 148, is GRANTED.

l.   CDK's motion for oral argument on the motion for sanctions and judicial notice, Dkt. 150, is GRANTED in part and DENIED in part. The parties may present additional input during the final pretrial conference on issues that remain unresolved by this order.

3.  Ron Workman's motion to quash his trial subpoena, Dkt. 168, is DENIED.

Entered January 10, 2025.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge