# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WISCONSIN

LOOP, LLC, D/B/A AUTOLOOP, on behalf of itself and all others similarly situated,

    Plaintiff,

v.

CDK GLOBAL, LLC,

    Defendant.

Case No. 3:24-cv-00571-jdp

## DECLARATION OF NATHAN JAYE

1. I, Nathan Jaye, pursuant to 28 U.S.C. § 1746, declare as follows:

2. I am knowledgeable about Loop, LLC d/b/a AutoLoop's service as the Class Representative for the Vendor Class and the overall antitrust litigation against CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds"). I submit this declaration in my personal capacity and on behalf of AutoLoop.

3. I became General Counsel of AutoLoop in February 2013. In August 2019, Affinitiv acquired AutoLoop. At that time, I also became Corporate Counsel at Affinitiv. AutoLoop remains a separate corporate entity, and I still serve as General Counsel to AutoLoop.

4. Beginning in approximately 2013, Reynolds began blocking our chosen data integration provider – Superior Integrated Solutions, LLC ("SIS"). This adversely affected our services to dealers using Reynolds's DMS.

5. In 2013, we hired a law firm – not Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") – to explore potential legal claims against Reynolds. Ultimately, this law firm did not present a viable legal strategy to stop Reynolds's blocking.

- 1 -

6. As a result of Reynolds's blocking, SIS decided to "wind-down" its integration services to Reynolds dealers. This forced us to join Reynolds's integration service – the Reynolds Certified Interface ("RCI") – and to pay much higher fees. However, we continued to use SIS for integration on CDK's DMS.

7. In 2015, CDK informed us that it would no longer allow the use of independent integration providers like SIS and instead would require vendors to use CDK's data integration service called Third Party Access ("3PA"). CDK informed us that it would block SIS just as Reynolds had blocked SIS. We were forced to adopt 3PA and to pay higher integration fees for lower quality data integration service.

8. Without the possibility of using independent data integrators, our business relied on continued access to CDK's 3PA and Reynolds's RCI data integration services because our applications could not function without data integration. If Reynolds or CDK refused to provide us with data integration service, we would have gone out of business.

9. In 2016 and 2017, we again explored potential legal actions against CDK and Reynolds. We contacted multiple other vendors in similar circumstances – many of the largest in the industry – to discuss the possibility of joint litigation against CDK and Reynolds. While other app vendors commiserated about the difficult circumstances we were in, none were willing to bring litigation against CDK and Reynolds because of the risk of retaliation.

10. In late 2016, I became aware that another app vendor, Motor Vehicle Services Corporation ("MVSC"), represented by Kellogg Hansen, sued CDK and Reynolds for antitrust violations. Several months later, I learned that Kellogg Hansen also brought antitrust claims against CDK and Reynolds on behalf of Authenticom, Inc. – another independent data integrator that we had used in the past.

11. One of our employees – Tony Petruzelli – reached out to Kellogg Hansen about the litigation. We discussed with Kellogg Hansen the damage that CDK's and Reynolds's blocking of independent integrators had done to our business.

12. Kellogg Hansen asked us to testify to those problems at a preliminary injunction hearing in June 2017 in the Western District of Wisconsin in the *Authenticom* litigation. Our Chief Product Officer Matt Rodeghero testified at that hearing, and I spent many hours preparing him for that testimony. This was an important event for us because, to my knowledge, none of our employees had ever testified in court on behalf of our company.

13. In early December 2017, we began discussing with Kellogg Hansen whether we should bring antitrust litigation against CDK and Reynolds, either by ourselves or as a representative of a class. This was a difficult decision for us because of the risk that CDK and Reynolds would retaliate against us. We were aware that CDK and Reynolds had refused to allow some vendors like MVSC to participate in the 3PA and RCI data integration programs. If CDK and Reynolds did the same to us, we would have gone out of business. Further, the likelihood of success in the litigation was uncertain. While Kellogg Hansen believed there were potential antitrust violations, no one had the evidence yet to prove those violations.

14. To mitigate these risks, we contacted other vendors to see if they would serve as class representatives alongside us. We believed that there would be safety in numbers. We contacted many of the largest app vendors. None were willing to join us in being a co-class representative.

15. Only one other vendor (Cox Automotive, Inc.) sued CDK. But Cox Automotive's suit did little to diminish our risk. Cox Automotive is the largest dealer app vendor in our industry by far. We did not believe it was possible for CDK or Reynolds to deny data integration

to Cox Automotive without causing great harm to their dealer clients who depended on Cox Automotive's apps. On the other hand, it was quite possible for CDK and Reynolds to retaliate against us. Perhaps for that reason, no other vendors were willing to sue CDK and Reynolds.

16. While we were exploring potential litigation against CDK and Reynolds, we worked closely with Kellogg Hansen to provide them with information necessary to the lawsuit – including about our damages, circumstantial evidence of the conspiracy between Reynolds and CDK, facts that undermined CDK's and Reynolds's stated reasons for blocking independent data integrators, and other facts necessary to understand the industry dynamics (like how CDK allegedly used control over data integration to favor its own apps over competing apps). This information formed the basis for the complaint that Kellogg Hansen later filed on our behalf.

17. In March 2018, we made the decision to sue CDK despite the risk and uncertainty involved. We did not sue Reynolds because of an arbitration clause in our RCI agreement.

18. On March 26, 2018, we signed an engagement letter to have Kellogg Hansen represent us individually in antitrust litigation against CDK and Reynolds. We decided to proceed with a non-class suit because we had not been successful in recruiting other class representatives. Because of the risk of litigation and the substantial attorney's fees that we would have incurred – tens of millions – we agreed to pay a contingency fee of 30 percent of any net recovery. That was the only possible way for us to bring this suit. Kellogg Hansen also agreed to pay all out-of-pocket expenses, while we would pay expert fees – both to be reimbursed from any gross recovery.

19. On April 9, 2018, we filed our complaint. At the time we filed the complaint, my understanding is motions to dismiss were still pending in the other litigation against CDK and Reynolds and fact discovery had yet to start.

20. After filing that complaint, we continued to have discussions with Kellogg Hansen about serving as the sole class representative for a class of vendors. Ultimately, we decided to do so despite no other vendor being willing to join as class representatives. This was a difficult decision because we were taking additional risk to serve as the class representative, and further, doing so would benefit our own direct competitors (other app vendors in the class).

21. On May 1, 2019, we entered into an amended engagement agreement with Kellogg Hansen. This agreement stated that Kellogg Hansen would petition the court for attorney's fees from any class recovery, with Kellogg Hansen "agree[ing] not to petition the Court for an attorney's fee in excess of thirty (30%) of any class recovery." That provision was intended to ensure that the original 30% fee as to AutoLoop would remain in place. Kellogg Hansen agreed to pay all litigation expenses (including expert fees) subject to reimbursement from any class recovery. On June 5, 2018, we amended our complaint to bring class claims.

22. Throughout the summer and fall of 2018, we were a target of substantial written discovery from both CDK and Reynolds as the sole class representative. They served 75 document requests and 19 interrogatories on us. In response, we produced substantial data and documents. We spent dozens of hours responding to these discovery requests.

23. In late 2018 and early 2019, CDK sought seven depositions of us. Four were depositions of employees as fact witnesses: (1) CEO Steve Anderson, (2) COO Alex Eckelberry, (3) CPO Matt Rodeghero, and (4) Mr. Petruzelli. CDK also sought three Rule 30(b)(6) depositions spanning 34 different topics. I was one of the Rule 30(b)(6) deponents. I and the other deponents spent dozens of hours preparing for these depositions and educating ourselves on the noticed topics.

24. In the spring and summer of 2019, Kellogg Hansen began preparing expert reports on damages and data security issues. We spent dozens of hours compiling the necessary data to substantiate the various experts' opinions.

25. In the summer of 2023, I understand the court allowed additional discovery to obtain updated data for class certification. We refreshed our prior data production – a process that required manual data pulls by our employees.

26. In the fall of 2024, after the Vendor Class was remanded to the Western District of Wisconsin, I understand this Court allowed additional fact discovery to occur. At this time, we were the sole remaining party in the litigation. CDK had hired new counsel that aggressively sought discovery from us. We needed to collect and produce many documents on an expedited basis and to present another Rule 30(b)(6) witness on six noticed topics (and many subparts). I and the deponent (Mr. Rodeghero) spent dozens of hours responding to this discovery and preparing for deposition.

27. In late 2024 and early 2025, Mr. Rodeghero and I were heavily involved in trial preparation and planning. I was going to be our corporate representative, and Mr. Rodeghero was going to be the first witness at trial and one of only two class members to testify. We spent dozens of hours preparing his testimony and strategizing with Kellogg Hansen about the trial.

28. In January 2025, I learned from Kellogg Hansen that CDK had made settlement overtures. I was involved throughout settlement discussions and provided our views on the adequacy of the proposed settlement.

29. I, nor anyone else at AutoLoop, discussed the size of any incentive award during consideration of the settlement. Any such award was not a material consideration for us given

the size of the potential recovery from the proposed settlement – $14.5 million for AutoLoop and $14.1 million for our parent company Affinitiv.

30. Throughout the course of the litigation, I routinely provided oversight and advice on legal issues – reviewing drafts of key pleadings, advising on legal strategy, and providing information regarding the industry dynamics. In total, we produced approximately 90,000 pages of documents plus significant amounts of data.

31. I conservatively estimate that I and others at AutoLoop spent at least 1,000 hours providing assistance to Kellogg Hansen as the sole class representative.

32. We enthusiastically support the proposed $630 million settlement. This settlement provides us, our parent company Affinitiv, and all other vendors nearly complete recovery of the damages suffered from September 2013 to January 2025. This vastly exceeds what any of us had believed possible.

33. I have witnessed the extraordinary work Kellogg Hansen put into this litigation over more than seven years. We tried to hire multiple other firms to address CDK's and Reynolds's alleged wrongdoing, but none had the resources or determination to bring litigation on our behalf – and certainly not for the eight years and tens of thousands of hours of work that was necessary to reach the current proposed settlement. I strongly believe they should receive the one-third fee they are seeking, and we will not seek to enforce the provision in our engagement letter that provides Kellogg Hansen "agrees not to petition the Court for an attorney's fee in excess of thirty (30%) of any class recovery." I personally raised the possibility of Kellogg Hansen receiving 33 percent – notwithstanding the fee agreement – without Kellogg Hansen asking for that.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on: June 10, 2025                                  _____
                                                            Nathan Jaye