## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

LOOP, LLC, D/B/A AUTOLOOP, on behalf of
itself and all others similarly situated,

        Plaintiff,

   v.

CDK GLOBAL, LLC,

        Defendant.

Case No. 3:24-cv-00571-jdp

**PUBLIC REDACTED**

## THE VENDOR CLASS'S UNOPPOSED MOTION FOR
## FINAL APPROVAL OF THE PROPOSED SETTLEMENT,
## AWARD OF ATTORNEY'S FEES AND COSTS,
## AND PLAINTIFF'S SERVICE AWARD

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

LITIGATION HISTORY AND SETTLEMENT ............................................................... 5

    I.    Litigation History ............................................................................................... 5

        A.    The Complaints and Engagement Letters ................................................. 5

        B.    Discovery, Non-*AutoLoop* Settlements, and Dispositive Motions ........... 9

        C.    Federal Trade Commission and State Attorneys General ........................ 13

        D.    Class Certification and Remand ............................................................... 13

        E.    Pre-Trial Proceedings .............................................................................. 14

    II.    The Settlement ................................................................................................. 15

    III.   The Distribution Plan ...................................................................................... 16

    IV.  The Notice Plan ............................................................................................... 17

ARGUMENT ..................................................................................................................... 18

    I.    The Court Should Grant Final Approval of the Proposed Settlement ............. 18

        A.    The Proposed Settlement Applies to the Already-Certified Vendor Class ............... 18

        B.    The Vendor Class Received Adequate Notice ......................................... 19

        C.    The Settlement Satisfies Rule 23(e)(2) Factors ...................................... 19

            1.    AutoLoop and Class Counsel Have Adequately Represented the Vendor Class Throughout This Litigation ................................................. 20

            2.    The Parties Negotiated the Settlement Agreement at Arm's Length ............... 20

            3.    The Proposed Settlement Treats Class Members Equitably ............. 21

            4.    The Relief Provided Is Exceptional ................................................. 21

                a.    Strength of case compared to settlement offer ........................ 21

                b.    Costs, risks, and delay of trial and appeal ............................... 23

|   |   | c. | The effectiveness of the Proposed Distribution Plan | 24 |
|   |   | d. | Attorney's fees and timing of payment | 26 |
|   |   | e. | Other agreements | 27 |
|   |   | f. | Other Seventh Circuit factors | 27 |

II. The Court Should Award an Attorney's Fee of One-Third of the Net Recovery .......... 28

A. Introduction .................................................................................. 28

B. The Percentage-of-the-Fund Method Is Appropriate ................................. 30

C. A One-Third Contingency Fee Is the Market Rate ................................... 31

    1. The Parties' Actual *Ex Ante* Contracts Define the Market Rate ............ 31

    2. Class Counsel's Other Contingency Fee Agreements Support a One-Third Fee as the Market Rate ...................................................... 35

D. The *Ex Ante* Standard Does Not Permit Reduction of the Percentage for Large Recoveries or Application of a Declining Scale Structure ....................... 37

E. Other Secondary Factors Also Support a One-Third Fee ............................ 43

    1. Risk of Nonpayment .................................................................. 43

       a. No prior case or investigation ............................................. 44

       b. Other risks ...................................................................... 48

    2. Information from Other Cases ...................................................... 53

       a. The 33% award to dealer class counsel in this litigation ........... 53

       b. Case law in this Circuit on the ex ante market rate for antitrust class actions ............................................................................. 56

       c. Fee awards in other cases ................................................... 57

    3. Amount of Work Required ........................................................... 59

    4. Quality of Representation ........................................................... 60

F. A Lodestar Cross-Check Confirms That a One-Third Attorney Fee Award Is Reasonable .............................................................................. 61

1. The Lodestar Was Calculated Using a Reasonable Method and Contemporaneous Time Records ........................................................ 61

2. The 3.09 Lodestar Multiplier Is Reasonable ........................................ 65

3. Class Counsel's Hours Are Reasonable ............................................. 68

4. Class Counsel's Rates Are Reasonable ............................................. 70

III. Class Counsel's Requested Expenses Are Reasonable .................................... 75

IV. The Court Should Grant AutoLoop a $250,000 Incentive Award ................................ 79

V. The Court Should Close the Case After Entering Final Judgment ................................ 82

CONCLUSION ........................................................................................ 83

# TABLE OF AUTHORITIES

## CASES

*Advoc. Aurora Health Pixel Litig.*, *In re*, 740 F. Supp. 3d 736 (E.D. Wis. 2024)..................20, 27

*AIG, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727 (N.D. Ill. Feb. 28, 2012)......................81

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006)..........42, 58, 66, 70

*Allen v. Lanier, Inc.*, 2023 WL 3529512 (W.D. Wis. May 18, 2023) ...........................................61

*American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013)..................................60

*Amino Acid Lysine Antitrust Litigation, In re*, 918 F. Supp. 1190 (N.D. Ill. 1996) .....................42

*Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989) .......................................................49

*Apple Inc. v. Pepper*, 587 U.S. 273 (2019) ...................................................................................60

*Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*,
  15 F.4th 831 (7th Cir. 2021) ....................................................................................................78

*Authenticom, Inc. v. CDK Global, LLC*:

  2017 WL 3017048 (W.D. Wis. July 14, 2017), *vacated*,
  874 F.3d 1019 (7th Cir. 2017) ...................................................................................................6

  874 F.3d 1019 (7th Cir. 2017) ...................................................................................................6

*Averbeck v. Lincoln Nat'l Life Ins. Co.*, 2023 WL 6307414
  (W.D. Wis. Sept. 28, 2023)..........................................................................................71, 72, 76

*Beesley v. Int'l Paper Co.*, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014) .........................................77

*Behrens v. Landmark Credit Union*, 2018 WL 9801773 (W.D. Wis. Sept. 11, 2018)..................30

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................................60

*Bills v. TLC Homes Inc.*, 2020 WL 5982880 (E.D. Wis. Oct. 8, 2020).........................................21

*Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018)....................................40

*Blue Cross Blue Shield Antitrust Litig., In re*, 2022 WL 4587617
  (N.D. Ala. Aug. 9, 2022) ...........................................................................................................78

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)..........................................................28

*Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160 (2d Cir. 1979)......................................48

*Briggs v. PNC Fin. Servs. Grp., Inc.*, *In re*, 2016 WL 7018566
(N.D. Ill. Nov. 29, 2016)................................................................................32, 57

*Broiler Chicken Antitrust Litig.*, *In re*, 80 F.4th 797 (7th Cir. 2023) ...........28, 32, 35-38

*Burnett v. Nat'l Ass'n of Realtors*, 2024 WL 2842222 (W.D. Mo. May 9, 2024)..................49, 53

*Cap. One TCPA Litig.*, *In re*, 80 F. Supp. 3d 781 (N.D. Ill. 2015).................................82

*Capacitors Antitrust Litig.*, *In re*, 2023 WL 2396782 (N.D. Cal. Mar. 6, 2023)..........................58

*Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032 (N.D. Ill. 2006) ....................................22

*Castillo v. Noodles & Co.*, 2016 WL 7451626 (N.D. Ill. Dec. 23, 2016)...............................79, 81

*Chambers v. Together Credit Union*, 2021 WL 1948452
(S.D. Ill. May 21, 2021)..................................................................................30, 57

*Checking Acct. Overdraft Litig.*, *In re*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011)....................25, 58

*Chen v. Select Income REIT*, *In re*, 2019 WL 6139014 (S.D.N.Y. Oct. 11, 2019) .....................48

*Chesemore v. All. Holdings, Inc.*, 2014 WL 12730484 (W.D. Wis. Apr. 9, 2014) ......................24

*Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760 (7th Cir. 1982) ...........................................71

*City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902 (S.D. Ill. 2012) .....22, 57, 77

*CMS Energy Sec. Litig.*, *In re*, 2007 WL 9611274 (E.D. Mich. Sept. 6, 2007) ...........................69

*Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002),
*cert. denied*, 573 U.S. 1148 (2003).................................................................23, 60

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998) ...........................................................79

*Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498 (D. Colo. Apr. 28, 2017)...............................70

*Corzo v. Brown Univ.*, 2024 WL 3506498 (N.D. Ill. July 20, 2024)......................................44, 56

*DeLoach v. Phillip Morris Co.*, 2003 WL 25683496 (M.D.N.C. May 16, 2003) ........................69

*DMS Antitrust Litig.*, *In re*:

2023 WL 4297643 (N.D. Ill. June 29, 2023) ...................................................12

2024 WL 3509668 (N.D. Ill. July 22, 2024)........................................19, 21, 21

291 F. Supp. 3d 1367 (J.P.M.L. 2018).............................................................8

362 F. Supp. 3d 477 (N.D. Ill. 2019) ...............................................................10

581 F. Supp. 3d 1029 (N.D. Ill. 2022) .......................................................12, 21

680 F. Supp. 3d 919 (N.D. Ill. 2023) ...............................................................12

*Dynamic Random Access Memory (DRAM) Antitrust Litig.*, *In re*,
2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) .................................................70

*Elec. Carbon Prods. Antitrust Litig.*, *In re*, 447 F. Supp. 2d 389 (D.N.J. 2006).........................50

*FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, *In re*,
2017 WL 1750154 (N.D. Ind. May 1, 2017) ....................................................40

*Flonase Antitrust Litig.*, *In re*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) .....................................58, 65

*Freeland v. Unum Life Ins. Co. of Am.*, 2014 WL 988761 (W.D. Wis. Mar. 13, 2014) ..............69

*Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215 (N.D. Ill. 2016) .............................................42

*Genworth Fin. Sec. Litig.*, *In re*, 210 F. Supp. 3d 837 (E.D. Va. 2016) ........................................69

*Goldsmith v. Tech. Sols. Co.*, 1995 WL 17009594 (N.D. Ill. Oct. 10, 1995) ...............................30

*Grant v. Martinez*, 973 F.2d 96 (2d Cir. 1992)................................................................69

*Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*,
212 F.R.D. 400 (E.D. Wis. 2002) ...................................................................27

*Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079
(S.D. Ill. Dec. 16, 2018)....................................................................... *passim*

*Harman v. Lyphomed, Inc*., 945 F.2d 969 (7th Cir. 1991) ...........................................61

*Hash v. First Fin. Bancorp*, 2021 WL 12269064 (S.D. Ind. Nov. 22, 2021) ..............................30

*Holloway v. Kohler Co.*, 2024 WL 5088316 (E.D. Wis. Dec. 12, 2024) ....................................20

*Humphrey v. Navient Sols., Inc.*, 473 F. Supp. 3d 889 (W.D. Wis. 2020) ...................................71

*Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D. Ga. 2001) ................................................80

*Initial Pub. Offering Sec. Litig.*, *In re*, 2011 WL 2732563 (S.D.N.Y. July 8, 2011) ....................77

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) .................................................................................18

*Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 2015 WL 13546111
    (W.D. Wis. Jan. 5, 2015) ..................................................................................22, 27, 48

*JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, *In re*,
    2023 WL11820531 (N.D. Cal. Dec. 18, 2023) ...................................................................62

*Kleen Prods. LLC v. Int'l Paper Co.*, 2017 WL 5247928 (N.D. Ill. Oct. 17, 2017) ..............44, 58

*K3 Prop, LLC v. GQ Sand, LLC*, 2017 WL 5033659 (W.D. Wis. Nov. 1, 2017) ........................71

*Linman v. Marten Transp., Ltd.*, 2024 WL 5076031 (W.D. Wis. Dec. 11, 2024) ..................19, 21

*Linnear v. Illinicare Health Plan, Inc.*, 2019 WL 13072750 (N.D. Ill. Dec. 17, 2019) ..........48, 50

*Linerboard Antitrust Litig.*, *In re*, 296 F. Supp. 2d 568 (E.D. Pa. 2003) ......................................48

*Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738 (7th Cir. 2003) ........................................73, 75

*McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448 (D.N.J. 2008) ..................................................69

*McDaniel v. Qwest Commc'ns Corp.*, 2011 WL 13257336 (N.D. Ill. Aug. 29, 2011) ...............30

*McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295 (2d Cir. 2021) ...................................49

*Method of Processing Ethanol Byproducts & Related Subsystems ('858)
    Pat. Litig.*, *In re*, 2022 WL 1402875 (S.D. Ind. May 3, 2022) ..........................................72

*Myatt v. Gladieux*, 2015 WL 6455387 (N.D. Ind. Oct. 23, 2015) ................................................75

*Natzke v. PACCAR Inc.*, 2019 WL 1499725 (E.D. Wis. Apr. 5, 2019) ........................................75

*Negrete v. Allianz Life Ins. Co. of N. Am.*, 2015 WL 12592726
    (C.D. Cal. Mar. 17, 2015) .................................................................................................69

*Ohio v. American Express Co.*, 585 U.S. 529 (2018) ...................................................................60

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009) ..................60

*Packaged Ice Antitrust Litig.*, *In re*, 322 F.R.D. 276 (E.D. Mich. 2017) .....................................49

*Phemister v. Harcourt Brace Jovanovich, Inc.*,
  1984 WL 21981 (N.D. Ill. Sept. 14, 1984) .......................................................22

*Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632 (7th Cir. 2011) ............................71

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014).....................................68

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856
  (N.D. Ill. Dec. 10, 2001) ..........................................................................56

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ...............................18

*Rite Aid Corp. Sec. Litig.*, In re, 396 F.3d 294 (3d Cir. 2005)....................................69

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ...................................22

*Rogowski v. State Farm Life Ins. Co.*, 2023 WL 5125113 (W.D. Mo. Apr. 18, 2023) ..........58, 66

*Schering-Plough Corp. Enhance Sec. Litig.*, In re,
  2013 WL 5505744 (D.N.J. Oct. 1, 2013).......................................................70

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011)...............................23

*Scott v. Dart*, 99 F.4th 1076 (7th Cir. 2024) ...................................................79

*Silverman v. Motorola Solutions, Inc.*:

  2012 WL 1597388 (N.D. Ill. May 7, 2012), *aff'd sub nom. Silverman v.
  Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013) ..........................................77

  739 F.3d 956 (7th Cir. 2013) ..............................................39, 40 ,42, 43, 77

*Skelton v. Gen. Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) .................................28, 75

*Slaughter v. Wells Fargo Advisors, LLC*, 2017 WL 3128802 (N.D. Ill. May 4, 2017)................80

*Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572 (N.D. Ill. Oct. 22, 2014).......44, 56, 58

*Stericycle Sec. Litig.*, In re, 35 F.4th 555 (7th Cir. 2022)....................31, 33, 38, 46, 47, 50, 52, 59

*Suboxone Antitrust Litig.*, In re, 2024 WL 815503 (E.D. Pa. Feb. 27, 2024)...............................22

*Synthroid Mktg. Litig.*, In re:

  264 F.3d 712 (7th Cir. 2001) ("*Synthroid I*")............................................ *passim*

325 F.3d 974 (7th Cir. 2003) ("*Synthroid II*") ............................................................ *passim*

*T.K. ex rel. Leshore v. Bytedance Tech. Co.*, 2022 WL 888943
(N.D. Ill. Mar. 25, 2022) ................................................................ 24, 79

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) ............................................. 31

*TFT-LCD [Direct Purchaser] Antitrust Litig.*, *In re*:

    2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .................................................. 58

    2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ............................................. 58, 66

*Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel
Fire Litig.*, *In re*, 56 F.3d 295 (1st Cir. 1995) ................................................ 70

*TikTok, Inc., Consumer Priv. Litig.*, *In re*, 617 F. Supp. 3d 904 (N.D. Ill. 2022) ............ 19, 38, 51

*Titanium Dioxide Antitrust Litig.*, *In re*, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ........... 58, 80

*Trans Union Corp. Priv. Litig.*, *In re*, 629 F.3d 741 (7th Cir. 2011) ............................ 33

*Tricor Direct Purchaser Antitrust Litig.*, *In re*, 2009 WL 10744518
(D. Del. Apr. 23, 2009) .................................................................... 69

*Urethane Antitrust Litig.*, *In re*:

    2016 WL 4060156 (D. Kan. July 29, 2016) ......................................... 57, 65, 70

    768 F.3d 1245 (10th Cir. 2014),
    *cert. dismissed*, 579 U.S. 969 (2016) ........................................... 23, 24, 60

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ........................................................................ 60

*Vitamins Antitrust Litig.*, *In re*, 2001 WL 34312839 (D.D.C. July 16, 2001) ..................... 58

*Wilk v. Am. Med. Ass'n*, 895 F.2d 352 (7th Cir. 1990) ............................................ 48

*Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011) .......................... *passim*

*Young v. County of Cook*, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ............................ 56

*Zall v. Standard Ins. Co.*, 2023 WL 6388781 (W.D. Wis. Sept. 29, 2023) .......................... 75

## STATUTE AND RULES

28 U.S.C. § 1920 ...................................................................................................................76

Fed. R. Civ. P. 23 .............................................................................................19, 34, 50, 53, 65

    (e) ...................................................................................................................................1

    (e)(1) ......................................................................................................................18, 19

    (e)(1)(B)(ii) ..................................................................................................................18

    (e)(2) ..................................................................................................................1, 18, 19, 27

    (e)(2) advisory committee note to 2018 amendment ........................................................18

    (e)(2)(A) .......................................................................................................................20

    (e)(2)(B) .......................................................................................................................20

    (e)(2)(C) ..................................................................................................................21, 23

    (e)(2)(C)(i) ....................................................................................................................21

    (e)(2)(C)(ii) .............................................................................................................21, 24

    (e)(2)(C)(iii) ...........................................................................................................21, 26

    (e)(2)(C)(iv) ..................................................................................................................21

    (e)(2)(D) .......................................................................................................................21

    (e)(3) ............................................................................................................................27

    (h) .............................................................................................................5, 28, 74, 76

Fed. R. Civ. P. 54(d)(1) .........................................................................................................76

## PLEADINGS

*Ackley v. Marathon Cheese Corp.*, No. 3:22-cv-232-jdp, Dkt. 37
    (W.D. Wis. Dec. 6, 2024) .................................................................................80

*Aero Techs. LLC, In re*, No. 22-02890 (Bankr. S.D. Ind.).........................................72

*Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 (W.D. Wis.) ..................................6

*Brown v. Google LLC*, No. 4:20-cv-03664 (N.D. Cal.):

    Dkt. 1107-20 (Apr. 23, 2024) ..........................................................73

    Dkt. 1107-21 (Apr. 23, 2024) ..........................................................73

*Cox Auto., Inc. v. CDK Global, LLC*, No. 17-925, Dkt. 1 (W.D. Wis. Dec. 11, 2017).................7

*CS Wang & Assoc. v. Wells Fargo Bank, N.A.*, No. 16-11223,
    Dkt. 654 (N.D. Ill. Dec. 2, 2021) ......................................................56

*Dahl v. Bain Cap. Partners, LLC*, No. 07-12388 (D. Mass.):

    Dkt. 1051 (Nov. 13, 2014) ..............................................................58

    Dkt. 1052 (Nov. 13, 2014) ..............................................................58

    Dkt. 1095 (Feb. 2, 2015) ................................................................58

*DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, Dkt. 419
    (M.D.N.C. Sept. 20, 2004) ..............................................................69

*DMS Antitrust Litig., In re*, No. 18-864 (N.D. Ill.):

    Dkt. 515 (Feb. 15, 2019) ................................................................10

    Dkt. 1321 (Jan. 21, 2022) ..............................................................49

    Dkt. 1381 (June 29, 2023) ..............................................................49

    Dkt. 1387 (July 25, 2023) ..............................................................14

    Dkt. 1427 (Nov. 21, 2023) ............................................................8, 14

    Dkt. 1457 (Feb. 23, 2024) ..............................................................50

    Dkt. 1459-1 (Feb. 23, 2024) ...........................................................14

    Dkt. 1538-3 (Nov. 27, 2024) ...........................................................51

    Dkt. 1545 (Feb. 25, 2025) ...........................................................53, 63

*Emerson v. Florida Dep't of Revenue*, No. 2021-CA-000487
    (Fla. Cir. Ct. Hillsborough Cnty.) ......................................................71

*First Impressions Salon Inc. v. Nat'l Milk Producers Fed.*, No. 13-454 (S.D. Ill.):

    Dkt. 531 (Feb. 26, 2020) ............................................................................58, 66

    Dkt. 540 (Apr. 27, 2020) ...........................................................................58, 66

*FuboTV Inc. v. The Walt Disney Co.*, No. 24-cv-01363 (S.D.N.Y.) .............................72

*Loop, LLC v. CDK Global, LLC*, No. 18-2521, Dkt. 1 (N.D. Ill. Apr. 9, 2018) ............................8

*Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, No. 2:07-cv-1078, Dkt. 713 (E.D. Pa. July 14, 2014)............................................................................80

*MVSC v. CDK Global, Inc.*, No. 17-896 (C.D. Cal.) ......................................................5

*Spectrum Brands Securities Litigation, In re*, No. 19-347 (W.D. Wisc.):

    Dkt. 24 (Aug. 10, 2020) .................................................................................59

    Dkt. 123 (Mar. 31, 2022) ...............................................................................79

*Titanium Dioxide Antitrust Litig.*, No. 10-318, Dkt. 546-1 (D. Md. Oct. 18, 2013) ....................58

*Tricor Direct Purchaser Antitrust Litig., In re*, No. 05-340 (D. Del.):

    Dkt. 530-1 (Mar. 9, 2009) .............................................................................58

    Dkt. 532 (Mar. 9, 2009) .................................................................................69

    Dkt. 543 (Apr. 23, 2009)............................................................................58, 66

*U.S. Foodservice, Inc. Pricing Litig., In re*, No. 07-894, Dkt. 521 (D. Conn. Dec. 9, 2014) ...........................................................................58

*Urethane Antitrust Litig., In re*, No. 2:04-md-1616 (D. Kan.):

    Dkt. 3274 (July 9, 2016) .................................................................................80

    Dkt. 3276 (July 29, 2016) ...............................................................................80

*United States ex rel. Scott v. Humana, Inc.*, No. 3:18-cv-00061 (W.D. Ky.)...............................72

*Williams Sec. Litig., In re*, No. 4:02-cv-00072 (N.D. Okla.):

    Dkt. 1599 (Jan. 12, 2007)...............................................................................70

Dkt. 1638 (Feb. 12, 2007) .................................................................................70

## OTHER MATERIALS

Brookfield Business Partners L.P., *Q3 Supplemental Information* (Sept.
    30, 2024), https://bbu.brookfield.com/sites/bbu-brookfield-ir/files/
    Brookfield-BBU-IR-V2/2024/Q3/bbu-q3-2024-supplemental-vff.pdf ............................24

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action
    Settlements: An Empirical Study,* 1 J. Empirical Legal Stud. 27 (2004) ..........................77

Theodore Eisenberg & Geoffrey Miller, *Incentive Awards to Class Action Plaintiffs:  An
    Empirical Study*, 53 UCLA L. Rev. 1303 (2006) .................................................................82

Brian T. Fitzpatrick, *A Fiduciary Judge's Guide To Awarding Fees in Class
    Actions*, 89 Fordham L. Rev. 1151 (2021) ...................................................................37, 41

The Judicial Business of the United States Courts of the Seventh Circuit 2023,
    https://www.ca7.uscourts.gov/assets/pdf/2023_report.pdf.................................................23

Judicial Panel on Multidistrict Litigation – Judicial Business 2024, U.S. Courts,
    https://www.uscourts.gov/data-news/reports/statistical-reports/judicial-
    business-united-states-courts/judicial-business-2024/judicial-panel-
    multidistrict-litigation-judicial-business-2024...................................................................14

Standard Attachments for Civil Cases Assigned to Judge Peterson .............................................61

David Thomas and Mike Scarcella, *More Lawyers Join the $3,000-an-hour
    Club, As other Firms Close in*, Reuters (Feb. 27, 2025),
    https://www.reuters.com/legal/legalindustry/3000-an-hour-
    lawyer-isnt-unicorn-anymore-2025-02-27/.........................................................................74

Debra Cassens Weiss, *This BigLaw Firm Charges Nearly $2,500 Per
    Hour For Top Billers' Bankruptcy Work*, ABA Journal (Dec. 19, 2023),
    https://www.abajournal.com/news/article/this-biglaw-firm-charges-nearly
    -2500-an-hour-for-top-billers-bankruptcy-work#google_vignette ...................................74

4 *Newberg and Rubenstein on Class Actions* § 13:53 (6th ed.)...............................................24, 79

5 *Newberg and Rubenstein on Class Actions* § 17:3 ...................................................................79

## INTRODUCTION

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, the Vendor Class respectfully requests that the Court approve the settlement between the Vendor Class and CDK Global, LLC ("CDK"). CDK has agreed to pay $630 million to the Vendor Class, which is $140 million above the class's actual damages of $490 million. That extraordinary result – and more generally, this case – is a success story for private civil enforcement of our nation's antitrust laws. Without the aid of any government agency or prior action, class counsel (Kellogg Hansen) investigated the facts, discovered the alleged conspiracy, and pursued claims for the Vendor Class for over seven years – from complaint through motion to dismiss, fact and expert discovery, *Daubert* and summary judgment, class certification, pretrial proceedings, and to the brink of trial. To do so, class counsel expended $66.5 million in lodestar time and $12.3 million in out-of-pocket expenses, putting almost $80 million at risk of complete loss. That risk paid off for the Vendor Class with a settlement where CDK has agreed to pay 130% of joint-and-several damages.

a.       The Court should approve the Proposed Settlement. It is "fair, reasonable, and adequate" under Rule 23(e)(2). There is no serious question that class counsel has adequately represented the class, as the MDL court has already ruled. The settlement was negotiated at arms' length, with CDK represented by able defense counsel (Kirkland & Ellis). A recovery of more than actual damages is rare in class-action litigation; courts approve settlements for far less. Even in a case with strong evidence of collusion, the Proposed Settlement is fair and reasonable in light of the inherent risks of a jury trial, the delays of post-judgment motions and appeal, and uncertainty regarding CDK's ability to pay a treble-damages verdict.

b.       Class counsel also respectfully requests that the Court award attorney's fees equal to one-third of the settlement amount, net of expenses. We appreciate the Court's desire to give careful scrutiny to class counsel's fee petition and its admonition in the preliminary approval order

not to request more than the law supports.  We take that admonition with the utmost seriousness.

Under Seventh Circuit law, the Court's task is "to assign fees in accord with a hypothetical *ex ante*

bargain." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).  Here, there

is no need to hypothesize:  at the outset of this litigation, Kellogg Hansen negotiated contingency

fee agreements with AutoLoop (30%), Cox Automotive (33.33%), and Authenticom (40%).  Those

are three similarly situated plaintiffs with the same claims, same defendant, same facts, and same

defenses, in the same MDL.  They are sophisticated purchasers of legal services and were

represented in the negotiations by in-house counsel.  Under unequivocal Seventh Circuit

precedent, these contracts "*define* the market" rate for class counsel's services in this litigation.  *In

re Synthroid Mktg. Litig.*, 264 F.3d 712, 720 (7th Cir. 2001) (emphasis in original).  The one-third

fee request is below the average of those percentages, which is the measure *Synthroid* endorses

where there are multiple *ex ante* fee agreements in the same litigation.  *See id.*  Other factors the

Seventh Circuit uses for setting the hypothetical *ex ante* bargain – such as the risk of nonpayment

and the amount of work – also support a one-third contingency fee, although it is unnecessary to

resort to them given the determinative *ex ante* fee agreements in this case.

The *ex ante* bargain standard does not permit reducing the fee award just because the

recovery is large.  Rather, putting aside the *ex ante* market evidence here, the appropriate way to

determine whether the requested fee is unreasonably high is to perform a lodestar cross-check.

Class counsel's total lodestar is $66,474,455, yielding a multiplier of 3.09, which is well within

the range courts accept as reasonable.  Class counsel's lodestar is higher (and multiplier

correspondingly lower) than its "conservative estimate" in the preliminary approval motion

because of an administrative error that Kellogg Hansen discovered after filing that motion.  As

explained in the sworn declaration of Lynn Taylor, Kellogg Hansen's administrator, she

inadvertently failed to export a significant amount of time from the firm's billing records for AutoLoop when calculating the lodestar estimate for the preliminary approval motion. It was an unfortunate but innocent mistake. After a careful audit of its contemporaneous records of work for AutoLoop and the Vendor Class – including categorically excluding all time spent on behalf of Kellogg Hansen's other clients in the MDL (MVSC, Authenticom, and Cox Automotive) from the lodestar – class counsel affirms that its lodestar is correct. As a further precaution, class counsel retained the Honorable Tom Scott – a former federal judge, U.S. Attorney, and longtime practitioner of complex litigation – whose opinion confirms that the lodestar calculation is accurate and the time spent was reasonable.

Prof. Bill Rubenstein – the author of *Newberg and Rubenstein on Class Actions* – has submitted a formal opinion in support of the requested fee award. As he opines, "[t]he lodestar cross-check here reveals a multiplier that is entirely normal for this size settlement, while the risks Class Counsel took and the results they achieved are extraordinary" such that an award "3 times their hourly rates would in no way constitute a windfall." Rubenstein Decl. ¶¶ 2-3. Importantly, even if the 3.09 multiplier was considered too high, the Seventh Circuit has rejected attempts to cap an award based on an "excessive" lodestar multiplier because it "echoes the 'megafund' cap" the court "rejected in *Synthroid*." *Rohm & Haas*, 658 F.3d at 636. As Prof. Rubenstein concludes: "I have been an expert in more than 125 class action cases this century and I can say without hesitation that this is one of the most remarkable cases I have ever seen. There is no doubt whatsoever that the facts provide strong support for the conclusion that an award to Class Counsel that is 3 times their hourly rates would in no way constitute a windfall, even if the award is one third of a relatively large fund." Rubenstein Decl. ¶ 3.

    **c.**     Class counsel also respectfully requests reimbursement for the $12,358,238 in unreimbursed out-of-pocket expenses that it incurred for the Vendor Class and $200,000 for costs associated with the Settlement Administrator.  Class counsel has submitted details of the expenses for which it seeks reimbursement, including itemized invoice descriptions.  The largest category of expenses – expert fees totaling $11 million – were the result of hiring experts preeminent in their fields, as well as the multiple rounds of expert reports in the merits, class certification, and pretrial phases of the case.  Overall, the expenses were 1.96% of the total settlement, which is less than the median (three percent) and average (two percent) in cases of similar size and complexity.

    Kellogg Hansen's other clients – MVSC, Authenticom, and Cox Automotive – paid their share of litigation expenses attributable to them, including a large share of expert fees.  Kellogg Hansen ensured that only those expenses it paid on behalf of the Vendor Class, and not already reimbursed by its other clients, are included in its request here.  That is one reason the requested expenses are much lower than the $20 million estimated in the preliminary approval motion.

    **d.**     Finally, the Court should approve the requested incentive award for AutoLoop.  Its contribution to this extraordinary result was itself extraordinary.  It is the sole vendor that was brave enough to step up and serve as class representative.  In doing so, it bore significant litigation burdens for the entire class, including sitting for seven depositions, producing nearly 100,000 pages of documents, and devoting substantial time and attention to this case over the past seven years.  AutoLoop also put its business – which is dependent on access to data on the CDK DMS – at significant risk of retaliation.  Ultimately, if AutoLoop had not been willing to serve as named plaintiff, no class member would be receiving any compensation for the hundreds of millions of dollars in harm caused by the alleged conspiracy.  A $250,000 incentive award is merited in light of the result AutoLoop helped deliver to the Vendor Class.

## LITIGATION HISTORY AND SETTLEMENT

We set out a robust history of this protracted litigation, of counsel's work, and of the resulting settlement. That history shows why the Court should grant final approval and should award the requested attorney's fees and costs under Rule 23(h).

## I.     Litigation History

### A.     The Complaints and Engagement Letters

This litigation began with a phone call. In the fall of 2016, an executive at an automotive software application company, Motor Vehicle Software Corporation ("MVSC"), called Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") because something was wrong: his company was not being allowed to join the certified data integration programs at CDK and Reynolds, the two largest providers of dealer management systems ("DMS") in the country. *See* Nemelka Decl. ¶ 17. On November 22, 2016, MVSC hired Kellogg Hansen to investigate potential antitrust claims, agreeing to pay a flat fee for a complaint and on an hourly basis thereafter. *See id.* ¶ 64. To investigate MVSC's concerns, Kellogg Hansen had to start from scratch. There was no government investigation, exposé, or other litigation to draw from. *See id.* ¶ 18. On February 3, 2017, after months of investigation, Kellogg Hansen filed an antitrust complaint against CDK and Reynolds on behalf of MVSC alleging a Section 1 group boycott. *See id.* ¶ 19; *MVSC v. CDK Global, Inc.*, No. 17-896 (C.D. Cal.).

As part of its investigation into MVSC's claims, Kellogg Hansen talked to Authenticom, an independent data integrator that competed directly with CDK and Reynolds in the market for data integration services. *See* Nemelka Decl. ¶ 21. Authenticom voiced concerns about CDK and Reynolds's conduct, as well – in particular, their apparent concerted action in blocking independent data integrators like Authenticom from accessing their DMS systems. On January 24, 2017, Authenticom hired Kellogg Hansen to investigate whether Authenticom also had antitrust claims,

agreeing to pay a contingency fee of "forty percent (40%) of the net recovery." *See id.* ¶ 65; Ex. B[1] at 2.[2]  Kellogg Hansen again needed to develop a case from scratch based on new legal theories to account for the facts of Authenticom's situation and its place in the industry.  *See id*. ¶ 22.

On May 1, 2017, Kellogg Hansen, along with Godfrey & Kahn, filed suit in this Court on behalf of Authenticom against CDK and Reynolds alleging violations of Section 1 (conspiracy, exclusive dealing, and tying) and Section 2 (monopolization of the DMS-specific data integration aftermarkets).  *See id.* ¶ 23; *Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 (W.D. Wis.). Authenticom also sought a preliminary injunction to prevent CDK and Reynolds from blocking its access to dealer data on their DMSs.  *See* Nemelka Decl. ¶ 23.  On July 14, 2017, after a three-day evidentiary hearing, this Court granted the preliminary injunction.  *See Authenticom, Inc. v. CDK Global, LLC*, 2017 WL 3017048 (W.D. Wis. July 14, 2017), *vacated*, 874 F.3d 1019 (7th Cir. 2017).

As part of its investigation, Kellogg Hansen also met with several vendors – i.e., the participants in the industry that purchase data integration services directly from Authenticom, CDK, and Reynolds.  *See* Nemelka Decl. ¶ 24.  Those vendors, too, reported being harmed by the prices that CDK and Reynolds were charging for their certified data integration services – prices far higher than those charged by independent competitors like Authenticom.  Cox Automotive is by far the largest vendor in the country and is part of Cox Enterprises, a privately held company with $22 billion in revenues.  *See id*. ¶ 25.  On September 1, 2017, Cox Automotive hired Kellogg Hansen to investigate whether it had any antitrust claims against CDK, agreeing to a one-third

---

[1] Exhibits A through I refer to the exhibits attached to the Declaration of Michael N. Nemelka ("Nemelka Decl.").

[2] Kellogg Hansen and Authenticom agreed to a 35% contingency fee if the case settled *before* the first status conference, i.e., before any work in the case was completed other than the filing of a complaint. *See* Ex. B at 2.  The 40% contingency fee applied to any recovery after that point.  *Id*.

contingency fee. *See id.* ¶ 66; Ex. C at 2 ("[A]s fees for services, the firm will receive one-third (1/3) of any Adjusted Gross Recovery.").

While Kellogg Hansen was preparing the Cox Automotive complaint, Kellogg Hansen and its client Authenticom suffered a significant setback that called into question these lawsuits' chances of success: on November 6, 2017, the Seventh Circuit vacated the *Authenticom* injunction. *Authenticom, Inc. v. CDK Global LLC*, 874 F.3d 1019 (7th Cir. 2017) (Wood, J., joined by Easterbrook and Rovner, JJ.). In its opinion, the Seventh Circuit neither endorsed nor rejected this Court's finding of a likelihood of success on the merits, but it did say that by assuming "some likelihood of success" it was being "generous[] to Authenticom." *Id.* at 1025. And after recounting arguments made by CDK and Reynolds – such as that Reynolds "has always had a closed system," that CDK closed its system in 2015 "with data security in mind," and that neither company has a "duty to continue dealing with data integrators such as Authenticom" – the court stated that, while "not a complete summary of Reynolds and CDK's arguments," it was "enough to show that they have raised serious points." *Id.* The court then vacated the injunction as "inconsistent with *Trinko*," a key Supreme Court case; characterized Authenticom's tying claim as "dubious in the extreme"; and said its Section 2 theories could not "support relief." *Id.* at 1026.

The Seventh Circuit's opinion increased the risk in this litigation sharply. Nevertheless, Cox Automotive instructed Kellogg Hansen to file suit against CDK in this Court, which it did on December 11, 2017. *See Cox Auto., Inc. v. CDK Global, LLC*, No. 17-925 (W.D. Wis.). The complaint was based on and largely the same as the Authenticom complaint. *See generally id.*; Nemelka Decl. ¶ 25.

By this point, Kellogg Hansen's work had attracted other law firms. Between October 2017 and January 2018, firms across the country filed seven copycat class-action complaints on

behalf of car dealerships, the indirect purchasers of data integration services. *See id.* ¶ 28. Counsel does not use the term "copycat" lightly. The dealer lawsuits cut-and-pasted from Kellogg Hansen's *Authenticom* and Cox Automotive complaints and were based on the firm's work. *See id.*

On November 7, 2017, CDK and Reynolds sought to consolidate the burgeoning litigation against them into an MDL, and on February 1, 2018, the Joint Panel on Multidistrict Litigation granted consolidation. *See In re DMS Antitrust Litig.*, 291 F. Supp. 3d 1367 (J.P.M.L. 2018). The MDL was assigned to then-District Judge St. Eve in the Northern District of Illinois. The request for and creation of an MDL stopped the litigation in its tracks. Even before the JPML acted on the consolidation request, this Court stayed the *Authenticom* action; motions to dismiss were still being litigated in the *MVSC* action and were not decided; and no other case advanced beyond filing of the complaint. *See* Nemelka Decl. ¶ 32.

In December 2017, Kellogg Hansen began working for AutoLoop – another large automotive software vendor – to prepare a complaint against CDK. *See id.* ¶ 26. On March 26, 2018, shortly after the MDL was formed, AutoLoop and Kellogg Hansen entered a formal engagement letter, agreeing to a 30% contingency fee. *See id.* ¶ 68; Ex. D at 2 ("[A]s fees for services, the firm will receive thirty percent (30%) of any Adjusted Gross Recovery"). AutoLoop did not sue Reynolds because it, like other vendors, had a binding arbitration agreement with Reynolds. On April 9, 2018, following instructions from Judge St. Eve, AutoLoop filed suit against CDK directly in the MDL for administrative convenience, but the suit was deemed filed in this Court. *See* Compl. at 15 n.3, *Loop, LLC v. CDK Global, LLC*, No. 18-2521, Dkt. 1 (N.D. Ill.); *see also* MDL Dkt. 1427.[3] Shortly thereafter, on June 5, 2018, AutoLoop amended its complaint to take on the responsibility of sole class representative for a nationwide class of automotive

---

[3] MDL Dkt. refers to docket entries in the MDL. *See In re DMS Antitrust Litig.*, No. 18-864 (N.D. Ill.).

software vendors (excluding Cox Automotive, which had already filed a separate complaint) (the "Vendor Class"). *See* Nemelka Decl. ¶ 26. The AutoLoop complaints were based on and substantially the same as the Authenticom and Cox Automotive complaints. *See id.*

In organizing the MDL, Judge St. Eve appointed Kellogg Hansen co-lead counsel of the MDL and interim class counsel for the putative direct-purchaser Vendor Class, with another firm being appointed as co-lead counsel of the MDL and interim class counsel for the putative indirect-purchaser Dealer Classes. *See id.* ¶ 33.

On May 1, 2019, Kellogg Hansen and AutoLoop entered into an updated engagement letter to account for AutoLoop serving as class representative, which maintained the 30% contingency fee percentage. *See id.* ¶ 68; Ex. E. In that agreement, Kellogg Hansen "agree[d] not to petition the Court for an attorney's fee in excess of thirty (30%) of any class recovery." *Id.* Later, in light of the amount of work performed and extraordinary results achieved, AutoLoop – without Kellogg Hansen broaching the issue in any way – stated that it felt class counsel deserved one-third and would not seek to enforce that part of its agreement. *See* Jaye Decl. ¶ 33; *infra* p. 34 (further discussing the amended agreement).

## B. Discovery, Non-*AutoLoop* Settlements, and Dispositive Motions

On May 7, 2018, the antitrust litigation against CDK and Reynolds began in earnest when Judge St. Eve entered a scheduling order for the MDL setting deadlines for motions to dismiss, discovery, dispositive motions, and class certification. *See* Nemelka Decl. ¶ 34. CDK moved to dismiss all of the complaints (MVSC, Authenticom, Cox Automotive, AutoLoop, and the consolidated Dealer Class). The MDL court granted and denied in part the motions in separate opinions for each case. For AutoLoop, the court substantially denied the motion in a 43-page opinion, although it dismissed AutoLoop's Section 1 tying and exclusive dealing claims. *See In*

*re DMS Antitrust Litig.*, 362 F. Supp. 3d 477 (N.D. Ill. 2019).  CDK responded with counterclaims against AutoLoop for breach of contract.  *See* MDL Dkt. 515.

The stage was now set for a massive multi-year discovery effort.  Judge St. Eve had been confirmed to the Seventh Circuit, and the MDL was reassigned to Judge Dow, who oversaw discovery.  Starting in May 2018, Kellogg Hansen on behalf of AutoLoop and its other clients served 344 requests for production and 74 interrogatories, and responded to 75 requests for production and 19 interrogatories for AutoLoop.  *See* Nemelka Decl. ¶ 35.  Document discovery included dozens of parties and third parties, who produced nearly two million documents, which Kellogg Hansen reviewed.  *See id*. ¶¶ 36-37.  The firm took or defended 86 fact depositions – 67 of party witnesses, and 19 of third parties.  *See id.* ¶ 38.  Much of this discovery was contested.  Kellogg Hansen briefed more than 20 discovery-related motions during this period.  *See id*. ¶ 39.

The strain on the firm's resources was intense, and the administrative and logistical burden of the effort required the team's total dedication.  To give a flavor, below is one month of the firm's color-coded deposition calendar.  As it shows, depositions were often double- or triple-tracked on the same days, with defensive, offensive, and third-party depositions across the country mixed together and defensive deposition preparation days fit in as well.

## April 2019

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| APRIL 1<br>S. Cottrell (Auth)<br>DEPO PREP – DC<br>NEMELKA/JWE | 2<br>S. Cottrell (Auth)<br>NEMELKA (*DC*) | 3<br>S. Herbers(CDK/CVR)<br>BONOMO (*Chicago*)<br><br>D. Brown (Auth)<br>DEPO PREP – DC<br>NEMELKA/JWE | 4<br>Cox 30b6 (data)<br>DORRIS (*Atlanta*)<br><br>AutoAlert<br>HAFENBRACK (*KC*) | 5<br>Authenticom 30b6<br>NEMELKA (*DC*) |
| 8 | 9<br>Carfax<br>MILLER (*DC*) | 10<br>S. Anenen (CDK)<br>NEMELKA (Chicago)<br><br>FTC Meeting w/ Mark Israel | 11<br>AutoLoop 30b6<br>MILLER (*Tampa*)<br><br>DealerSocket<br>HAFENBRACK(*Irvine*) | 12<br>AutoLoop 30b6 (data)<br>DSG (*Tampa*)<br><br>Auth. 30b6 (data)<br>NEMELKA (*Minnap.*) |
| 15 | 16<br>N. East (*Xtime*)<br>DORRIS (*Palo Alto*) | 17<br>J. Sowers (CDK)<br>SCHWARZ (*Chicago*)<br><br>B. Schaefer (Rey)<br>NEMELKA (*Houston*) | 18<br>Quinlan (CVR)<br>BONOMO (*Detroit*)<br><br>B. Schaefer (Rey)<br>NEMELKA (*Houston*) | 19<br>Stone Eagle, Inc.<br>HAFENBRACK (*TX*) |
| 22<br>T. Robinson (Auth)<br>Depo PREP – Madison<br>NEMELKA | 23<br>P. McKinley<br>WHITE (*Peoria, IL*)<br><br>T. Robinson (Auth)<br>NEMELKA (*Madison*)<br><br>IFM<br>HAFENBRACK (*MI*) | 24<br>R. Gentry (Auth)<br>Depo PREP – Madison<br>NEMELKA | 25<br>R. Gentry (Auth)<br>NEMELKA (*Madison*)<br><br>Cox 30b6 (Day 1)<br>DORRIS (*SLC*) | 26<br>Cox 30b6 (Day 2)<br>DORRIS (*SLC*)<br><br>T. Graham (CDK)<br>GUARNERA(*Chicago*) |

| CDK | CVR | CO-CONSP-DS | INDIVIDUAL/VENDOR PLFS | DEALER CLASS PLFS | THIRD-PARTIES |
|---|---|---|---|---|---|

*See id.* ¶ 38. There were many such months. *See id.*

The parties also engaged in extensive expert discovery. Kellogg Hansen engaged six experts for AutoLoop, while CDK engaged five experts against. *See* Nemelka Decl. ¶ 40. Each submitted at least one report (and sometimes two), and each was deposed, for 11 total expert depositions relating to AutoLoop. *See id.* ¶ 41. Lasting almost two years, this first round of fact and expert discovery ended in February 2020. *See id.* ¶ 34.

Starting in February 2020, the parties filed lengthy *Daubert* and summary judgment briefing of complicated legal and factual issues. Kellogg Hansen briefed five *Daubert* motions (total of 112 pages) and six motions for summary judgment (total of 284 pages of briefing and 385 pages of statements of fact) on behalf of AutoLoop. *See id.* ¶ 42. By September 2020, those motions were fully briefed.

By October 2020, Kellogg Hansen's non-AutoLoop clients had all settled with CDK.  Cox Automotive settled in July 2019.  *See id.* ¶ 43.  MVSC settled its suit in October 2019.  *See id.* And Authenticom settled with CDK in October 2020.  *See id.*  From that time forward, the only remaining case against CDK was AutoLoop's, and virtually all of Kellogg Hansen's work thereafter was solely for the benefit of the Vendor Class.  *See id.* ¶ 44.[4]

On January 21, 2022, after holding multiple hearings in 2021, the MDL court issued an omnibus 106-page *Daubert* ruling largely (but not entirely) denying challenges to the Vendor Class's experts.  *See In re DMS Antitrust Litig.*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022).  The court then ordered another round of briefing to address how the *Daubert* ruling affected the parties' summary judgment arguments, and held another hearing.  *See* Nemelka Decl. ¶ 45.  Before ruling on the parties' summary judgment motions, Judge Dow became counselor to Chief Justice Roberts, and the MDL was transferred to Chief Judge Pallmeyer.

On April 7, 2022, CDK announced that it had agreed to be acquired for $8.3 billion by a subsidiary of Brookfield Corporation, an enormous Canadian investment firm with over $1 trillion in assets under management.  *See id.* ¶ 46.  The deal closed on July 6, 2022.  *See id.*

On June 29, 2023, the MDL court denied in part and granted in part CDK's motions for summary judgment and granted AutoLoop's motion for summary judgment as to CDK's counterclaims.  *See In re DMS Antitrust Litig.*, 680 F. Supp. 3d 919 (N.D. Ill. 2023); *In re DMS Antitrust Litig.*, 2023 WL 4297643 (N.D. Ill. June 29, 2023).  After the dust had settled, AutoLoop had one claim left:  its core Section 1 conspiracy claim alleging that CDK and Reynolds had coordinated their data access policies.

---

[4] Authenticom would settle its claims against Reynolds in May 2022, and MVSC would settle its claims against Reynolds in November 2023.  *See* Nemelka Decl. ¶ 44.

After the summary judgment ruling, CDK hired new counsel – Kirkland & Ellis LLP – to oppose class certification and try the case.

### C.    Federal Trade Commission and State Attorneys General

Alongside its litigation efforts, Kellogg Hansen made extensive efforts to persuade the Federal Trade Commission ("FTC") and state attorneys general to bring enforcement actions against CDK and Reynolds based on the alleged conspiracy the firm had uncovered. *See* Nemelka Decl. ¶ 27. After filing the *Authenticom* complaint in May 2017, the firm brought evidence of what it had found to the FTC. *See id.* The agency opened up an investigation shortly thereafter, and over the course of 2017 through 2020, Kellogg Hansen met with the FTC more than a dozen times, summarized the best evidence (the FTC was getting copies of the discovery in the MDL), deployed its antitrust expert (Dr. Mark Israel) to meet with the agency three times, and made presentations to the director of the FTC's Bureau of Competition. *See id.* The firm also met with the offices of multiple attorneys general, including New York, Wisconsin, Ohio, Illinois, Virginia, and Utah in an effort to have them bring an action against CDK and Reynolds. *See id.* Those efforts were unsuccessful, leaving Kellogg Hansen and its clients to pursue their claims without any government support. *See id.*

### D.    Class Certification and Remand

From August 2023 to March 2024, AutoLoop engaged in another round of fact and expert discovery for class certification, including refreshes of the data underlying the expert opinions. *See* Nemelka Decl. ¶ 51. The parties produced another 50,000 pages of documents and took or defended another seven depositions (two experts and five dealer witnesses). *See id.* By its nature, all of this work by class counsel was solely to benefit the Vendor Class.

From November 2023 through June 2024, Kellogg Hansen briefed class certification and submitted updated reports from its antitrust liability and damages expert (Dr. Israel). *See id.* ¶ 51.

CDK also took another run at excluding Dr. Israel's damages opinions under *Daubert*. *See id.* ¶ 51(e); MDL Dkt. 1459-1. On July 22, 2024, the court granted AutoLoop's motion for nationwide class certification, denied CDK's *Daubert* motion, and appointed Kellogg Hansen and Prof. Issacharoff as class counsel. *See In re DMS Antitrust Litig.*, 2024 WL 3509668, at *18 (N.D. Ill. July 22, 2024).

As noted above, AutoLoop had filed its complaint directly in the MDL court (as instructed by Judge St. Eve), but that complaint was "deemed" filed in this Court, where counsel and AutoLoop wanted to try the case. *See supra* p. 8. When the time for remand came, CDK objected. *See* MDL Dkt. 1427. CDK wanted to consolidate the trials for the direct purchaser Vendor Class and indirect purchaser Dealer Class in the Northern District of Illinois, *see* MDL Dkt. 1387, at 22, as did counsel for the Dealer Class, *see id.* at 16-19, 21. Kellogg Hansen did not believe that such a trial was in the Vendor Class's interests. *See id.* at 21. The MDL court ultimately ruled that "Wisconsin is in fact the 'home' district for this case," and remanded the Vendor Class here for trial – a rarity in MDL proceedings.[5] *See* MDL Dkt. 1427, at 1, 8.

### E.    Pre-Trial Proceedings

After remand, this Court directed that notice of class certification and an opportunity to opt out be sent to all members of the Vendor Class. *See* Dkt. 74, at 5. Just one member opted out. *See* Dkt. 226, at 1-2.

In October and November 2024, the Vendor Class and CDK engaged in yet another round of fact and expert discovery (this time expedited while preparing for trial). That discovery focused

---

[5] Barely 1% of MDL cases are ever remanded to the transferor court. *See* Judicial Panel on Multidistrict Litigation – Judicial Business 2024, U.S. Courts ("Since its creation in 1968, the Panel has centralized 1,271,402 civil actions for pretrial proceedings. By the end of fiscal year 2024, a total of 17,621 actions had been remanded for trial . . . ."), https://www.uscourts.gov/data-news/reports/statistical-reports/judicial-business-united-states-courts/judicial-business-2024/judicial-panel-multidistrict-litigation-judicial-business-2024 (last accessed June 5, 2025).

on the 2020 through 2024 time period.  It included tens of thousands of documents, three Rule 30(b)(6) depositions, and supplements to four expert opinions (an antitrust and security expert for both sides).  *See* Nemelka Decl. ¶ 54.

Throughout the fall of 2024 and early 2025, Kellogg Hansen and Godfrey & Kahn prepared intensely for trial.[6]  They prepared fact and expert witnesses to testify; drafted direct and cross-examination outlines; prepared the opening presentation and closing summation; curated an exhibit list and objected to CDK's; designated deposition testimony and objected to CDK's designations; drafted jury instructions and verdict forms and negotiated with CDK over them; briefed a sanctions motion based on Reynolds's and CDK's alleged spoliation of evidence; filed or opposed 14 motions *in limine*; and briefed the jury instructions and verdict forms.  *See* Nemelka Decl. ¶ 55.

The trial was set to begin January 27, 2025.  Two weeks before trial, CDK reached out to discuss settlement.  *See id.* ¶ 56.  Representatives from Brookfield visited Kellogg Hansen's offices, and the parties negotiated a settlement in one day without a mediator.  *See id.*  On January 14, 2025, they executed the Settlement Agreement.  *See id.* ¶ 57.  It is the only agreement made in connection with the proposed settlement.  *See id.*

## II.    The Settlement

The Settlement Agreement (also, the "Proposed Settlement") provides that CDK will pay $630 million in settlement consideration.  CDK was required to pay (and has paid) $450 million no later than 23 days after the Court's preliminary approval order.  *See* Dkt. 250-1, ¶¶ 1(x), 13. That money is now sitting in escrow earning more than 4.25% interest.  *See* Brown Decl. ¶ 16.  If the settlement is finally approved, CDK will pay the remaining $180 million in three equal

---

[6] Earlier in 2024, class counsel had conducted a full-day mock jury exercise in Madison, Wisconsin, in order to refine its trial presentation and themes.  *See* Nemelka Decl. ¶ 55.

installments of $60 million on the first, second, and third anniversaries of that approval. *See* Dkt. 250-1, ¶¶ 1(x), 14.

The Proposed Settlement is not a "claims-made" settlement. That is, the settlement consideration is fixed and does not depend on the number of class members that submit claims. *See id.* ¶¶ 18, 21. If the Proposed Settlement does not receive final approval, CDK will have the right to rescind the Settlement Agreement and recoup its payments plus the accrued interest. *See id.* ¶¶ 12, 16, 28-29.

The Settlement Agreement applies to vendors that are members of the certified Vendor Class. *See id.* ¶ 1(e). Class members will release their claims against CDK, and CDK will likewise release its (already dismissed) counterclaims against AutoLoop. *See id.* ¶¶ 1(b), 1(h), 6-7.

## III.    The Distribution Plan

The Proposed Distribution Plan remains the same as the plan proposed at the preliminary approval stage. *See* Dkt. 250-2. The Settlement Administrator will first use any settlement consideration payments to pay taxes (for example, due to accrued interest), any litigation expenses approved by the Court to be reimbursed to class counsel, the Settlement Administrator's reasonable fees and costs approved by the Court, and any service award for AutoLoop approved by the Court. *See id.* ¶¶ 2(a)-(e), 3(a)-(d). For each installment payment (the $450 million initial payment and the three subsequent $60 million payments), the Settlement Administrator will then (1) pay class counsel the Court-approved percentage of the remaining funds as reasonable attorney's fees and (2) distribute the remaining funds to class members in proportion to their alleged damages, as calculated by the Vendor Class's damages expert. *See id.* ¶¶ 2(e)-(f), 3(d)-(e).[7]

---

[7] Although Dr. Israel calculated zero overcharges – and therefore no damages – for three vendors, those vendors will be deemed to have damages equal to the lowest non-zero damages ($198) to ensure that they receive consideration for releasing their claims. *See* Dkt. 250-2, ¶ 5.

If the Settlement Administrator cannot make any payment to a class member within 180 days despite its best efforts, that class member will forfeit that payment, and the payment will become settlement consideration available for distribution to the other class members on a pro rata basis.  *See id.* ¶ 4.  Class counsel has selected BrownGreer PLC – which previously administered class certification notice – to serve as Settlement Administrator.  *See* Dkt. 54, ¶ 3 (qualifications).

## IV.    The Notice Plan

Class counsel and BrownGreer have executed the notice plan ordered by the Court in its preliminary approval order.  *See* Brown Decl. ¶¶ 17-26.  On May 13, 2025, BrownGreer sent notice of the proposed settlement to all 243 class members using direct contact information (mailing addresses and email addresses) obtained from CDK and Reynolds and supplemented by independent research.  *See id.* ¶¶ 19, 21, 23.  As of this filing, the notice has successfully reached 96.7% of class members (235 out of 243).  *See id.* ¶ 25.  Kellogg Hansen has also been contacted separately by dozens of class members who are eager to receive the substantial payments they are due under the settlement.  *See* Nemelka Decl. ¶ 60.

As directed by the Court, the notice informed the class "(1) that the parties will be filing a motion for final approval of the settlement that will be available on the website; (2) the date the motion will be available on the website [June 10, 2025]; and (3) that the court's order granting preliminary approval [is] available [] on the website."  Dkt. 253, at 12; *see* Brown Decl. Ex. A (class notice).  The notice directed class members to the settlement website (www.VendorDMSLitigation.com), which prominently displays the Court's preliminary approval order and will prominently display this motion and accompanying materials.  *See* Brown Decl. ¶¶ 12-13.  The notice explains each member's right to object, how to do so, and by when (July 15, 2025); the nature of the action; the terms of the Proposed Settlement and Distribution Plan; the projected amount that each class member will receive if all fees, expenses, and awards are

approved; how to receive payment; the attorney's fees and reimbursements that are being sought; and how to participate in the final approval hearing on August 29, 2025.  *See* Brown Decl. Ex. A.

## ARGUMENT

### I.    The Court Should Grant Final Approval of the Proposed Settlement

"Federal courts naturally favor the settlement of class action litigation" and accordingly consider the facts "in the light most favorable to the settlement." *Isby v. Bayh*, 75 F.3d 1191, 1196, 1199 (7th Cir. 1996).  Even so, courts "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002).  This Court may grant final approval of the Proposed Settlement if:  (1) the settlement applies to the already-certified Vendor Class; (2) the Vendor Class was provided adequate notice and a public hearing; and (3) the Proposed Settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2).  All those requirements are met.

### A.    The Proposed Settlement Applies to the Already-Certified Vendor Class

Rule 23(e)(1) requires a "showing that the court will likely be able to . . . certify the class." Fed. R. Civ. P. 23(e)(1)(B)(ii).  Here, the Vendor Class was already certified by the MDL court before the parties settled.  In that situation, "the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted."  Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendment.  The Proposed Settlement applies to the certified class, minus the single opt-out.  *See* Dkt. 250-1, ¶ 1(e).  The claims being settled are the same ones for which the MDL court granted class certification.  *See id.* ¶ 1(b); *DMS Antitrust Litig.*, 2024 WL 3509668, at *3. Rule 23(e)(1) is therefore satisfied.

### B.    The Vendor Class Received Adequate Notice

The notice plan already ordered by the Court gives "notice in a reasonable manner to all class members." Fed. R. Civ. P. 23(e)(1).  The settlement administrator, BrownGreer, has executed that plan.  As explained above, BrownGreer sent the class notice to all 243 class members, *see* Brown Decl. ¶¶ 17-26 & Ex. A, and the notice successfully reached 96.7% of class members (235 out of 243), *see id*. ¶ 25, which far exceeds the requirements of Rule 23(e)(1) and due process.  *See In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 927-28 (N.D. Ill. 2022) ("According to the Federal Judicial Center, notice to at least seventy percent of the class generally meets this standard.").  The notice contains all the information required by law.  *See supra* pp. 17-18 (explaining contents of notice); *Linman v. Marten Transp., Ltd.*, 2024 WL 5076031, at *1 (W.D. Wis. Dec. 11, 2024) (finding notice with similar contents to satisfy Rule 23 and due process).

### C.    The Settlement Satisfies Rule 23(e)(2) Factors

In determining whether a settlement is "fair, reasonable, and adequate" under Rule 23(e)(2), courts evaluate whether:  (1) "the class representative[] and class counsel have adequately represented the class"; (2) the settlement was "negotiated at arm's length"; (3) the settlement "treats class members equitably relative to each other"; and (4) "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2).

The Vendor Class will first address the factors prescribed by Rule 23(e)(2) and then address other non-duplicative factors the Seventh Circuit has considered in evaluating settlements.[8]  Each factor supports final approval.

---

[8] In 2018, Rule 23 was amended to enumerate "core concerns" for courts to consider when deciding whether to approve a class-action settlement.  *See* Fed. R. Civ. P. 23(e)(2) advisory committee note to 2018 amendment.  The amendments did not "displace" the traditional test for fairness, reasonableness, and adequacy as enumerated by the circuit courts, however.  *Id*.  Accordingly, district courts have continued to analyze the Seventh Circuit factors following the 2018 Amendments.  *See, e.g., In re Advoc. Aurora Health*

### 1. AutoLoop and Class Counsel Have Adequately Represented the Vendor Class Throughout This Litigation

The first factor – requiring that "the class representatives and class counsel have adequately represented the class," Fed. R. Civ. P. 23(e)(2)(A) – is satisfied for all the reasons set forth in the Vendor Class's motion for preliminary approval.  *See* Dkt. 248, at 10-11.  For more than seven years, AutoLoop and class counsel have steadfastly and ably represented the Vendor Class in the prosecution of this case, expending tens of thousands of hours.  *See infra* p. 59.  In appointing them as class representative and class counsel, Chief Judge Pallmeyer held that it is "undisputed that AutoLoop and its counsel have adequately represented the class."  *DMS Antitrust Litig.*, 2024 WL 3509668, at *10.  The results also speak for themselves:  the settlement here is for $630 million. That is $140 million *more* than the $490 million of actual damages that would have been sought at trial.  A settlement above actual damages is a rare achievement.  *See* Rubenstein Decl. ¶ 44 ("That Class Counsel secured about 50% of that treble-damage possibility without risking it all at trial is a significant achievement.").

### 2. The Parties Negotiated the Settlement Agreement at Arm's Length

The Settlement Agreement was negotiated at arm's length by sophisticated parties with experienced counsel.  *See* Nemelka Decl. ¶ 56.  The parties reached the agreement with a full understanding of the merits and risks of the case, developed through years of hard-fought litigation. Such a negotiation meets the requirements of Rule 23(e)(2)(B).  *See*, *e.g.*, *Linman*, 2024 WL 5076031, at *1 (granting final approval of settlement "negotiated at arm's-length, in good faith and without collusion, by capable and experienced counsel, with full knowledge of the facts, the law, and the risks inherent in the litigation").

---

*Pixel Litig.*, 740 F. Supp. 3d 736, 748 (E.D. Wis. 2024); *Holloway v. Kohler Co.*, 2024 WL 5088316, at *2 (E.D. Wis. Dec. 12, 2024).

### 3.     The Proposed Settlement Treats Class Members Equitably

The Proposed Distribution Plan "treats class members equitably relative to each other" by awarding each vendor a share of the settlement consideration in proportion to its damages, as calculated by the Vendor Class's expert, Dr. Israel.[9] Fed. R. Civ. P. 23(e)(2)(D); *see* Dkt. 253, at 3. As the Court noted in its preliminary approval order, that plan allocates "settlement shares in a straightforward and equitable manner." *Id.*; *see also Bills v. TLC Homes Inc.*, 2020 WL 5982880, at *4 (E.D. Wis. Oct. 8, 2020) (finding Rule 23(e)(2)(D) to be met where allocation was apportioned pro rata).

### 4.     The Relief Provided Is Exceptional

In determining whether the "relief provided for the class is adequate," Fed. R. Civ. P. 23(e)(2)(C), courts evaluate "the relative strength of plaintiff['s] case on the merits" balanced against the settlement amount. *Isby*, 75 F.3d at 1199. Rule 23 instructs courts also to consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class . . . ; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified." Fed. R. Civ. P. 23(e)(2)(C)(i)-(iv).

#### a.     *Strength of case compared to settlement offer*

The $630 million settlement here is 130% of the Vendor Class's actual damages of $490 million. A settlement exceeding single damages is an "excellent[] result by traditional antitrust settlement standards," under which settlements for "substantially less than single damages for the

---

[9] Dr. Israel's expert opinion estimated damages for each of the 243 class members. *See* Dkt. 246, at tbl. 2 (Israel Rep.); Dkt. 247 (Israel Decl. for Proposed Distribution Plan). As explained above, it survived two separate *Daubert* challenges by CDK – one at summary judgment and one at class certification. *See DMS Antitrust Litig.*, 2024 WL 3509668, at *3-8; *DMS Antitrust Litig.*, 581 F. Supp. 3d at 1050-57.

class are considered fair and adequate settlements." *Phemister v. Harcourt Brace Jovanovich, Inc.*, 1984 WL 21981, at *11 (N.D. Ill. Sept. 14, 1984).  As Mr. Scott notes, settling for more than actual damages is exceedingly rare in any type of case – whether antitrust or otherwise.  *See* Scott Decl. ¶ 23.  Courts regularly approve class-action settlements providing far lower recoveries.  *See*, *e.g.*, *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964-65 (9th Cir. 2009) (antitrust settlement for 30 percent of single damages was "fair and reasonable no matter how you slice it"); *In re Suboxone Antitrust Litig.*, 2024 WL 815503, at *9 (E.D. Pa. Feb. 27, 2024) (antitrust settlement for 12 to 14 percent of single damages was "well within the range of reasonableness") (collecting cases); *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 2015 WL 13546111, at *2 (W.D. Wis. Jan. 5, 2015) (finding settlement representing "one-third of the best-case [litigation] scenario" to be "fair and reasonable"); *City of Greenville v. Syngenta Crop Prot., Inc.*, 904 F. Supp. 2d 902, 907 (S.D. Ill. 2012) (class-action settlement for 76 percent of damages was "far greater" than usual) (collecting cases).

As the Court noted in its preliminary approval order, "[if] the class prevailed at trial, they could have recovered treble damages."  Dkt. 253, at 2.  A full treble-damage award was a real possibility here.  But courts have long held that, "in determining a settlement value, the potential for treble damages should not be taken into account." *Carnegie v. Household Int'l, Inc.*, 445 F. Supp. 2d 1032, 1035 (N.D. Ill. 2006) (citing cases); *see Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *4 (S.D. Ill. Dec. 16, 2018) (finding settlement representing approximately 4% of potential trebled damages fair and noting the "suggestion that the adequacy of the relief secured by the Settlement must be measured against potential treble damages contravenes established authority").

### b. Costs, risks, and delay of trial and appeal

The result for the Vendor Class is even better after considering "the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). As the Court observed in its preliminary approval order, there "is no guarantee that the class would have prevailed at trial, or, if it did, that the jury would have agreed with Loop's damages calculations. (CDK's damages calculations were as low as $48 million.)." Dkt. 253, at 2. Although the case was well-positioned for trial after counsel's years of work, courts and all parties know that trials are inherently risky and could end with "little or no recovery." *See Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 582 (N.D. Ill. 2011). Class counsel has also already spent $12.3 million in unreimbursed, out-of-pocket expenses, *see infra* pp. 76-79, and "[t]rial would also have increased expenses substantially," Dkt. 253, at 2.

Further, CDK almost certainly would have exhausted its appellate rights in the event of a large verdict. Post-trial briefing in this Court alone would have taken months. The median time from notice of appeal in the Seventh Circuit to a decision is about 10 months.[10] A petition for a writ of certiorari would likely then have followed. The delay would have been years. For example, Kellogg Hansen represented plaintiffs in two antitrust verdicts of more than $1 billion (post-trebling) that were affirmed on appeal. In those cases, the Supreme Court did not deny certiorari until 43 months and 35 months after trial, respectively. *See In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014), *cert. dismissed*, 579 U.S. 969 (2016); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), *cert. denied*, 573 U.S. 1148 (2003). A major consideration for class counsel and AutoLoop in finding the agreement to be in the best interests of the Vendor Class was that the Settlement provides a guaranteed very large payment now and avoids an appellate

---

[10] *See* The Judicial Business of the United States Courts of the Seventh Circuit 2023, at Table 9, https://www.ca7.uscourts.gov/assets/pdf/2023_report.pdf.

process that would delay payment for years.  *See* Dkt. 248, at 11-12.  And, of course, appeals (like trials) are never without risk.

Class counsel and AutoLoop also considered the risk that CDK would be unable to pay a trebled verdict of $1.47 billion.  *See* Nemelka Decl. ¶ 58.  Public records show that, for the trailing 12 months ending September 30, 2024, CDK's adjusted EBITDA was $185 million and its adjusted earnings from operations – a measure of profit – was $65 million.[11]  If CDK were unable to pay a large trebled verdict, the Vendor Class would have faced a long road to recovery, and that recovery may have been only a fraction of the verdict.  This too weighs in favor of final approval.  *See Chesemore v.  All. Holdings, Inc.*, 2014 WL 12730484, at *1 (W.D. Wis. Apr. 9, 2014) (defendant's "ability . . . to pay" an appropriate settlement consideration).

### c.    The effectiveness of the Proposed Distribution Plan

The Proposed Settlement uses an "effective[ ] . . . method of distributing relief to the class." Fed. R. Civ. P. 23(e)(2)(C)(ii).  This is not a claims-made settlement.  Each of the 243 class members has already been identified, Dr. Israel has already calculated each member's pro rata share of the settlement, and no unclaimed funds will revert to CDK.  *See supra* p. 16.  That method avoids the concerns sometimes raised by complex claims processes and settlements that distribute only the "amount actually claimed by the class members."  4 *Newberg and Rubenstein on Class Actions* § 13:53 (6th ed.); *see also T.K. ex rel. Leshore v. Bytedance Tech. Co.*, 2022 WL 888943, at *14 (N.D. Ill. Mar. 25, 2022) ("[A] settlement that requires defendants to disgorge a predetermined sum is more likely to be found fair, reasonable, and adequate.") (citation omitted);

---

[11]    *See* Brookfield Business Partners L.P., *Q3 Supplemental Information* at 17 (Sept. 30, 2024), https://bbu.brookfield.com/sites/bbu-brookfield-ir/files/Brookfield-BBU-IR-V2/2024/Q3/bbu-q3-2024-supplemental-vff.pdf.

*In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d 1330, 1351 (S.D. Fla. 2011) ("The absence of a claims-made process further supports the conclusion that the Settlement is reasonable.").

To receive payment, class members must submit information and verify their identity with the Settlement Administrator, provide payment instructions, and (if the payment will exceed $600) submit information for a W-9 form. *See* Brown Decl. ¶¶ 27-30. In its preliminary approval order, the Court asked counsel to "identify more specifically how class members will verify their identities and provide payment instructions and how disputes about identity, payment, or tax forms will be resolved." Dkt. 253, at 12. Each notice sent to class members contains two identification numbers – a "Notice ID" unique to each notice and a "PIN" unique to each vendor. *See* Brown Decl. ¶ 20 & Ex. A. To ensure that only class members receive the notice with these unique identification numbers, the Settlement Administrator developed the distribution list using CDK's and Reynolds's customer records and independent research. *See id.* ¶ 19. It then checked the contact information (physical and email addresses) against a business record database maintained by Dun & Bradstreet. *See id.* In addition, because of the large payments at issue, class counsel has communicated with most of the vendors receiving substantial payments to independently verify points of contact (typically legal counsel or company officers). *See* Nemelka Decl. ¶ 60. As noted above, 235 of the 243 class members received their individualized notices. *See* Brown Decl. ¶ 25.

The notice directs class members to the settlement website, where they create an account to submit the required information. To create an account, members must enter their unique identification and PIN numbers. *See id.* ¶ 27. The individual creating the account for the class member must provide demographic information. *See id.* The Settlement Administrator then verifies that individual's identity using Plaid's Identity Verification services. *See id.* ¶ 28. The

individual creating the account must also certify his or her authority to act on behalf of the vendor. *See id*. ¶ 27. Once the account is created, the member can submit the required payment and wiring instructions. *See id.* ¶ 29. Given the large payments involved, the Settlement Administrator and class counsel will review the submitted information and may require additional verification information before payment. *See id*. ¶¶ 28-29.

In the unlikely event that the Settlement Administrator and class counsel do not accept a class member's submitted information as sufficient and cannot resolve the issue with the member, then class counsel will work with the class member to jointly raise the issue for the Court before the final approval hearing on August 29, 2025. *See* Nemelka Decl. ¶ 61. Similarly, if multiple individuals seek payment for a single class member, class counsel will work to obtain agreement on who should receive payment. *See id*. If that is not possible, the Settlement Administrator will not disburse any payment until the individuals with conflicting claims reach agreement among themselves or obtain a legal order directing payment to one of the individuals. *See id.*

To date, 78 of 243 class members – representing approximately 49% of settlement payments – have created accounts, successfully verified their identity, and submitted payment instructions. *See* Brown Decl. ¶ 14. Before the final approval hearing, class counsel will update this data for the Court. Upon final approval, all members who have completed the process will receive payments within days.

### d.    *Attorney's fees and timing of payment*

The relief provided to the class is also adequate considering "the terms of any proposed award of attorney's fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As addressed in detail below, *see infra* pp. 67-68, the relief provided to the Vendor Class will remain extraordinary even after deducting the amounts class counsel seeks in fees, costs, and a service

award for AutoLoop.  Assuming the Court grants those requests, vendors will receive 84 percent of their actual damages, which is high in comparison to other settlements.  *See supra* pp. 21-22.

As for timing, class counsel proposes to be paid at the same time as class members.  Therefore, when class members are paid in the four installments ($450 million upon final approval, and then three $60 million payments on the anniversary of final approval), class counsel's award would be paid in proportional share on the same dates.  Doing so will avoid any possibility of treating counsel better than the class.

### e.    *Other agreements*

The Settlement Agreement is the only agreement between the parties required to be identified under Rule 23(e)(3).  The executed Settlement Agreement, like the other important documents in this case, is available on the settlement website.

### f.    *Other Seventh Circuit factors*

Most of the factors traditionally considered by the Seventh Circuit overlap with the factors now enumerated by Rule 23(e)(2).  *See Aurora Health*, 740 F. Supp. 3d at 748.  The remaining factors also support final approval.

*Stage of proceedings and amount of discovery*.  The point in the litigation when the case settled (the eve of trial) and amount of discovery completed (all of it, over multiple years and multiple rounds) support final approval.  *See Meriter Health*, 2015 WL 13546111, at *2 (finding that a settlement "on the eve of the liability phase of . . . trial also supports approval of the settlement").

*The opinion of competent counsel*.  Both sides to this litigation are represented by counsel well versed in prosecuting and defending antitrust class actions, and both sides fully support final approval.  The "opinion of competent counsel" therefore supports final approval.    *See*, *e.g.*, *Great Neck Cap. Appreciation Inv. P'ship, L.P. v.*

- 27 -

*PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) (holding "[t]he opinion of competent counsel" with experience litigating federal class action cases "weighs in favor of approval of a settlement").

*Amount of opposition to settlement and reaction of class members*. So far, the reaction of class members has been overwhelmingly positive. *See* Nemelka Decl. ¶ 60. Objections to the Proposed Settlement are due on July 15, 2025, and class counsel will address any that may be lodged.

*        *        *

For all of the foregoing reasons, the parties respectfully request that the Court grant final approval of the Proposed Settlement.

## II.     The Court Should Award an Attorney's Fee of One-Third of the Net Recovery

### A.     Introduction

"[A] lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also* Fed. R. Civ. P. 23(h). The principle is that all "those who have benefited from litigation should share its costs." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988).

In the Seventh Circuit, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"). "That is, a 'district court must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed).'" *In re Broiler Chicken Antitrust Litig.*, 80 F.4th 797, 801-02 (7th Cir. 2023) (quoting *Synthroid I*, 264 F.3d at 718). This Court's task therefore is "to assign fees in

accord with a hypothetical *ex ante* bargain." *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 636 (7th Cir. 2011).

Having secured a settlement of $630 million, class counsel now seeks an award of one-third of that amount after deducting expenses, for a fee of $205.7 million. In its preliminary approval order, the Court stated that counsel had not at that point "made a robust case for justifying such a large amount of fees." Dkt. 253, at 3. Now given the opportunity to make that showing, counsel respectfully submits that a one-third is the "*ex ante* bargain" that would have been struck – indeed, was struck – at the outset of the case.

Unlike in many cases where a court must piece together from imperfect evidence what the *ex ante* bargain would have been, here class counsel has three actual fee agreements with similarly situated individual plaintiffs that agreed to contingency fees of 30 percent (AutoLoop), one-third (Cox Automotive), and 40 percent (Authenticom). As the Seventh Circuit held in *Synthroid I*, these contracts "define" the market rate. 264 F.3d at 720.

The Court's preliminary approval order also expressed concern about whether a one-third fee is appropriate given the size of the settlement. *See* Dkt. 253, at 4-5. The parties' actual bargain answers that concern: they did not negotiate *ex ante* a "declining sliding-scale" fee arrangement in which the percentage declines as the recovery increases. Nor does the rationale for such a structure apply here.

The *ex ante* bargain standard adopted by the Seventh Circuit does not permit reducing the percentage just because the recovery is large. Rather, the appropriate way to determine whether the market rate leads to an unreasonably high fee is to perform a lodestar cross-check. *See* Rubenstein Decl. ¶¶ 22-29 (explaining why the lodestar cross-check is the only appropriate way to assess whether the percentage fee award results in a windfall). Class counsel's total lodestar is

$66,474,455, yielding a multiplier of 3.09. That multiplier is not "exceptionally high." Dkt. 253, at 6. As Prof. Rubenstein concludes, "[t]he lodestar cross-check here reveals a multiplier that is entirely normal for this size settlement, while the risks Class Counsel took and the results they achieved are extraordinary" such that an award "3 times their hourly rates would in no way constitute a windfall." Rubenstein Decl. ¶¶ 2-3.

### B.     The Percentage-of-the-Fund Method Is Appropriate

Courts use two different methodologies to determine fee awards. One method is the "percentage-of-the-fund" method, under which fees are based on a percentage of the recovery obtained. That method "directly aligns the interests of the class and its counsel in achieving the maximum recovery possible in the most efficient manner." *Hash v. First Fin. Bancorp*, 2021 WL 12269064, at *2 (S.D. Ind. Nov. 22, 2021). The second method – the "lodestar-multiplier" method – calculates fees based on counsel's hours expended and hourly rates, enhanced by a risk multiplier. *See McDaniel v. Qwest Commc'ns Corp.*, 2011 WL 13257336, at *3 (N.D. Ill. Aug. 29, 2011).

The Seventh Circuit has "strongly endorsed the percentage method of computing appropriate fee awards in class action common fund cases." *Goldsmith v. Tech. Sols. Co.*, 1995 WL 17009594, at *7 (N.D. Ill. Oct. 10, 1995). Accordingly, "the percentage method is employed by the vast majority of courts in the Seventh Circuit." *Chambers v. Together Credit Union*, 2021 WL 1948452, at *1 (S.D. Ill. May 21, 2021) (citation omitted). As this Court has recognized, "[t]he compensation to class counsel should approximate the market value of their work," and, "for plaintiff-side class action work, that will be a percentage of the class recovery rather than a lodestar calculation based on the work expended on the case." *Behrens v. Landmark Credit Union*, 2018 WL 9801773, at *2 (W.D. Wis. Sept. 11, 2018). Consistent with those precedents – and the actual fee agreements in this case – the Court should use the percentage method.

### C.     A One-Third Contingency Fee Is the Market Rate

In assigning "fees in accord with a hypothetical *ex ante* bargain," courts "weigh[] the available market evidence" – such as "actual fee contracts that were privately negotiated for similar litigation, information from other cases, and data from class-counsel auctions" – and "assess[] the amount of work involved, the risks of nonpayment, and the quality of representation." *Rohm & Haas*, 658 F.3d at 635-36; *accord Broiler Chicken*, 80 F.4th at 802; *see also Synthroid I*, 264 F.3d at 721 (listing "the stakes of the case" as another factor).  The market evidence that exists for this case – the actual fee agreements – is dispositive.  Other factors such as risk of nonpayment or amount of work, although unnecessary, also support a one-third contingency fee.

### 1.     The Parties' Actual *Ex Ante* Contracts Define the Market Rate

"The first benchmark" for setting the market rate "is actual agreements." *Synthroid I*, 264 F.3d at 719; *see also In re Stericycle Sec. Litig.*, 35 F.4th 555, 560 (7th Cir. 2022) ("An *ex ante* agreement between the parties is a particularly useful guidepost for determining the market rate."); *Rohm & Haas*, 658 F.3d at 636 ("To determine the market for attorney's fees, the court should look to 'actual fee contracts that were privately negotiated for similar litigation.'") (quoting *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005)).

Kellogg Hansen privately negotiated three *ex ante* fee contracts with sophisticated businesses for this litigation.  Those were a 30% contingency fee agreement with AutoLoop, the named plaintiff; a one-third contingency fee agreement with Cox Automotive, the country's largest vendor; and a 40% contingency fee agreement with Authenticom.  *See supra* pp. 5-8.[12]

---

[12] Kellogg Hansen and MVSC did not have a contingency agreement; instead, they agreed to a fixed fee for drafting the complaint, and then a straight hourly arrangement for proceedings after that.  *See supra* p. 5.  That fee agreement "provide[s] little guidance" here because MVSC paid Kellogg Hansen "on an ongoing basis" – unlike the Vendor Class.  *Synthroid I*, 264 F.3d at 720 (discounting utility of ongoing billable arrangements in determining what an *ex ante* contingency fee should be).

All three agreements are relevant to the *ex ante* market rate. They are not just for "similar litigation," *Rohm & Haas*, 658 F.3d at 635 – they are for this specific litigation. AutoLoop is the named plaintiff for the Vendor Class; Cox Automotive would have been a member of the Vendor Class had it not chosen to sue individually. Authenticom is not a vendor, but its case had the same claims based on the same facts as *AutoLoop* and *Cox Automotive*. Indeed, counsel filed essentially the same complaints for each. *See supra* pp. 7-9. All three cases were part of the same MDL with coordinated discovery, schedules, and dispositive motions. And all three fee agreements were negotiated at the outset of the case, before motions to dismiss were decided and before any discovery had occurred. *See supra* p. 8.

*Synthroid* sets the governing rule. Where "sophisticated" businesses with in-house counsel (like all three of Kellogg Hansen's clients here) negotiate *ex ante* contingency fees, "these contracts *define* the market." *Synthroid I*, 264 F.3d at 720; *see also In re Synthroid Mktg. Litig.*, 325 F.3d 974, 976 (7th Cir. 2003) ("*Synthroid II*") ("this competitive process among informed buyers and sellers *defines* the market rate for legal services"); *Briggs v. PNC Fin. Servs. Grp., Inc.*, 2016 WL 7018566, at *4 (N.D. Ill. Nov. 29, 2016) (St. Eve, J.) ("[T]he Court knows what private plaintiffs 'would have negotiated with their lawyers, had bargaining occurred at the outset of the case . . . ,' because the Named Plaintiffs contracted for Plaintiffs' Counsel to be compensated with the amount Plaintiffs' Counsel now seek.") (quoting *Synthroid I*, 264 F.3d at 718).

In the *Synthroid* case – a fraud case about a pharmaceutical company misleading physicians into keeping patients on a more expensive drug when equally effective (and cheaper) drugs were available – two class settlements were at issue, one for insurance companies and another for consumers. *See Synthroid I*, 264 F.3d at 714-15. Some of the insurance companies had negotiated contingency fee agreements with their counsel ranging from 15% to 25%, *see id.* at 719-20, with

"the average rate that the [insurers] agreed to pay their lawyers [being] 22% of any recovery," *Synthroid II*, 325 F.3d at 976. "Fixing the market rate for the legal services of the [insurers'] counsel is simple," the Seventh Circuit affirmed, "because attorneys and clients set it themselves through arms'-length negotiations." *Id.* The same is true here: Kellogg Hansen and its clients set the market rate with negotiated contingency fee percentages set out in engagement letters. The court need not reconstruct "a *hypothetical* ex ante bargain," *Rohm & Haas*, 658 F.3d at 636 (emphasis added), because the bargaining happened in real life.[13]

*Ex ante* agreements carry such weight for setting the market rate because the "best time to determine this rate is the beginning of the case, not the end (when hindsight alters the perception of the suit's riskiness, and sunk costs make it impossible for the lawyers to walk away if the fee is too low)." *Synthroid I*, 264 F.3d at 718. "Only *ex ante* can bargaining occur in the shadow of the litigation's uncertainty; only *ex ante* can the costs and benefits of particular systems and risk multipliers be assessed intelligently." *Id.* at 719; *see also Stericycle*, 35 F.4th at 560 (same).

The appropriate *ex ante* market rate here is bounded by the range of 30 to 40 percent set forth in the three agreements between Kellogg Hansen and plaintiffs in this litigation; the fee award at a minimum must be within those bounds. And under *Synthroid*, the AutoLoop fee agreement – which sets the lower bound at 30 percent – should not be used on its own. As the largest vendor by far, Cox Automotive's one-third fee agreement also has substantial weight. The Seventh Circuit in the *Synthroid I* and *Synthroid II* opinions addressed how to define the precise market rate within the range set by multiple agreements with different contingency fee percentages: average them.

---

[13] The situation here – with sophisticated businesses with tens of millions in damages represented by in-house counsel, as in *Synthroid II* – is nothing like the "contingent fee agreements" in consumer class actions, where "named plaintiffs are usually cat's paws of the class lawyers." *In re Trans Union Corp. Priv. Litig.*, 629 F.3d 741, 744 (7th Cir. 2011); *see id.* (finding it appropriate that a special master "placed little weight" on such agreements, especially where "the prospective relief for an individual class member is minuscule" in a class with "190 million" consumers).

As noted above, some members of the class of insurers had fee agreements with class counsel that ranged from 15% to 25%, with the average rate of 22%. *Synthroid II*, 325 F.3d at 976. "The district judge therefore adopted [22%] as the measure of . . . class counsel's compensation," and the Seventh Circuit affirmed that approach. *Id*. The average of Kellogg Hansen's three contingency agreements is 34.44%, more than the one-third that class counsel requests.[14]

The provision in the amended AutoLoop fee agreement in which Kellogg Hansen agreed not to seek more than 30% does not preclude the firm from seeking (or the Court from awarding) a one-third fee. *First*, that provision is a private agreement between Kellogg Hansen and AutoLoop (AutoLoop cannot bind the entire class with respect to fees). The award of a "reasonable" fee under Rule 23 is not governed by contract law; rather, the actual *ex ante* fee agreements are data points that together define the market rate. That is why *Synthroid II* affirmed use of an average of class members' fee agreements, rather than treating any one as determinative, such as those that provided for a lower 15% contingency fee. *Second*, AutoLoop voluntarily offered – in light of the extraordinary recovery here and the work it took to achieve it – to support a one-third award (i.e., it does not wish to enforce the provision limiting class counsel to 30%). AutoLoop's support of class counsel's fee petition shows the value that class counsel created in achieving an extraordinary result for all class members.

---

[14] To be clear, the fee agreements in *Synthroid* were negotiated "mid-way through the case, after defendants already had agreed to pay substantial sums." *Synthroid I*, 264 F.3d at 720. The 22% average contingency fee thus reflected the market rate for a case "mid-way" through litigation, with the "risk of loss slight." *Id*. Kellogg Hansen and its clients negotiated their fee terms at the outset of the litigation when the risk of loss was anything but slight. They therefore define the market rate at the start of the case for class counsel's services for plaintiffs in this litigation, and, under *Synthroid I* and *Synthroid II*, that percentage is at least 33.33%.

2.    **Class Counsel's Other Contingency Fee Agreements Support a One-Third Fee as the Market Rate**

In determining the *ex ante* market rate, a relevant consideration is what contingency fees class counsel has been willing to accept in other full-contingency cases.  *See Broiler Chicken*, 80 F.4th at 803-04 (class counsel's prior bids and work in contingency cases are relevant to determining the "market price" of class counsel's "legal services").  This is an especially appropriate factor because Kellogg Hansen was the *only* firm to represent vendors in this litigation.  There were no other competing firms with fee rates to consider.  Below is a table summarizing Kellogg Hansen's pure contingency agreements:

**Table 1**

| Year | Subject Matter | Contingency Fee |
|------|----------------|-----------------|
| 1998 | ███████████ | ███ |
| 2000 | | |
| 2004 | | ██ |
| 2005 | ██████████████ | |
| 2009 | Securities (banking) | 25% |
| 2010 | | ██████████ |
| 2012 | ██████████ | |
| 2014 | | ████████████ |
| 2015 | ████████████ | |
| 2016 | | |
| 2017 | Antitrust (*Authenticom*) | 40% |
| 2017 | Antitrust (*Cox Automotive*) | 33.33% |
| 2018 | Antitrust (*AutoLoop*) | 30% |
| 2018 | | ███ |
| 2019 | ██████████ | |
| 2019 | | |
| 2021 | | █████████████████ |
| 2023 | ██████ | ███ |
| 2024 | ███████████ | |
| 2025 | | ██ |

*See* Nemelka Decl. ¶ 12.  This table shows that the market rate for Kellogg Hansen's services on a contingent basis is consistently at or above 33%, both before the inception of this litigation in 2018 (the *ex ante* time period) and after.  *See Broiler Chicken*, 80 F.4th at 802 (bids made "around the time this litigation began in September 2016 would ordinarily be good predictors of what *ex ante* bargain would have been negotiated").

There are only three outliers below 33.33%.  First, the 2009 securities case with a 25% fee was on behalf of a federal agency – the National Credit Union Association acting as liquidating agent for large credit unions – against banks involved in the subprime mortgage crisis.  *See* Nemelka Decl. ¶ 13.  The federal agency *capped* the fees it would agree to pay based on prior precedent where similar financial agencies acting as liquidating agents had paid a 25% contingency fee to outside counsel during the savings-and-loan crisis of the 1980s and 1990s.  *See id.*  Because the agency always could have had government lawyers bring an action without paying outside counsel anything, the firm's bargaining power was further limited vis-à-vis the government.  *See id.*  The firm's lower contingency fee is therefore an outlier and distinguishable.  █████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████  *Id.* ¶ 14.  Finally, the AutoLoop 30% contingency fee is lower than one-third, but under *Synthroid*, it should be averaged with the one-third fee agreement with Cox Automotive and the 40% agreement with Authenticom.  *See supra* pp. 33-34.

This firm-specific analysis shows that class counsel's market rate for contingency cases – not just complex antitrust actions – is at or above one-third of any recovery, which further supports a finding that the market rate in this case is at least that percentage.  Class counsel's typical one-

third rate is also consistent with what "sophisticated clients pay in the market for contingency representation" generally. *See* Brian T. Fitzpatrick, *A Fiduciary Judge's Guide To Awarding Fees in Class Actions*, 89 Ford. L. Rev. 1151, 1167 (2021).[15]

A word about *Broiler Chicken*, where the Seventh Circuit faulted the district court for ignoring two data points regarding class counsel's willingness to accept a lower than one-third fee: (1) class counsel's bids in auctions in other cases; and (2) class counsel's fee awards in the Ninth Circuit, which (unlike the Seventh Circuit) has adopted a cap on fee percentages in "megafund" cases. *See* 80 F.4th at 801-03. Neither of those data points is relevant in this case, because (1) Kellogg Hansen has never participated in a class counsel auction (and eschews such auctions precisely because they lead to below-market rates for its services), *see* Nemelka Decl. ¶ 11; and (2) Kellogg Hansen has never been awarded fees as lead class counsel in the Ninth Circuit, and has played only a small role in one Ninth Circuit class action, *see id.* ¶ 12. Rather, as the table above shows, Kellogg Hansen has consistently commanded a market rate of one-third or above.

### D. The *Ex Ante* Standard Does Not Permit Reduction of the Percentage for Large Recoveries or Application of a Declining Scale Structure

In its preliminary approval order, the Court stated that when "a settlement is as large as the one in this case, it raises questions about whether a standard percentage-of-recovery analysis should apply." Dkt. 253, at 5. The Seventh Circuit has specifically rejected placing a percentage cap on "megafund" recoveries, because "[m]arkets would not tolerate that effect" and "[p]rivate parties would never contract for such an arrangement." *Synthroid I*, 264 F.3d at 718; *see Broiler*

---

[15] Prof. Fitzpatrick surveyed 33 cases involving "large corporations" that used contingency representations for "enormous" antitrust claims. *See id.* at 1161-62. Three agreed to a one-third fixed fee (like sought here and agreed to by Cox Automotive), and the "vast majority" of those corporations "voice[d] affirmative support" for a one-third fee regardless of the size of damages. *Id.* He also found data on contingency representations in patent cases on behalf of sophisticated clients with "enormous potential damages" and found the mean to be 38.6 percent for a fixed-percentage and, for escalating percentages, to be 28 percent at the filing stage rising to 40.2 percent at the appellate stage. *See id.* at 1160-61.

*Chicken*, 80 F.4th at 804 & n.5 ("this court has rejected the application of a megafund rule" that "caps fees when the recovery exceeds a given value"). Having a cap on fees because the recovery is large would inappropriately "eliminate counsel's incentive to press for more . . . from the defendants." *Synthroid I*, 264 F.3d at 718. Here, the actual *ex ante* contracts set the market rate at one-third, and the Seventh Circuit has "never suggested that a 'megafund rule' trumps these market rates." *Id.* ("Having disapproved the megafund cap, we must remand – for the district judge did not attempt a market-based approach."); *see also* 5 *Newberg and Rubenstein on Class Actions* § 15:80 (explaining that courts should not "use the size of the fund as a policing mechanism" because "some high fund cases involve significant risks, require enormous investments of money and time, and may appropriately trigger a healthy percentage award").

The Court also asked whether class counsel "considered" a sliding-scale structure, where the attorney fee percentage decreases at increasing tiers of settlement recovery, "and if so, why they rejected it." Dkt. 253, at 6. As the Court's question recognizes, and other courts in this Circuit have emphasized, a sliding-scale approach is appropriate if it reflects the parties' *ex ante* bargain. Consistent with the Seventh Circuit's rejection of a fee percentage cap, there is no "general presumption in favor of a sliding-scale approach for large cases," and "many sliding-scale cases [that] involve large fund sizes . . . do not use a sliding-scale formula." *TikTok*, 617 F. Supp. 3d at 940; *see id.* (noting that "the *Stericycle* court spoke approvingly of using a sliding-scale approach in cases where an actual ex ante fee agreement also has adopted a sliding-scale formula"); *accord Stericycle*, 35 F.4th at 560-61 (parties' actual agreement contained declining tiered recovery structure). Here, the parties negotiated *ex ante* on a flat-percentage rather than declining-scale basis; it would not be appropriate to override that bargain by imposing a declining scale *ex post*. *See Synthroid I*, 264 F.3d at 718-20 (the actual contracts "define" the market rate); *Broiler Chicken*,

80 F.4th at 803 (explaining that "the appropriateness of a declining fee scale award structure" depends on the case).

Indeed, Kellogg Hansen has *never* agreed to a declining fee structure, and there is no basis to conclude that it would have agreed to one here.  As demonstrated in the table above, Kellogg Hansen's contingency agreements are consistently one-third or above, and to the extent the firm has agreed to a tiered structure, the percentage *increases* as the case progresses.  *See supra* p. 35.  Notably, Kellogg Hansen's agreement with Authenticom has this structure:  if the case settled "before the first status conference after the complaint is filed," Kellogg Hansen would "receive thirty-five percent (35%)," but after that point, the rate rose to 40%.  *See* Ex. B at 2.  Imposing a declining fee structure would be contrary to the actual contracts in this case.

The Court's preliminary approval order also noted commentary in *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956 (7th Cir. 2013), that a declining fee scale may have certain benefits: "enabl[ing] [class counsel] to recover the principal costs of litigation from the first bands of the award, while allowing the clients to reap more of the benefit at the margin."  *Id.* at 958-59.  Whatever the merits of those considerations, they do not justify overriding the parties' actual bargain.  *Silverman* itself affirmed the district court's approval of a flat-percentage fee award despite remarking on potential benefits from a declining fee scale.  *See id*.

The *Silverman* court's favorable view of declining fee arrangements was based on the record in that case.  The plaintiffs' expert there failed to "identify suits seeking more than $100 million in which solvent clients agree *ex ante* to pay their lawyers a flat portion of all recoveries, as opposed to a rate that declines as recovery increases."  *Id*. at 959.  Nor did the district court "discuss whether a market-based rate would include different portions of different bands of the recovery."  *Id*.  In this case, by contrast, the record shows not only that the parties entered into flat-

percentage agreements, but that, contrary to *Silverman*'s assumption, such agreements are common in similar cases. *See* Rubenstein Decl. ¶ 18.

Even if this Court were to disregard the parties' actual *ex ante* agreements and impose its own substitute bargain (which it should not), a declining fee scale would be particularly unsuitable for this case. The core premise of the declining fee scale award is the possibility that there might be a break point after which counsel can obtain larger recoveries without needing to invest as much time and expense. *Silverman*, 739 F.3d at 959 (noting the possibility that at some point the "costs of litigation do not depend on the outcome"). That may be true in some situations – for example, in securities-litigation cases (like *Silverman*) or in cases involving automatic statutory damages (like *Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792, 794 (7th Cir. 2018)). In those cases, the bulk of the investment is devoted to proving liability, with class certification generally uncontroversial and damages then left to "be calculated mechanically." *Silverman*, 739 F.3d at 959. But that is not the real-world experience of antitrust litigation, and certainly not of this case. CDK fought tooth and nail on liability, antitrust injury, causation, and damages (all of which are intertwined) at every turn – through *Daubert* motions, summary judgment, and class certification (which included another round of *Daubert* motions). Class counsel was not able to achieve the extraordinary settlement it did – 130% of actual damages – until they had prevailed on all of those issues and were on the eve of trial. It took every penny of the $66 million in lodestar and $12.3 million in expenses to achieve that result. Accordingly, no part of the $630 million was obtained at "low" marginal cost. *See, e.g., In re FedEx Ground Package Sys., Inc., Emp. Pracs. Litig.*, 2017 WL 1750154, at *6-7 (N.D. Ind. May 1, 2017) (distinguishing securities cases like *Silverman* from wage-and-hour class actions); *Hale*, 2018 WL 6606079, at *11 (rejecting a sliding scale in a

consumer-protection and RICO class action; distinguishing securities-fraud cases where "class certification is relatively perfunctory").

As Prof. Rubenstein opines, moreover (both in his expert opinion here and in the *Newberg* treatise), the considerations recited by *Silverman* reflect only one side of the coin. A declining scale has serious downsides. *First*, a declining sliding scale "lacks rigor because it provides no direction to courts about when to start decreasing the percentage award, nor by how much." Rubenstein Decl. ¶ 24. *Second*, the premise of a "smooth inverse relationship between the size of the common fund and an appropriate percentage may not be accurate: some high fund cases involve significant risks, require enormous investments of money and time, and may appropriately trigger a healthy percentage award; conversely, a relatively small fund (say $25 million), secured with a few months' work, may not truly entitle class counsel to a mean 25% award." *Id*. *Third*, "the approach can create perverse incentives." *Id*. Instead, "both scholars and courts have embraced precisely the opposite sliding scale, wherein the percentage fee awarded for the marginal dollar increases as the size of the fund increases." *Id*. This "increasing percentage approach incentivizes class counsel to fight for every last dollar and discourages quick and easy settlements that may not be in the best interest of the class." *Id*.; *see also* Fitzpatrick, *A Fiduciary Judge's Guide To Awarding Fees In Class Actions*, 89 Ford. L. Rev. at 1169-70 (explaining that "marginally decreasing percentages exacerbate rather than mitigate agency costs"; finding that "sophisticated" clients "apparently do not use them"; and concluding "judges should not use them either").

Nor does the logic behind a declining sliding scale support using it to avoid a perceived windfall. The point of a declining sliding scale is not to reduce otherwise large fees. Instead, it is meant to account for the possibility – absent here – that there was a difference between the work needed to obtain "the first large chunk and the rest of the settlement." *Gehrich v. Chase Bank*

*USA, N.A.*, 316 F.R.D. 215, 239 (N.D. Ill. 2016).  The proper safeguard against a windfall to class counsel is the lodestar cross-check, addressed below, which shows that a flat one-third fee award is reasonable.  *See infra* pp. 66-69.

Looking at this case in particular, there is no evidence that "after a certain point the costs incurred in increasing a recovery [we]re low relative to the actual increase in the recovery." *Gehrich*, 316 F.R.D. at 239 (citing *Silverman*, 739 F.3d at 959).  Indeed, if the Court were to override the parties' *ex ante* agreements and discount the extra work required to achieve the extraordinary result here, that would create the perverse incentives the Seventh Circuit warned about in *Synthroid I*.  264 F.3d at 721; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1213 (S.D. Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little," and "defendants would quickly come to understand that plaintiffs' counsel lacked an incentive to maximize the recovery.").  The concerns that animate the application of declining fee structures simply do not apply to long-running, hard-fought, and complex antitrust cases like this one.

Class counsel has found only *two* antitrust cases in this circuit that have ever applied declining fee structures.  First, in *In re Amino Acid Lysine Antitrust Litigation*, the court applied such a structure because it was set *ex ante* based on an auction – the court appointed the class counsel that had proposed the declining scale.  918 F. Supp. 1190, 1200 (N.D. Ill. 1996).  The case is therefore inapplicable to the situation here – in which there was no auction (Kellogg Hansen developed these cases and was the only candidate for class counsel) and class counsel did not agree *ex ante* to the declining fee structure (and would not have done so).  Second, in *Synthroid* – where plaintiffs "sought relief under a variety of state and federal law theories, including antitrust, RICO,

and state consumer-fraud statutes," 264 F.3d at 714 – the court of appeals affirmed the application of a declining fee structure to the consumer class (though it changed the scale), *see Synthroid II*, 325 F.3d at 980. But crucially, for the class of insurers (unlike the consumer class), where there was market evidence that defined the appropriate rate, the court applied the average percentage in the *ex ante* fee agreements negotiated by counsel with some of the insurers. *Id*. at 976. That is the appropriate course here.

### E.     Other Secondary Factors Also Support a One-Third Fee

Under Seventh Circuit law, the parties' actual *ex ante* agreements define class counsel's market rate and support a one-third fee here. *See supra* pp. 31-34. It is inappropriate to reevaluate that *ex ante* bargain after the fact, because after a case has settled – in this case, at a high number – there is a significant risk of hindsight bias. *See Synthroid I*, 264 F.3d at 719. Risks that were large through the windshield may appear smaller in the rearview mirror. *See id*. The value of counsel's work may appear diminished after the positive result has already been obtained. *See id*.

For the sake of thoroughness, however, class counsel discusses below the other factors the Seventh Circuit has identified for determining in the absence of market evidence the hypothetical *ex ante* bargain (even though, again, that bargaining actually happened here and so there is no need to hypothesize). Those factors, too, support a one-third fee.

#### 1.     Risk of Nonpayment

In this case, the "risks of nonpayment," *Rohm & Haas*, 658 F.3d at 636, were daunting, which supports a one-third fee. As the Court stated in its preliminary approval order, "[a] large percentage of recovery can be appropriate when it is necessary to ensure that class counsel receive adequate compensation for the risk they accepted." Dkt. 253, at 6; *see also Silverman*, 739 F.3d at 958 ("The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel."). That is the case here.

### a.    *No prior case or investigation*

Class counsel developed this case on its own.  It developed the facts and crafted the legal theories.  Everything in the *AutoLoop* complaint comes directly from class counsel's investigation and work.  There was no prior lawsuit, public exposé, or government investigation from which to draw.  *See* Rubenstein Decl. ¶ 42 ("It was Class Counsel alone who detected, investigated, theorized, and executed this entire class action from scratch to the eve of trial."); *In re Dairy Farmers of Am., Inc.*, 80 F. Supp. 3d 838, 848 (N.D. Ill. 2015) ("One proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter.").

In such situations, courts award large fee percentages, including in megafund cases.  *See, e.g.*, *Kleen Prods. LLC v. Int'l Paper Co.*, 2017 WL 5247928, at *4-5 (N.D. Ill. Oct. 17, 2017) (30% fee award in $354 million settlement was "within range of the market rates approved in other complex antitrust cases," particularly where "case was developed solely by counsel, without the aid of government investigations or indictments"); *Standard Iron Works v. ArcelorMittal*, 2014 WL 7781572, at *1 (N.D. Ill. Oct. 22, 2014) ("33% fee comports with the prevailing market rate" for a $163.9 million settlement fund, particularly where "Class Counsel initiated and developed this [antitrust class action] with no assistance from any prior government investigation or prosecution" and steered the matter "through more than six years of hard-fought litigation"); *Hale*, 2018 WL 6606079, at *9  (33.33% of $250 million settlement reasonable in part because, "unlike many cases where attorneys seek a substantial fee, Class Counsel here were not assisted by any governmental investigations or prosecution"); *Corzo v. Brown Univ.*, 2024 WL 3506498, at *6-7 (N.D. Ill. July 20, 2024) (33.33% of $284 million settlement is "a reasonable market rate" when "[b]alanced against the many significant risks and uncertainties of litigation and without the benefit of a prior government case or investigation").

The Court noted that "[t]his case was filed later, in April 2018," after the complaints in *MVSC*, *Authenticom*, and *Cox Automotive*, *see* Dkt. 253, at 7, but that slight difference in timing does not change the risk profile of this case. At its inception, this case bore just as much risk as, if not more risk than, the prior filed cases. The litigation was still in its infancy when the Vendor Class litigation was filed. Motions to dismiss had yet to be decided, and discovery had not started; indeed, the MDL had just been formed. *See supra* p. 8. Therefore, although it is chronologically true that "[t]his case was filed later," it makes no difference to the *ex ante* risk analysis: all the cases were still at the starting line.

If anything, *AutoLoop* was *riskier* at inception than the other cases. AutoLoop filed its case in the shadow of the Seventh Circuit's November 2017 decision that called into question the merits of the claims in this litigation. *See supra* p. 7 (characterizing the possibility of Authenticom having a likelihood success on the merits as "generous," describing the tying claim as "dubious," holding that the Section 2 claim could not "support relief," and calling CDK's defenses "serious"). And Cox Automotive, which filed its case a few months before AutoLoop, was (and is) an important business partner of both CDK and Reynolds: a business-to-business resolution there (as actually did occur) was much more likely than for AutoLoop or the Vendor Class. *See supra* pp. 6-7.

The Court stated that "[c]lass counsel do not explain why it is appropriate to evaluate attorney fees based on risks for other lawsuits." Dkt. 253, at 7. To be clear, counsel is not trying to recover for risks taken in other lawsuits. Counsel is instead making the point that those cases did not lessen the risk of this case. AutoLoop rode no coattails – it came in on the ground floor. The situation might be different if the Seventh Circuit had affirmed the preliminary injunction, leaving in place a judicial finding that Authenticom was likely to succeed. Or the situation might be different if Authenticom or Cox Automotive had already settled on favorable terms. But that

did not happen.  Instead, the most relevant development before AutoLoop sued was the Seventh Circuit's decision, which cast doubts on the legal theories here.  Otherwise, all the cases were in the starting blocks together at the outset of the MDL.

Similarly, the Court noted that the non-AutoLoop "cases against CDK all settled years ago," Dkt. 253, at 6, which in isolation might imply that AutoLoop's case was not as risky.  But any such implication falls away when the timing is considered.  AutoLoop filed its case before any of those settlements occurred.  The Seventh Circuit has been unequivocal:  "[T]he analysis should be based on the risk that existed when the litigation began – not at the time of settlement." *Stericycle*, 35 F.4th at 565.  At the time that Kellogg Hansen and AutoLoop negotiated fees, and at the time that AutoLoop filed its case, none of those settlements existed.  Accordingly, taking the settlements into account as evidence of lower risk would be contrary to governing precedent.

Even through an (inappropriate) *ex post* lens, Cox Automotive settled with CDK in July 2019; MVSC in October 2019; and Authenticom in October 2020 – all before the MDL court issued *Daubert* or summary judgment rulings.  *See supra* p. 12.  For the next four years, AutoLoop was on its own litigating against CDK.  It alone took the risk of surviving *Daubert* and summary judgment.  And those risks were real:  the MDL court had previously dismissed AutoLoop's tying and exclusive dealing claims, and in its summary judgment opinion, it dismissed its Section 2 claims.  *See supra* pp. 9-10, 12.  Therefore, AutoLoop only had one claim left after summary judgment:  the main conspiracy claim.  *See id*.  AutoLoop then took on the risk of class certification, and after beating back CDK's efforts there, it fought to be remanded to this Court and set for trial.  *See supra* pp. 13-14.  At any time, one misstep could have wiped out its claims.  Therefore, even from an *ex post* perspective, AutoLoop was much riskier than the other cases that settled early.

Finally, the Court noted that "presumably class counsel have already received compensation for the risk they took for those earlier cases," Dkt. 253, at 7, but this is not a proper *ex ante* consideration because class counsel is seeking compensation only for the risk it took on in this case. Cox Automotive, Authenticom, and AutoLoop each had its own separate fee agreements that compensated Kellogg Hansen for the risk the firm was taking on behalf of that litigant. None sought a discount based on recoveries that Kellogg Hansen might obtain for others. *See supra* pp. 5-8. In other words, none of those plaintiffs thought they should get a discount because Kellogg Hansen would be doing some work for the common benefit of them all; each agreed to pay its own way. In addition, as explained below, class counsel has *categorically excluded* all hours spent on the discrete MVSC, Cox Automotive, and Authenticom cases from its lodestar; the only hours included are those spent for and on behalf of the Vendor Class. *See infra* pp. 62-63. In short, class counsel is not seeking compensation for the risk taken in its other engagements; it is seeking compensation only for the work done and risk taken in *this* case.

The Seventh Circuit's decision in *Stericycle* provides a helpful contrast. The court reversed the district court because its analysis was "incomplete" by not considering "the prior litigation involving Stericycle's billing practices and the subsequent, very substantial settlements [totaling $325 million], which signaled that class counsel were taking on a significantly reduced risk of nonpayment." 35 F.4th at 563. While class counsel there "still faced meaningful challenges" in proving securities fraud, "the prior litigation gave them excellent starting field position." *Id*. at 565. And that "reduced risk would have been taken into account in any ex ante auction or market transaction for representation of the securities fraud class." *Id*. The opposite is true here: at the outset of the case, when the *ex ante* bargain occurred, there was no prior litigation; no prior settlement of any kind; and no reduced risk. *See Dairy Farmers*, 80 F. Supp. 3d at 848 ("One

proxy for assessing risk is whether the litigation followed on the heels of some prior criminal or civil proceeding involving the same parties or subject matter."). Class counsel did not start with favorable field position; they had to carry the ball the entire length of the field.

### b.   Other risks

Class counsel accepted many other risks that also support a one-third award.

*Antitrust case on contingent basis*. Class counsel "took this case on a contingent basis, meaning that there was a strong risk that they would not be paid." *Linnear v. Illinicare Health Plan, Inc.*, 2019 WL 13072750, at *3 (N.D. Ill. Dec. 17, 2019). All contingency cases involve some degree of risk, but antitrust cases are especially risky. *See Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 355 (7th Cir. 1990) ("We have observed before that 'antitrust cases are notoriously extended.'"); *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1169 n.9 (2d Cir. 1979) ("antitrust cases are notoriously lengthy and tortuously complex."); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) ("An antitrust class action is arguably the most complex action to prosecute . . . . The legal and factual issues involved are always numerous and uncertain in outcome.").

*Novel theory*. The application of antitrust laws to the industries and markets here was novel. *See Meriter Health*, 2015 WL 13546111, at *5 ("class counsel faced a fairly significant risk of nonpayment given . . . the novel character of some of plaintiffs' legal claims"). Nobody had ever sued CDK before for antitrust violations. In addition to developing the facts, class counsel also had to fit them into plausible legal theories. This is unlike many class actions that repeat the same theories from case to case. *Cf. Chen v. Select Income REIT*, 2019 WL 6139014, at *17 (S.D.N.Y. Oct. 11, 2019) ("This is a simple and straightforward securities putative class action that does not involve any novel or difficult questions and requires only a basic level of skill and not significant time and labor to perform the legal services properly.").

*Uncertain claims*. Prevailing on the pleaded claims was not a given. That is shown both by the Seventh Circuit's skeptical decision and by the fact that only one claim – the conspiracy claim – remained for trial after motions practice. A key risk therefore was whether class counsel could prove a conspiracy, which is almost always (absent a confession) a difficult challenge. *See In re Packaged Ice Antitrust Litig.*, 322 F.R.D. 276, 292 (E.D. Mich. 2017) ("an antitrust litigation of this scope has great complexity and undeniable inherent risks, such as . . . whether the conspiracy as alleged in the Complaint can be established"); *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 599 (S.D.N.Y. 1989) ("The frequent difficulty of proving a conspiracy needs no extended comment."). CDK and Reynolds vehemently denied (and continue to deny) that they conspired, and submitted voluminous evidence at summary judgment to suggest they did not. *See* MDL Dkt. 1381, at 50-60. The jury could have credited CDK's explanation that it closed its system unilaterally for data security purposes; as the MDL court stated in its summary judgment ruling, "[t]here is no dispute that data security is important to the automotive industry, including dealers and data integrators." *Id.* at 21. All the more so as data breaches have become "increasingly common in our digitized world," *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 297 (2d Cir. 2021), and companies have made legitimate efforts to secure the data on their networks – just as CDK did here. From the start, class counsel knew that CDK's data security defense would pose a risk.

*Particularly complex issues*. It is axiomatic that "antitrust claims are especially complex, expensive, and difficult to prosecute," *Burnett v. Nat'l Ass'n of Realtors*, 2024 WL 2842222, at *16 (W.D. Mo. May 9, 2024), but this one was unusually so. The Court need look no further than the MDL court's 106-page *Daubert* and 126-page summary judgment opinions. *See* MDL Dkt. 1321 (*Daubert* opinion); MDL Dkt. 1381 at 61 (summary judgment opinion) (describing the

antitrust standing and injury issues as "thorny" because of the interplay of the antitrust laws with the federal Computer Fraud and Abuse Act and the Digital Millenium Copyright Act).

*Class certification.* Class counsel and AutoLoop had the added risk of satisfying Rule 23's demanding standards for class certification. *See Linnear*, 2019 WL 13072750, at *3 (noting in fee award that "Plaintiff's Counsel also faced significant legal hurdles in establishing certification"). CDK had credible arguments against class certification – including that vendors use different types of data integration, with some vendors needing only simple extract on a weekly basis and others needing real-time bi-directional access. *See* MDL Dkt. 1457 (CDK class certification opposition). If CDK had defeated class certification, that would have destroyed the value of this case. The Dealer Class, notably, did not take the risk of going all the way to class certification; it settled before the MDL court ruled. If after discovery and summary judgment the Dealer Class would not roll the dice, that is a strong indication of how much more uncertain class certification was at the start of the case.

In its preliminary approval order, the Court stated that the case may not have been "especially risky . . . after the case proceeded past major hurdles, such as summary judgment and class certification." Dkt. 253, at 7. But again, the "analysis should be based on the risk that existed when the litigation began – not at the time of settlement," *Stericycle*, 35 F.4th at 565 – or, by the same logic, after summary judgment and class certification. At the beginning of the case, surviving summary judgment and clearing the hurdles of class certification were far from certain. And "even after preliminary victories were achieved," "as in any antitrust case, this one present[ed] substantial risks of non-recovery." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006). Those risks included prevailing on liability and proving damages at trial. *See* Dkt. 253,

- 50 -

at 2 (There "is no guarantee that the class would have prevailed at trial, or, if it did, that the jury would have agreed with Loop's damages calculations.").

*Only CDK.*  AutoLoop sued only CDK on behalf of the Vendor Class because Reynolds – CDK's alleged co-conspirator – had enforceable arbitration agreements with class members.  This increased the risk substantially because the class could not settle with one defendant to lock in a recovery and to gain leverage against the others, like plaintiffs often do in conspiracy cases.  *See*, *e.g.*, *In re Urethane Antitrust Litig.*, 2016 WL 4060156, at *1 (D. Kan. July 29, 2016) ("During the course of the litigation, plaintiffs reached settlements with the other [alleged co-conspirators] for amounts totaling $139,300,000.").  Unlike with the Dealer Class, which settled early with Reynolds for $29.5 million, the Vendor Class had all of its eggs in the CDK basket.

*Top-flight defense counsel.*  CDK hired two of the most well-respected defense firms in the world – Mayer Brown and Kirkland & Ellis – to defend it against AutoLoop's claims.  The skill and resources of these two firms increased the risk substantially.  *See TikTok*, 617 F. Supp. 3d at 942 ("[T]he quality of representation Defendants had for their defense supports the fee request as well . . . .  That Class Counsel were able to secure a favorable settlement in the face of this opposition weighs in favor of a one-third fee.").

*Kellogg Hansen litigated alone.*  Kellogg Hansen largely litigated this case alone and took all of the risk.  Godrey & Kahn and Prof. Issacharoff provided invaluable help, but their hours make up less than 1% of the total lodestar.  *See infra* p. 63 n.18.  In most cases, class counsel spread the risk across multiple firms.  For example, the Dealer Class was represented by fifteen different law firms that all contributed to the lodestar, which spread the risk.  MDL Dkt. 1538-3, at 2.  Here, a single 100-lawyer firm took nearly all the risk.

*Large investment.*  Class counsel's investment in this case was $66.5 million in lodestar and $12.3 million in out-of-pocket expenses, totaling nearly $80 million.  *See infra* pp. 63, 76-77. Over a seven-year period, class counsel essentially loaned this $80 million to the Vendor Class at no expense, and it was all at risk.  Had there been no recovery, every penny of that large investment would have been lost.

*Expert testimony.*  In his report, Prof. Rubenstein discusses the foregoing, and more, to highlight the magnitude of risk that class counsel faced.  *See* Rubenstein Decl. ¶ 42.  "While such [expert] evidence is not required, it can be useful to a district court that is attempting to estimate the *ex ante* risk of the litigation."  *Stericycle*, 35 F.4th at 565-66.  The Seventh Circuit has cited with approval a district court's reliance on "expert testimony about value generated by counsel in concluding that unique circumstances of case merited higher-than-average fee award."  *Id*.  The Court should rely on Prof. Rubenstein's expert report and do the same here.  *See* Rubenstein Decl. ¶ 2 ("[T]he risks Class Counsel took and the results they achieved are extraordinary.").

*Other considerations.*  In its preliminary approval order, the Court observed that "more than half of antitrust cases are resolved through settlement," and "[c]lass counsel do not identify any reasons to believe that settlement was less likely in this case."  Dkt. 253, at 7.  That many antitrust cases settle does not show that they are low-risk.  Many settlements reflect failure, not success.  There was no indication in early 2018 – the proper time period for this consideration – that this case would coast to a settlement.  To the contrary, CDK had not settled with any party (neither had Reynolds).  Instead, CDK had dug in its heels, sought consolidation in an MDL, and was gearing up for a long fight.  And even considered in hindsight, it took seven years of litigation, an $80 million dollar investment by class counsel, three rounds of discovery and expert reports, and so much more before CDK finally settled right before trial.

The reality is that class counsel took a huge bet at massive risk – and that willingness to invest in an uncertain but promising antitrust claim paid off in a big way for the Vendor Class. "At its best, this consideration" of the risk of nonpayment "incentivizes attorneys to accept and (wholeheartedly) prosecute the seemingly too-big-to-litigate wrongs hidden within the esoteric recesses of the law, ensuring that the attorneys are compensated for their work at the end of the day (or, as is the case here, at the end of the six-year dispute)." *Dairy Farmers*, 80 F. Supp. 3d at 848. That was the incentive class counsel responded to, and they delivered. A one-third award, as is common in antitrust cases, is therefore more than merited for being willing to take that risk on behalf of the Vendor Class. *See Burnett*, 2024 WL 2842222, at *16 ("[C]ourts have recognized that antitrust settlements should result in attorneys' fees equal to one-third of the fund.").

### 2.    Information from Other Cases

"Information from other cases," *Rohm & Haas*, 658 F.3d at 635-36, further confirms that one-third is the market rate for this antitrust class action. That information includes: (1) the 33% fee that Chief Judge Pallmeyer awarded to dealer class counsel in this litigation; (2) case law in this circuit on the market rate for antitrust actions; and (3) awards in other large-fund cases.

### a.    The 33% award to dealer class counsel in this litigation

Chief Judge Pallmeyer recently awarded dealer class counsel 33% of the "combined $100 million CDK Settlement Fund and $29.5 million Reynolds Settlement Fund," for a total award of $42.735 million. *See* MDL Dkt. 1545, at 8. Unlike the request here, the award was for 33% of the *gross* settlement, which equals 35% of the *net* settlement after deducting expenses. *See id*. Comparing apples to apples, class counsel here seeks a smaller fee percentage than dealer counsel received. The MDL court held that this award was "reasonable under Rule 23 . . . based, inter alia, on the amount of work performed in this case, the recoveries obtained and the risks involved." *Id*.

Like this Court, the MDL court's task was "to assign fees in accord with a hypothetical *ex ante* bargain," *see Rohm & Haas*, 658 F.3d at 636, and if that bargain was 33% gross (35% net) for dealer class counsel, it should be at least that amount for vendor class counsel.  Both cases involved the same claims, same defendant, same facts, same defenses, and were in the same MDL. If anything, because Kellogg Hansen developed the facts and theories for the claims, it would have been able to command a premium for its services, above what dealer class counsel could have negotiated *ex ante*.  *See supra* pp. 7-8 (noting how dealer counsel cut-and-pasted from Kellogg Hansen's complaints).  Moreover, as explained above, the Dealer Class had two defendants from which to recover (CDK and Reynolds); while the Vendor Class had only one (CDK).  If the risk profile for the Dealer Class would have resulted in a 33% negotiated bargain at the outset of the case, then the same must be true for the Vendor Class.  There is no basis to conclude that dealer class counsel would have been able to negotiate a higher *ex ante* bargain than vendor class counsel because of any differences between the cases.

In its preliminary approval order, the Court said the dealer fee award provided "limited guidance" because of the lack of reasoning and because the absolute amount of the fee award ($42.735 million) is a "fraction of the fees that class counsel" seeks here.  Dkt. 253, at 4-5.  As to the first point, the absence of extensive reasoning does not sap the award of significance as another market data point supporting one-third as the prevailing rate for class counsel's services in a nearly identical case.  As to the second point, the absolute amount of fees (which is known only *ex post*) is a function of the superior result achieved by class counsel here, not because of any fact that could be relevant to what would have been negotiated *ex ante*.  As explained above, it is contrary to Seventh Circuit precedent and unsound in principle to reduce the percentage for "megafund" cases merely because the settlement is large (and therefore so is the amount of fees).  Rather, the

proper way to assess whether the percentage results in an unreasonable fee award in absolute terms is to perform a lodestar cross-check, which in this case results in a reasonable multiplier of 3.09. *See infra* pp. 66-69.

If the Proposed Settlement is approved, vendor class counsel will have achieved a better result for the Vendor Class than dealer class counsel achieved for the Dealer Class along every possible metric. The table below shows the comparison. *See* Nemelka Decl. ¶ 59 (providing citations).

**Table 2**

| Metric | Dealer Class | Vendor Class |
|---|---|---|
| Gross Settlement | $129,500,000 | $630,000,000 |
| Expenses | $7,192,133 | $12,358,238 |
| Expenses as % of Fund | 5.55% | 1.96% |
| Service Award | $230,000 | $250,000 |
| Service Award as % of Fund | 0.18% | 0.04% |
| Net Settlement | $121,847,867 | $617,191,762 |
| Fee Award | $42,735,000 | $205,730,587 |
| Gross Fee % | 33.00% | 32.66% |
| Net Fee % | 35.07% | 33.33% |
| Class Benefit | $79,112,867 | $411,461,175 |
| Claimed Damages | ██████████ | $490,426,137 |
| % of Claimed Damages Distributed to the Class | ████████ | 83.90% |
| Total Class Members | 25,235 | 243 |
| Average Payment Per Class Member | $3,123.90 | $1,693,255.86 |

In short, not only would it be inequitable for dealer class counsel to receive a higher net percentage of the settlement fund (35%) than vendor class counsel's requested one-third – notwithstanding the far superior result achieved here – but it is contrary to any rational application of the hypothetical *ex ante* bargaining that would have occurred.

> b.  Case law in this Circuit on the **ex ante** *market rate for antitrust class actions*

The contingency percentages in the actual fee contracts in this case accord with the prevailing *ex ante* market rates for antitrust class actions.  "The sought fee of one-third of the Settlement Fund is within the ordinary range of contingency fee arrangements actually negotiated *ex ante* between parties, and awarded, in complex antitrust actions."  *Corzo*, 2024 WL 3506498, at *7 (granting class counsel one-third of a $284 million settlement).  The Court stated in its preliminary approval order that *Corzo* "is not helpful" because the lodestar multiplier there was 1.35, Dkt. 253, at 7 – an issue addressed below.  But for purposes of determining the *ex ante* market rate for antitrust class actions, it is directly on point and in line with established authority.  *See*, *e.g.*, *Standard Iron Works*, 2014 WL 7781572, at *1 (finding "33% fee [of $163.9 million] comports with the prevailing market rate" based upon "data provided by Class Counsel concerning market rates," among other things).

Even leaving aside complex antitrust class actions, the "typical contingency agreement in this circuit might range from 33% to 40% of recovery."  *CS Wang & Assoc. v. Wells Fargo Bank, N.A.*, No. 16-11223, Dkt. 654, at 7-8 (N.D. Ill. Dec. 2, 2021) (citing cases); *see Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (one-third to 40 percent is "customary") (citing cases).  In *Young v. County of Cook*, for example, the district court found that "a 33% contingent fee of the total recovery is on the low end of what is typically negotiated *ex ante* by plaintiffs' firms taking on large, complex cases."  2017 WL 4164238, at *4-6 (N.D. Ill. Sept. 20, 2017) (granting 33 percent of $55 million settlement, relying in substantial part on a declaration from prominent plaintiff-side firm Susman Godfrey that "the market rate for plaintiffs' contingency litigation in large commercial cases . . . ranges from a low of 33% to a high of 49%").  And in *Hale*, the court awarded one-third of a $250 million settlement in reliance on

"significant evidence" that "sophisticated clients and sophisticated class representatives regularly agree to pay 33.33% or more in risky, complex litigation, even when potential rewards are very large." 2018 WL 6606079, at *8.[16]

### c.    Fee awards in other cases

In addition to one-third being what is regularly negotiated *ex ante*, "[c]ourts within the Seventh Circuit, and elsewhere, regularly award percentages of 33.33% or higher to counsel in class action litigation." *Hale*, 2018 WL 6606079, at *10; *see also Chambers*, 2021 WL 1948452, at *2 ("a one-third fee is common throughout district courts in the Seventh Circuit") (citing authorities); *Briggs*, 2016 WL 7018566, at *4 ("Courts routinely hold that one-third of a common fund is an appropriate attorneys' fees award in class action settlement.").

These statements by courts in this circuit are borne out by statistical analysis. Prof. Rubenstein compared the requested "flat 33.33% award to empirical evidence concerning (a) awards in standard retainer agreements, (b) class action fee awards in the Seventh Circuit, and (c) class action fee awards in cases throughout the country progressing to trial" and concluded that these all "support[] [its] reasonableness." Rubenstein Decl. ¶ 25.

This is no ordinary case, though. It is a huge recovery for the class – $630 million. The requested fee of one-third of the net fund – $205 million – is therefore also large. In such situations, courts have still found a one-third fee reasonable if merited by the risks counsel took and results they achieved for the class (setting aside the conclusive *ex ante* market evidence that exists here). *See*, *e.g.*, *Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (awarding one-third fee from a $835

---

[16] *See also*, *e.g.*, *Chambers*, 2021 WL 1948452, at *2 (one-third is the "normal rate of compensation in the market"); *Briggs*, 2016 WL 7018566, at *4 (St. Eve, J.) ("Named Plaintiffs contracted for Plaintiffs' Counsel to be compensated with" one-third fee.); *City of Greenville*, 904 F. Supp. 2d at 908 (for $105 million settlement, "sophisticated plaintiffs . . . concluded a one-third contingency fee with advanced costs was in their best financial interests").

million recovery, with a lodestar multiplier of 3.2); *Rogowski v. State Farm Life Ins. Co.*, 2023 WL 5125113, at *5 & n.8 (W.D. Mo. Apr. 18, 2023) (awarding one-third fee from a $325 million recovery, with a lodestar multiplier of 5.75); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340, Dkt. 530-1, at 1-2, Dkt. 543, at 9-10 (D. Del. Apr. 23, 2009) (awarding one-third award fee from a $250 million recovery, with a lodestar multiplier of 3.93); *Allapattah Servs.*, 454 F. Supp. 2d at 1204-18 (awarding 31.33 percent fee from a $1.06 billion recovery, with a lodestar multiplier well in excess of four); *Standard Iron Works*, 2014 WL 7781572, at *1-2 (awarding one-third fee from a $163.9 million recovery, with a 1.97 multiplier); *First Impressions Salon Inc. v. Nat'l Milk Producers Fed.*, No. 13-454, Dkt. 540, Dkt. 531, at 16 (S.D. Ill. Apr. 27, 2020) (awarding a one-third fee from a $220 million recovery, with a lodestar multiplier of 2.6); *Kleen Prods.*, 2017 WL 5247928, at *4-5 (awarding a 30 percent fee from a $354 million recovery, with a lodestar multiplier of 1.1).[17]

In any event, as Prof. Rubenstein explains, comparing percentages across cases is not as helpful as a lodestar cross-check, which is the only data point that "enables an assessment of

---

[17] *See also In re Capacitors Antitrust Litig.*, 2023 WL 2396782, at *1-2 (N.D. Cal. Mar. 6, 2023) (awarding a 31.01 percent of $604.5 million recovery, with a lodestar multiplier of 1.81); *Hale*, 2018 WL 6606079, at *8-14 (awarding one-third of $250 million with a 2.83 lodestar multiplier); *In re TFT-LCD [Direct Purchaser] Antitrust Litig.*, 2011 WL 7575003, at *1 (N.D. Cal. Dec. 27, 2011) (awarding a 30 percent fee from a $405 recovery, with a lodestar multiplier of 1.25); *In re TFT-LCD [Indirect Purchaser] Antitrust Litig.*, 2013 WL 1365900, at *7-8 & n.11 (N.D. Cal. Apr. 3, 2013) (awarding a 28.6 percent fee from a $1.08 billion recovery, with a lodestar multiplier of 2.4 to 2.6); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 747-51 (E.D. Pa. 2013) (awarding a one-third fee from a $150 million recovery, with a 2.99 multiplier); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding a one-third fee from a $163.5 million recovery, with a lodestar multiplier of 2.39, available at No. 10-318, Dkt. 546-1, at 28); *Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1366-67 (awarding a 30 percent fee from a $410 million recovery and noting "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements"); *Dahl v. Bain Cap. Partners, LLC*, No. 07-12388, Dkt. 1051, Dkt. 1052, at 6, 12, 15-16, Dkt. 1095 (D. Mass. Nov. 13, 2014) (awarding a 33 percent fee from a $590.5 recovery, with a lodestar multiplier of 2.43); *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10, *14 (D.D.C. July 16, 2001) (awarding a 33.7 percent fee from a $365 million recovery); *In re U.S. Foodservice, Inc. Pricing Litig.*, No. 07-894, Dkt. 521, at 7 (D. Conn. Dec. 9, 2014) (awarding a one-third fee from a $297 million recovering, with a lodestar multiplier of 2.23).

whether that profit is disproportionate to the risks counsel took and the results they achieved for the class." Rubenstein Decl. ¶ 25. As explained below, the 3.09 lodestar multiplier here is reasonable and shows a one-third award would not result in a windfall. *See infra* pp. 66-69.

### 3.    Amount of Work Required

"[T]he amount of work necessary to resolve the litigation," *Synthroid I*, 264 F.3d at 721, also supports a one-third fee. "All other things being equal, a case that settled before the motion-to-dismiss stage, for instance, would be expected to result in a lower fee than a case that proceeded all the way to trial or beyond." *Stericycle*, 35 F.4th at 566.

There is no need to describe again all the work performed by class counsel from inception to trial over a seven-year period. And no one judge has had a full view of class counsel's work; this case was handled by four separate judges at different stages. *See supra* pp 9-12. Suffice it to say that this case did not involve a quick settlement after a motion to dismiss ruling or even summary judgment, as many class actions do. Instead, it took class counsel 63,479 hours of work to take this case to the brink of trial. *See infra* pp. 61-65.

The Court's preliminary approval order cites *In re Spectrum Brands Securities Litigation* as an example of a case where a lower fee percentage (15%) was approved. *See* Dkt. 253, at 5. But *Spectrum* was a cookie-cutter stock-drop suit that settled for $39 million before the motion to dismiss was decided and where the only discovery was a voluntary production of "nearly 2,000 pages." Dkt. 45, at 5, No. 19-347 (W.D. Wis. Aug. 10, 2020). That is the type of class action settlement where a lower fee percentage may be appropriate because of the early stage at which the case resolved. That situation bears no resemblance to this one – where class counsel battled through a motion to dismiss, discovery, *Daubert*, summary judgment, class certification, and pretrial proceedings – and therefore provides little guidance.

### 4.    Quality of Representation

Courts consider the "quality of representation" when assessing "available market evidence." *Rohm & Haas*, 658 F.3d at 636.  After all, "[q]uality varies among lawyers, and awards net of fees could rise with the level of fees if a higher payment attracts the best counsel." *Synthroid I*, 264 F.3d at 720.  Here, that consideration further supports a one-third fee as the market rate that would have been bargained for *ex ante*.

Kellogg Hansen has successfully litigated some of the largest and most complex antitrust cases in the country.  It has secured the largest and second largest verdicts ever under the U.S. antitrust laws – $1.3 billion in *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002), and $1.2 billion in *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014).  It has also briefed, argued, and *won* almost every major antitrust case to come before the Supreme Court in the past two decades, including *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009); *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013); *Ohio v. American Express Co.*, 585 U.S. 529 (2018); and *Apple Inc. v. Pepper*, 587 U.S. 273 (2019).  Apart from these leading plaintiffs-side and Supreme Court cases, Kellogg Hansen also represents defendants in high stakes antitrust matters, including serving as lead trial counsel for Meta Platforms, Inc. in the just-concluded United States Federal Trade Commission lawsuit against the company before Chief Judge Boasberg.  *See* Nemelka Decl. ¶ 4.

Few firms can match class counsel's ability to both prosecute the largest plaintiff-side antitrust cases at the trial level and defend them on appeal to the Supreme Court.  Even fewer bring the additional experience gained from defending companies in consequential antitrust actions brought by government agencies and private plaintiffs.  The firm can therefore command

consistently high contingency percentages in its engagements, *see supra* pp. 35-37, just as it did in this case, *see supra* at pp. 33-34.

### F.     A Lodestar Cross-Check Confirms That a One-Third Attorney Fee Award Is Reasonable

The Seventh Circuit does not require a lodestar cross-check, *Rohm & Haas*, 658 F.3d at 636 ("consideration of a lodestar check is not an issue of required methodology"), but many courts within the circuit – including this Court – do it as a safeguard against awarding windfalls to class counsel at the expense of class members. *See Allen v. Lanier, Inc.*, 2023 WL 3529512, at *4 (W.D. Wis. May 18, 2023) (Peterson, J.) ("Although counsel is relying on the percentage-of-recovery method to justify their fee request, this court requires a lodestar cross check, as it is entitled to do."); *see also* Standard Attachments for Civil Cases Assigned to Judge Peterson at 39 (Attorney Fees).

The cross-check confirms that class counsel's requested fees are reasonable and would not result in a windfall. Class counsel's lodestar is $66.47 million. This means that counsel's one-third fee request ($205.73 million) is 3.09 times its lodestar. As the Court noted in its preliminary approval order, "[m]ultipliers anywhere between one and four . . . have been approved," with a multiplier above four "quite rare." Dkt. 253, at 7 (quoting *Harman v. Lyphomed, Inc*., 945 F.2d 969, 976 (7th Cir. 1991)). Thus, as Prof. Rubenstein opines, the "lodestar cross-check here reveals a multiplier that is entirely normal for this size settlement, while the risks Class Counsel took and the results they achieved are extraordinary." *See* Rubenstein Decl. ¶ 2.

#### 1.     The Lodestar Was Calculated Using a Reasonable Method and Contemporaneous Time Records

Class counsel has meticulously maintained billing records to support its $66,474,455 lodestar. From the outset of this litigation, class counsel has maintained separate matter numbers for each of its engagements:  one for MVSC, one for Authenticom, one for Cox Automotive, and

one for AutoLoop.  Nemelka Decl. ¶ 72; Taylor Decl. ¶ 4.  Class counsel also maintained a separate matter number for time spent working on behalf of AutoLoop that also benefitted the firm's other clients in the MDL proceedings, referred to as the "AutoLoop Common Benefit" matter number. Nemelka Decl. ¶ 72.  Examples of this kind of work include offensive discovery (both document and deposition) of CDK and Reynolds; most third-party discovery; most of the summary judgment briefing; and substantial expert work.  *Id*. ¶ 74.

Kellogg Hansen uses a software program called Aderant for time entry and billing purposes.  *See* Taylor Decl. ¶ 3.  Every month from the inception of this litigation, Kellogg Hansen attorneys and staff have entered their time into Aderant.  *Id*.  Each time entry includes the matter number, the name of the attorney or staff member who performed the work, a description of the work, and the amount of time.  *Id*.  Consistent with best practices, timekeepers were required to track and enter the time spent on each specific task for each day's time entry.  *Id*.  This far exceeds the rigor of the timekeeping methods approved in similar cases.  *See*, *e.g.*, *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2023 WL11820531, at *3 (N.D. Cal. Dec. 18, 2023) (approving $76.5 million fee request despite "lack of detailed billing summaries").

Class counsel's lodestar includes only time entries for the AutoLoop-specific matter number and the AutoLoop Common Benefit matter number.  *See* Nemelka Decl. ¶ 79.  Class counsel *categorically excluded* all hours billed for its other clients MVSC, Authenticom, and Cox Automotive.  *See id*.  Class counsel also performed a line-by-line audit of the time entries included in its lodestar – an endeavor that took over a month – to ensure that it included only work on behalf of AutoLoop.  *Id*. ¶¶ 81-82.  If a time entry appeared to benefit one of class counsel's other clients but not AutoLoop, then it was removed.  *Id*. ¶ 81.  Class counsel also did not include any time spent on this fee application in its lodestar (but it did include time spent on final approval, which

- 62 -

benefits the class).  *Id.* ¶ 83.  For reference, Kellogg Hansen has excluded 43,104 hours – worth $49,686,105 million – from its lodestar to ensure that no time was incorrectly attributed to work for the Vendor Class.  *See id.* ¶¶ 79, 81.  For the AutoLoop Common Benefit matter number, that time begins in January 2018 after AutoLoop hired Kellogg Hansen in December 2017 to pursue this case.  *Id.* ¶ 26.

After this careful accounting, class counsel affirms that it spent 63,479 hours working on behalf of the Vendor Class.  Multiplying those hours by each timekeeper's customary rates results in a lodestar of $66,474,455 and a 3.09 multiplier.  Exhibit F contains every time entry included in the lodestar.  Exhibit F-1 is for the AutoLoop-only matter number ($30,162,090.75 total), and Exhibit F-2 is for the AutoLoop Common Benefit matter number ($36,312,364.25 total).  *Id.* ¶ 79. Class counsel has filed these exhibits under seal (in part) to preserve the attorney-client and work-product protections for the information in the work description column.  If any class member wishes to review these records, class counsel will work with them individually, and can also provide a sortable Excel spreadsheet to class members or to the Court, if requested.  *Id.*[18]

Class counsel's lodestar is significantly higher than the "conservative estimate" set forth in the preliminary approval motion, which means that the multiplier is correspondingly lower.  *See* Dkt. 248, at 15 ("Class Counsel have not conducted a definitive review of their time records, but their conservative estimate of lodestar fees at current rates totals more than $40 million.").  That

---

[18] Class counsel's lodestar also includes Prof. Issacharoff's hours spent on behalf of the Vendor Class (they comprise 0.8% of the total).  *See* Nemelka Decl. ¶ 84.  Godfrey & Kahn was not appointed as class counsel, but from the start, Kellogg Hansen has paid its monthly bills for AutoLoop out-of-pocket. *Id.*  Godrey & Kahn's hours are therefore part of the risk class counsel undertook and are included in the lodestar (they comprise 0.2% of the total).  *Id.*  Godfrey & Kahn made material contributions to the case and was going to play a substantial role at trial.  *Id.* ¶ 55.  Kellogg Hansen is not seeking reimbursement of its payment of Godfrey & Kahn's bills, but instead – as is typical – will further compensate the firm and Prof. Issacharoff from the Court's fee award.  *See* MDL Dkt. 1545, at 8-9 (lead counsel has discretion in how to compensate co-counsel).

discrepancy is due, in large part, to an administrative error that Kellogg Hansen discovered after the filing of the preliminary approval motion. Shortly after the parties reached a settlement in January, Kellogg Hansen's administrator, Lynn Taylor, generated an Excel spreadsheet with the time entries for the AutoLoop-specific and the AutoLoop Common Benefit matter numbers. Taylor Decl. ¶ 5. "Due to an inadvertent mistake, [Ms. Taylor] failed to export the AutoLoop Common Benefit time entries from April 2018 to May 2019. As a result, the Excel spreadsheet used to provide the initial lodestar estimate in the preliminary approval motion was missing a total of 20,524.6 hours of work worth $19,598,206.50 in current rates." *Id*. The missing time was for one of the busiest periods in the case: document and deposition discovery. Nemelka Decl. ¶ 34.

The Honorable Tom Scott – a former federal judge, U.S. Attorney, and longtime complex litigation practitioner – reviewed in detail the time entries included in the lodestar and concluded that class counsel "followed timekeeping best practices throughout the entire, multi-year duration of this litigation." Scott Decl. ¶ 75. He confirmed that counsel "used task billing, not block billing; provided detailed descriptions of every task in which they engaged; and diligently omitted from their timesheets all time spent on work benefitting solely other matters in the MDL." *Id.* ¶ 87.

Finally, as Prof. Rubenstein notes, discounting the AutoLoop Common Benefit time because it also benefited other plaintiffs "is unwarranted for a simple reason: [c]lass [c]ounsel did no common benefit work that they would not have done for this class if it were the only client." Rubenstein Decl. ¶ 31. "[T]hat this work benefited some individual plaintiffs in addition to the class in no way diminishes its usefulness to the class," and "is accordingly attributable to the 'public good' nature of MDL work, not to anything specific to [the] individual clients that would warrant a discount here." *Id*. Relatedly, class counsel has already excluded the hours for its other clients from the lodestar calculation; the lodestar therefore includes only that work that benefited

the Vendor Class.  *See supra* pp. 62-63.  Finally, as noted by Prof. Rubenstein, an attempt at perfect precision by discounting some small percentage of the common time is unwarranted because "the lodestar here is not the basis of the award, but merely a back-of-the-envelope guardrail against a windfall."  Rubenstein Decl. ¶ 31; *see also Newberg and Rubenstein on Class Actions* § 15:86 n.13 (noting that the "lodestar cross-check calculation need entail neither mathematical precision nor bean-counting") (citing additional authorities).[19]

### 2.        The 3.09 Lodestar Multiplier Is Reasonable

The lodestar cross-check – which results in a 3.09 multiplier – confirms that class counsel's requested fees are reasonable and would not result in a windfall.  There is no hard-and-fast rule for what multipliers are reasonable, but "multipliers anywhere between one and four . . . have been approved."  Dkt. 253, at 7 (quoting *Harman*, 945 F.2d at 976).  This is borne out by statistical analysis.  As Prof. Rubenstein shows, in "the five studies with pertinent data," "the average lodestar multiplier ranged from 1.42 to 3.89."  Rubenstein Decl. ¶ 33.

The same empirical studies "also show that multipliers tend to rise as the size of the class's fund increases," and "the average lodestar multiplier in cases with common funds comparable to the size of the relief" in this case "is 3.20."  *Id.* ¶ 35.  "The 3-level multiplier sought here," Prof. Rubenstein concludes, "is accordingly fully consistent with the *average* multiplier in comparably

---

[19] If the Court were inclined to discount some of the AutoLoop Common Benefit time because it also helped other clients, then class counsel respectfully suggests that a 20% discount is the maximum that would be appropriate.  The common work predominantly benefited the Vendor Class, given the relative magnitude of class-wide damages and its need to establish a record that could satisfy Rule 23's commonality and predominance requirements.  And the Vendor Class relied on that common work – almost all of it from fact and expert discovery – to a much greater extent than Cox Automotive or Authenticom, both of which settled with CDK before summary judgment was decided.  If the Court were to discount the AutoLoop Common Benefit time by 20%, that would still result in a lodestar of $59,211,982, and a multiplier of 3.47 – still comfortably within the range of lodestars that have been approved.  *See infra* pp. 65-69.

sized settlements." *Id*. ¶ 36.[20]  Prof. Rubenstein attached to his declaration a list of more than 130

cases "with multipliers over 3,"[21] which is not meant to be "exhaustive or representative of all

multipliers," but it shows "that courts approve percentage awards that embody multipliers well

above the multiplier sought here in appropriate circumstances." *Id*. ¶ 37.

Against that background, class counsel's work and the risk undertaken in this case justify

the requested multiplier.  As summarized above, the risk at the inception of this case was significant

for many reasons:  (1) there was no prior government or private action and class counsel developed

the facts and legal theories on its own; (2) the merits of the claims were not a given, especially in

light of the Seventh Circuit's decision, and as proven by the fact that only one claim remained for

trial (all others had been dismissed); (3) the application of the antitrust laws to the car dealership

enterprise software and data integration industries required novel theories; (4) while most antitrust

cases are complex, this case was unusually so; (5) class certification under Rule 23 is difficult and

uncertain, and CDK had strong arguments against it, which if successful, would have destroyed

the value of the case; (6) class counsel sued only CDK on behalf of the Vendor Class, and so there

was no settlement to be had with a co-conspirator; (7) because of the stakes, CDK hired two of the

---

[20] Multipliers of three or more are not uncommon in cases with large settlements.  *See*, *e.g.*, *Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (lodestar multiplier of 3.2 for $835 million settlement); *Rogowski*, 2023 WL 5125113, at *5 n.8 (lodestar multiplier of 5.75 for $325 million settlement); *In re Tricor Direct Purchaser Antitrust Litig.*, 05-340, Dkt. 543, at 9-10 (D. Del. Apr. 23, 2009) (lodestar multiplier of 3.93 for $250 million settlement); *Allapattah Servs.*, 454 F. Supp. 2d at 1191, 1204-18 (lodestar multiplier well in excess of four for $1.06 billion settlement); *First Impressions Salon Inc. v. Nat'l Milk Producers Fed.*, No. 13-454, Dkt. 540, Dkt. 531, at 16 (S.D. Ill. Apr. 27, 2020) (lodestar multiplier of 2.6 for $220 million settlement); *Hale*, 2018 WL 6606079, at *8-14 (lodestar multiplier of 2.83 for $250 million settlement); *TFT-LCD [Indirect Purchaser] Antitrust Litig.*, 2013 WL 1365900, at *7-8 n.11 (lodestar multiplier of 2.4 to 2.6 for $1.08 billion settlement); *Flonase Antitrust Litig.*, 951 F. Supp. 2d at 747-51 (lodestar multiplier of 2.99 for $150 million settlement). Indeed, as Prof. Rubenstein observes, "[a]ll of the empirical studies with pertinent data also show that multipliers tend to rise as the size of the class's fund increases."  Rubenstein Decl. ¶ 35.

[21] Based upon Class Counsel's review, of the cases listed in Professor Rubenstein's Exhibit C, more than 40 involve megafund settlements exceeding $100 million.

most capable defense firms in the world; (8) class counsel largely litigated this case alone and took all the risk; and (9) class counsel's investment in this case was immense – nearly $80 million – all of which would have been lost absent a favorable recovery.

Class counsel's willingness to undergo that risk paid off for the Vendor Class. The $630 million settlement results in an average gross award of $2.5 million for the 243 class members. If the Court awards the requested fees here, class members will still receive **84%** of their actual damages. To put this in perspective, members of the Dealer Class received ▉ of their actual damages. *See supra* p. 55. And most large class settlements are for even less. *See* Rubenstein Decl. ¶ 44 ("[T]he median settlement as a percentage of damages in comparably sized securities class actions was 4.2% in 2024 and 4.4% from 2015–2023.").

As Prof. Rubenstein concludes, the preceding qualitative review is "evidence that Class Counsel, a relatively small law firm, took significant risks in investing substantial capital and labor in adversarial litigation without the promise of an easy return on that investment, and Class Counsel shouldered that risk superbly, prevailing at each critical juncture and generating a good return for the class. This contextual review provides strong support for the conclusion that Class Counsel's 3-level multiplier is reasonable." *Id.* ¶ 45.

Critically, the Seventh Circuit has warned district courts not to impose a cap on lodestar multipliers they are willing to approve. In *Rohm & Haas*, the court rejected the argument from an objector "that any percentage fee award exceeding a certain lodestar multiplier is excessive" because it "echoes the 'megafund' cap we rejected in *Synthroid*." 658 F.3d at 636 (noting that "[p]rivate parties would never contract for such an arrangement, because it would eliminate counsel's incentive to press for" a higher settlement) (quoting *Synthroid I*, 264 F.3d at 718). A multiplier of 3.09 is certainly within the range of a reasonable return given the substantial risk

undertaken by counsel. And the results of a lodestar cross-check – which are reasonable here – cannot override the clear *ex ante* evidence of the market rate for class counsel's services here.

That said, the Court has rightly noted that "attorneys' fees don't ride an escalator called risk into the financial stratosphere." Dkt. 253, at 7 (quoting *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014)). But that is not what is happening here, where the lodestar multiplier is well within the norm. The concerns that motivated the Seventh Circuit's statement in *Redman* are not present here. There, a class action settlement provided that each class member "would receive a $10 coupon that it could use at any RadioShack store." *Redman*, 768 F.3d at 628. About 83,000 class members responded, meaning that coupons worth about $830,000 issued. *Id.* Yet the settlement also provided "that RadioShack would pay class counsel $1 million" – more than the entire value of the settlement to the class. *Id.* at 629. After observing this, the Seventh Circuit said that "[t]he ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Id.* at 630. That ratio was $1,000,000 / $1,830,000, "which equates to a contingent fee of 55%." *Id.* It is no surprise that the Seventh Circuit found that a 55% contingent fee for a "meager" settlement could not be justified by vague appeals to risk. *Id.* at 632.

This case is nothing like that. Class counsel will not receive attorney's fees greater than the value of what the class will receive. And the value of the settlement to the class here is anything but "meager" – it will receive more than $411 million collectively, and each member nearly $1.7 million on average. The proposed ratio in this case is ($205,730,587) / ($205,730,587 + $411,461,175) = 33.33%. *Redman* therefore supports class counsel's fee request.

### 3.    Class Counsel's Hours Are Reasonable

The 63,479 hours class counsel spent working on behalf of the Vendor Class are reasonable for a case of this size, length (seven years), and complexity. Courts assess the reasonableness of

hours by checking whether they are "customary and reasonable for cases of [similar] complexity." *Hale*, 2018 WL 6606079, at *13. Courts do not demand "mathematical precision," *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); do not "second-guess [counsel's] litigation tactics," *Freeland v. Unum Life Ins. Co. of Am.*, 2014 WL 988761, at *4 (W.D. Wis. Mar. 13, 2014); and do not "engage in an *ex post facto* determination of whether attorney hours were necessary to the relief obtained," *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).

Mr. Scott's analysis shows class counsel's hours are reasonable in comparison to similar cases. *See* Scott Decl. ¶¶ 65-72. Mr. Scott discusses 13 cases of similar magnitude (between $200 million and $1.5 billion recovered) and length (resolution near or after trial), listed in ascending order of hours in the table below. *See id.* ¶¶ 67-71.

**Table 3**

| Case | Settlement | Hours |
|------|------------|-------|
| *DeLoach v. Phillip Morris Co.*, No. 1:00-cv-01235, 2003 WL 25683496 (M.D.N.C. May 16, 2003); *id.* Dkt. 419, at 2 (Sept. 20, 2004) | $212 million | 38,909 |
| *In re Tricor Direct Purchaser Antitrust Litig.*, 1:05-cv-00340-SLR, 2009 WL 10744518, at *5 (D. Del. Apr. 23, 2009); *id.* at Dkt. 532, at 14 (Mar. 9, 2009) | $250 million | 45,175 |
| *In re CMS Energy Sec. Litig.*, No. 02 CV 72004(GCS), 2007 WL 9611274, at *4 (E.D. Mich. Sept. 6, 2007) | $200 million | 49,315 |
| *Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079, at *13 (S.D. Ill. Dec. 16, 2018) | $250 million | 55,000 |
| ***Loop LLC v. CDK Global, LLC*** | **$630 million** | **63,479** |
| *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 844-45 (E.D. Va. 2016) | $219 million | 66,000 |
| *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 477 (D.N.J. 2008) | $255 million | 71,918 |
| *Negrete v. Allianz Life Ins. Co. of N. Am.*, 2015 WL 12592726, at *14 (C.D. Cal. Mar. 17, 2015) | $251 million | 77,333 |

| Case | Settlement | Hours |
|---|---|---|
| *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) | $326 million | 94,000 |
| *In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744, at *29 (D.N.J. Oct. 1, 2013) | $215 million | 126,177 |
| *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1.06 billion | 140,479 |
| *Williams Sec. Litig.*, No. 4:02-cv-00072 (N.D. Okla. Feb. 12, 2007), Dkt. 1638; *id.* at Dkt. 1599, at 13 (Jan. 12, 2007) | $311 million | 140,483 |
| *Cook v. Rockwell Int'l Corp.*, 2017 WL 5076498, at *2-3 (D. Colo. Apr. 28, 2017) | $375 million | 160,000 |
| *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 312 (1st Cir. 1995) | $220 million | 166,000 |

Because "Class Counsel's total hours here are at the lower end of the range established by these cases," Mr. Scott concluded that those hours were not only reasonable but demonstrated class counsel's "skill and capability" and that class counsel "was scrupulous in recording its hours and has not inflated" them.  Scott Decl. ¶¶ 71-72.

The closest comparison is to the Dealer Class settlement.  There, class counsel spent more hours (69,000) to obtain a far lower settlement, and the district court approved the 33% fee award. *See supra* p. 55.  That dealer class counsel spent more hours litigating the same case – despite drafting off of vendor class counsel's work, *see supra* at pp. 7-8 – speaks to the efficiency of counsel here.  And, of course, "[i]f spending 69,000 hours to achieve a $129.5 million settlement is reasonable, then spending 63,479 hours to achieve a $630 million settlement on the same facts and theories is much more so."  Scott Decl. ¶ 65.

#### 4.     Class Counsel's Rates Are Reasonable

For purposes of deciding which hourly rate to use to calculate the lodestar cross-check, the Seventh Circuit "defines a reasonable hourly rate as one that is derived from the market rate for

the services rendered and presumes that an attorney's actual billing rate for similar litigation is appropriate to use as the market rate." *Averbeck v. Lincoln Nat'l Life Ins. Co.*, 2023 WL 6307414, at *7 (W.D. Wis. Sept. 28, 2023) (Peterson, J.) (quoting *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 640 (7th Cir. 2011)).  Relevant factors in assessing the reasonableness of class counsel's hourly rate therefore include that counsel's billing rates in other cases, *Humphrey v. Navient Sols., Inc.*, 473 F. Supp. 3d 889, 898 (W.D. Wis. 2020) ("the most persuasive evidence of reasonableness is the hourly rate that clients actually pay, both to the counsel in that case and to other lawyers in the relevant market"); the rates charged by other lawyers in the relevant market for the same kind of work, *see id.*; and the defendant's counsel's rates, *e.g.*, *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982).  Here, these factors all show that class counsel's rates here are reasonable.

      **a.**      The hourly rates class counsel used in its lodestar calculation are the same market rates the firm charges its clients who pay bills monthly.  *See* Ex. G; *see Humphrey*, 473 F. Supp. 3d at 898; *K3 Prop, LLC v. GQ Sand, LLC*, 2017 WL 5033659, at *3 (W.D. Wis. Nov. 1, 2017) (accepting, as "evidence of reasonableness," an affidavit from counsel "indicating that these are the normal rates they charge").  The current billing rates for each attorney or staff who contributed to this case are set forth in the accompanying Excel time sheets.  *See* Nemelka Decl. ¶ 92; Ex. F. The hourly rates sought by Kellogg Hansen for the staff and attorneys that worked on this case range from $1,825 to $1,225 for partners; $1,165 for of counsel; $1,110 to $680 for associates; $590 for staff attorneys; and $545 to $475 for paralegals.  *See id.* ¶ 92; Ex. G.  The same is true for the hourly rates of Prof. Issacharoff and Godfrey & Kahn.  *See id.* ¶ 84.

      In antitrust matters like this one, Kellogg Hansen has had several recent fee-paying antitrust cases on behalf of plaintiffs where the firm charged and clients paid its customary hourly rates on

a monthly basis.  *See* Scott Decl. ¶ 34. ██████████████████████████████

████████████████████████     Thus, the hourly rates Kellogg Hansen has submitted

for its lodestar cross-check reflect the firm's "actual billing rate for similar litigation."  *See*

*Averbeck*, 2023 WL 6307414, at *7.

It is also a matter of public record that these are the market rates that class counsel uses for

its clients.  Courts across the country have recently approved Kellogg Hansen's current rates as

reasonable and appropriate.  Six weeks ago, the United States District Court for the Western

District of Kentucky ruled that the 2025 hourly rates for the Kellogg Hansen staff and attorneys

working on a plaintiffs-side case against a health insurer – ranging from $475 for paralegals to

$1,800 for partners – were reasonable and appropriate market rates.  *See United States ex rel. Scott*

*v. Humana, Inc.*, No. 3:18-cv-00061 (W.D. Ky. Apr. 30, 2025).  Last year, a Florida state court

ruled that the 2024 hourly rates for the Kellogg Hansen staff and attorneys working on another

plaintiff-side case – ranging from $450 for paralegals to $1,675 for partners – were reasonable and

appropriate market rates.  *See Emerson v. Florida Dep't of Revenue*, No. 2021-CA-000487 (Fla.

Cir. Ct. Hillsborough Cnty. 2024).  And in 2023, a bankruptcy court in the Southern District of

Indiana ruled that the 2023 hourly rates for the Kellogg Hansen staff and attorneys working in that

case – ranging from $495 for paralegals to $1,850 for partners – were reasonable and appropriate

market rates.  *See In re Aero Techs. LLC*, No. 22-02890 (Bankr. S.D. Ind. 2023).

**b.**     Class counsel's rates are consistent with the prevailing market rates for attorneys of

comparable experience, reputation, and ability.  *See* Scott Decl. ¶ 36.  Because this case involves

a nationwide class action, the relevant market extends to experienced antitrust practitioners

nationwide.  *See*, *e.g.*, *In re Method of Processing Ethanol Byproducts & Related Subsystems*

*('858) Pat. Litig.*, 2022 WL 1402875, at *7 (S.D. Ind. May 3, 2022) (courts award counsel's

customary national rates in complex cases, including MDLs and antitrust cases); *see also* Scott Decl. ¶ 38 (the relevant market for determining the market rate for class counsel is nationwide). That fits with the general principle that courts apply national rates in complex cases, where, as here, it was reasonable for the plaintiff to hire out-of-town specialists. *See, e.g.*, *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 744 (7th Cir. 2003) ("[I]f an out-of-town attorney has a higher hourly rate than local practitioners, district courts should defer to the out-of-town attorney's rate when calculating the lodestar amount" so long as there was good reason to use of out-of-town attorneys).

As summarized above, few firms can match Kellogg Hansen's antitrust experience and success representing both plaintiffs and defendants at trial and on appeal. *See supra* pp. 60-61. Nevertheless, as shown in the Scott Declaration, the rates of other firms that litigate complex antitrust cases (particularly on the plaintiff's side) are consistent with – or even *higher* than – those charged by class counsel here. *See* Scott Decl. ¶¶ 47-48. For example, Susman Godfrey, another leading firm with significant plaintiff's-side antitrust experience, recently submitted a fee petition reflecting 2024 partner rates of up to $2,500 per hour and associate rates of up to $800 per hour.[22] Boies Schiller Flexner recently submitted a fee petition reflecting 2024 partner rates of up to $2,330 per hour and associate rates of up to $920 per hour.[23] Similar rates have been approved by courts in this circuit and nationwide. Exhibit C to the Scott Declaration sets out the court-approved rates of numerous Am Law 50 firms and litigation specialty firms as pulled from public court filings. Approved hourly partners rates at these peer firms can be $2,400 or more, approved associate rates are frequently $1,200 or more, and approved paralegal rates are frequently $550 or

---

[22] *Brown v. Google LLC*, No. 20-3664, Dkt. 1107-21, at 18-20 (N.D. Cal. Apr. 23, 2024).

[23] *Id.* at Dkt. 1107-20, at 21-23.

more.  *Id.*  This demonstrates that "Kellogg Hansen's rates are reasonable and customary in the national market for attorneys who take on complex, plaintiff-side antitrust cases."  Scott Decl. ¶ 48.

      **c.**     The reasonableness of class counsel's rates is further demonstrated by the fact that CDK retained national counsel (Kirkland & Ellis and Mayer Brown) with rates higher than class counsel's.  *See Chrapliwy*, 670 F.2d at 768 n.18 ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case.").  Reuters recently reported that partners at Kirkland & Ellis "bill at $2,675 an hour this year, up from $2,445 in 2024,"[24] – that is almost *$1,000 per hour higher* than class counsel's partner rates.  And the ABA Journal reported two years ago that Kirkland & Ellis was billing associates at rates from "$745 to $1,495 per hour."[25]  Those rates are certainly higher now and already exceeded the rates for class counsel's associates.

     In a significant antitrust case like this, class members were entitled to have counsel with customary rates similar to those (though still lower) charged by defense counsel.  *See Chrapliwy*, 670 F.2d at 768 n.18 ("[W]hen the defendant has hired expensive, out of town counsel, the plaintiffs seem justified in saying that the nature of the case required the skills of out of town specialists" with similar rates.).

      **d.**     Finally, calculating the lodestar based on class counsel's current 2025 rates is the appropriate methodology.  Courts compensate counsel for delays in payment in one of two ways: (1) by using the attorneys' current rates; or (2) by using historical rates plus interest.  Courts in the

---

[24] David Thomas and Mike Scarcella, *More Lawyers Join the $3,000-an-hour Club, As other Firms Close in*, Reuters (Feb. 27, 2025), https://www.reuters.com/legal/legalindustry/3000-an-hour-lawyer-isnt-unicorn-anymore-2025-02-27/.

[25] Debra Cassens Weiss, *This BigLaw Firm Charges Nearly $2,500 Per Hour For Top Billers' Bankruptcy Work*, ABA Journal (Dec. 19, 2023), https://www.abajournal.com/news/article/this-biglaw-firm-charges-nearly-2500-an-hour-for-top-billers-bankruptcy-work#google_vignette.

Seventh Circuit "generally use current rates" to ensure counsel receive fair compensation and to give competent attorneys incentives to litigate multi-year plaintiff-side cases. *Skelton*, 860 F.2d at 255 n.5; *see also Mathur*, 317 F.3d at 745 (holding current rates were "proper rates to use when calculating the lodestar amount"); *Natzke v. PACCAR Inc.*, 2019 WL 1499725, at *1 (E.D. Wis. Apr. 5, 2019) ("applying the current hourly rates to account for the delay in payment is appropriate"); *Zall v. Standard Ins. Co.*, 2023 WL 6388781, at *4 (W.D. Wis. Sept. 29, 2023) (same); *Myatt v. Gladieux*, 2015 WL 6455387, at *2 (N.D. Ind. Oct. 23, 2015) (same). Use of current rates is therefore appropriate considering the length and complexity of this case and the seven-year (and counting) delay in recovery.[26]

## III.    Class Counsel's Requested Expenses Are Reasonable

Class counsel should be reimbursed for the $12,358,238 in unreimbursed expenses that it incurred for the Vendor Class. Rule 23(h) provides that this Court "may award . . . nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Seventh Circuit has explained that courts should allow class counsel to be reimbursed for "what expenses private clients in large class actions . . . pay." *Synthroid I*, 264 F.3d at 722. The appropriate inquiry is whether "the private market would permit" reimbursement of expenses, not whether expenses can be said to be "too high in general." *Id.* Here, reimbursement of litigation expenses is permitted by the Settlement Agreement and Kellogg Hansen's engagement letter with AutoLoop. *See* Dkt. 250-1, ¶ 22; Ex. D; Ex. E.[27]

---

[26] Because of the long duration of the case, some associate members of the team at Kellogg Hansen later became partners at the firm as the case progressed. The lodestar uses the equivalent 2025 associate rates for their hours before they became partner, and their partner rates thereafter. *See* Nemelka Decl. ¶ 89.

[27] Kellogg Hansen's original engagement letter with AutoLoop states that the payment of expert fees would be AutoLoop's responsibility, *see* Ex. D, at 2-3, but in fact the firm paid for all expert fees, Nemelka Decl. ¶ 68.

The expenses for which class counsel seek reimbursement are ordinarily reimbursed by private clients.  As this Court requested in its preliminary approval order, *see* Dkt. 253, at 11, class counsel has submitted details of the expenses for which it seeks reimbursement, including itemized invoice descriptions.  *See* Ex. H; Ex. I.[28]  Class counsel has separated these expenses into categories to aid this Court's review, with the main categories being expert and consultant fees ($11 million); discovery vendors providing review platforms ($533,000); legal research ($276,000); court reporting ($202,000); travel/airfare ($207,000); and Madison, Wisconsin trial office and hotel reservation expenses ($127,000).  *See* Nemelka Decl. ¶¶ 97-99; Ex. H; Ex. I.  "It is well established that [class counsel] are entitled to the reimbursement of litigation costs and expenses," such as "expert witness costs; computerized research; court report[ers]; [and] travel expense."  *Hale*, 2018 WL 6606079, at *14 (cleaned up); *see also* Scott Decl. ¶¶ 103-137 (explaining that these are ordinarily reimbursable expenses).[29]

The expense amounts are also what the "private market would permit."  *Synthroid I*, 264 F.3d at 722.  The $12.3 million in litigation expenses are appropriate given the duration of the litigation (seven years); when it was resolved (eve of trial); and its magnitude ($630 million settlement).  The expenses were 1.96 percent of the total settlement, which is less than the median (three percent) and average (two percent) in cases of similar size and complexity.  *See* Scott Decl. ¶ 105 (citing Center for Litigation and Court, UC Law SF, "2022 Antitrust Annual Report: Class

---

[28] As with its time records, class counsel has submitted its out-of-pocket expenses under seal to preserve attorney-client and work-product protections of the information in the descriptions.  If any class member wants to review these records unredacted, class counsel will work with them individually.  Class counsel can also provide any class member or the Court a sortable Excel spreadsheet, if requested.

[29] While legal research costs are not recoverable as taxable costs under Rule 54(d)(1) and 28 U.S.C. § 1920, *see Averbeck*, 2023 WL 6307414, at *8, they are recoverable as nontaxable costs under Rule 23(h).

Actions in Federal Court" 31-33 (Sept. 2023)).[30]  And class counsel, which paid them out-of-pocket, had every incentive to keep them reasonable.

The amounts for the different categories of expenses are also in accord with what private clients pay in high-stakes antitrust litigation.  The largest expense was expert fees ($11 million) with most paid ($9.6 million) to the Vendor Class's antitrust and damages expert, Dr. Israel, and his economic consulting firm.  *See In re Initial Pub. Offering Sec. Litig.*, 2011 WL 2732563, at *2 (S.D.N.Y. July 8, 2011) (awarding $43 million in expenses – including $20 million for experts from Compass Lexecon, the firm with which Dr. Israel was affiliated).  There is no doubt that private antitrust clients would (and do) pay Dr. Israel's fees.  *See* Dkt. 246-2 (Israel Rep.) (curriculum vitae listing engagements).  As a preeminent antitrust expert, he is in great demand. *Id.*  As the Vendor Class's antitrust and damages expert, his work was indispensable to achieving the settlement.  And in this case, he charged (and Kellogg Hansen paid) the standard fees that he would charge any of his other private fee-paying clients.  *See* Nemelka Decl. ¶ 99(d).  The remaining expert expenses ($1.4 million) are smaller and spread among several experts, each of whom charged the ordinary fees they would charge any other private client. *See id.* ¶ 99.

The balance of expenses ($1.5 million) are non-expert expenses that Kellogg Hansen incurred over seven years of litigation.  Many of those expenses – travel, hotel/lodging, and court

---

[30] *See also*, *e.g.*, *Silverman v. Motorola, Inc.*, 2012 WL 1597388, at *4 (N.D. Ill. May 7, 2012) (awarding litigation expenses that were 2.4 percent of the settlement in reliance on a study showing the average was 4 percent) (citing Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical Legal Stud. 27, 70 (2004)), *aff'd sub nom. Silverman v. Motorola Sols., Inc.*, 739 F.3d 956 (7th Cir. 2013); *Hale*, 2018 WL 6606079, at *14-15 (awarding expenses amounting to 2.8% of settlement fund as "the costs of doing business in a complex and high-stakes case"); *Beesley v. Int'l Paper Co.*, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014) (expenses amounting to 5% of settlement fund, incurred over seven years, "were reasonable and necessary," particularly considering class counsel's "strong incentive to keep expenses at a reasonable level due to the high risk of no recovery"); *City of Greenville*, 904 F. Supp. 2d at 910 (expenses of 8% of fund are "fair and reasonable" due to "length and complexity of this litigation").

reporters (combined total of $492,000) – reflect the size of the litigation, including 97 depositions, many court hearings, and non-refundable payments for trial accommodations. *See* Nemelka Decl. ¶¶ 38, 41; *see also Hale*, 2018 WL 6606079, at *14-15 (reimbursement of 2.8% of fund reasonable where class counsel "traveled to well over a hundred hearings and depositions; employed a discovery vendor to host and help analyze hundreds of thousands of pages of documents over more than six years"). The $533,000 for document review platforms was necessary (and even cheap compared to most litigation) to host and review over 1.7 million documents produced in the case. *See* Nemelka Decl. ¶¶ 36-37, 97(f). And the $276,000 for legal research costs reflects the massive amount of work by class counsel to ensure it made the best possible legal arguments. *See id.* ¶ 42.

It is important to emphasize that Kellogg Hansen's other clients – MVSC, Authenticom, and Cox Automotive – paid their share of litigation expenses attributable to them, including a large share of Dr. Israel's work. *See id.* ¶ 86. As with its time entries, class counsel performed an audit to ensure that only those expenses it paid on behalf of the Vendor Class, and not already reimbursed by its other clients, are included in its request here. *See id.* ¶ 95. That audit is one reason the requested expenses are much lower than the $20 million that class counsel estimated in the preliminary approval motion. *See* Dkt. 248, at 2.

Class counsel appreciates that $12.3 million in litigation expenses is still a high number, but that number must be considered in the context of the complexity, size, and duration of this litigation. "[M]odern antitrust litigation is expensive," *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 835 (7th Cir. 2021), and these expenses reflect funds that Kellogg Hansen put at risk in this case. *See In re Blue Cross Blue Shield Antitrust Litig.*, 2022 WL 4587617, at *2 (N.D. Ala. Aug. 9, 2022) (awarding $41 million in litigation expenses in another recent antitrust MDL of similar duration).

This Court should also award $200,000 for costs of the Settlement Administrator.  The Settlement Administrator, BrownGreer, has incurred costs effectuating the class certification notice plan, effectuating the proposed settlement notice plan, and in undertaking its duties to administer the settlement funds (including setting up a secure website, creating and overseeing an escrow account, and verifying identity and payment information for the Vendor Class).  Its estimated expenses over the lifetime of the litigation – which will extend at least three years in the future – are $350,000.  *See* Brown Decl. ¶ 31.  Nonetheless, class counsel seeks $200,000 and will pay any additional costs of the Settlement Administrator itself without seeking reimbursement.  As Mr. Scott explains, costs of settlement administrator are ordinarily awarded by courts in class action litigation, and the $200,000 costs here are modest considering the duties undertaken by the Settlement Administrator and the size of the fund that it oversees.  *See* Scott Decl. ¶¶ 139-144.

## IV.    The Court Should Grant AutoLoop a $250,000 Incentive Award

AutoLoop should receive an incentive award of $250,000 as appropriate "compensation for shouldering the time-consuming burdens of litigation and assuming risks of financial, and potentially reputational, harm."  *Scott v. Dart*, 99 F.4th 1076, 1085-86 (7th Cir. 2024) (citing 5 *Newberg and Rubenstein on Class Actions* § 17:3).  Other relevant factors in setting the size of the incentive award include "the degree to which the [Vendor Class] benefitted from" AutoLoop's effort, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998)); and the size of the award relative to the class recovery, *see Bytedance*, 2022 WL 888943, at *15 (citing 4 *Newberg and Rubenstein on Class Actions* § 13:53).  All factors support a substantial $250,000 incentive award.

*Burdens of Litigation.*  AutoLoop was the sole class representative and shouldered the entire burden of representing the Vendor Class.  A typical class representative at most sits for a deposition, produces minimal documents, and provides cursory oversight of legal decision-making.  *See*, *e.g.*, *Castillo v. Noodles & Co.*, 2016 WL 7451626, at *3 (N.D. Ill. Dec. 23, 2016)

(citing $10,000 to $25,000 awards for non-specific "participat[ion] in discovery" and "assist[ing] counsel"); *Ackley v. Marathon Cheese Corp.*, No. 3:22-cv-232-jdp (W.D. Wis. Dec. 6, 2024), Dkt. 37 (Peterson, J.) (seeking $20,000 for minimal effort); *In re Spectrum Brands Sec. Litig.*, No. 3:19-cv-347-jdp (W.D. Wis. Mar. 31, 2022), Dkt. 123 (Peterson, J.) (awarding less than $8,000 to each of two class representatives in case with de minimis effort that settled before a motion to dismiss was decided).

AutoLoop, in contrast, provided important oversight to legal strategy and insight to factual underpinnings of this complex seven-year antitrust litigation. *See* Jaye Decl. ¶¶ 16, 22-27, 30-31. AutoLoop produced more than 90,000 pages of documents in three separate discovery periods – many requiring manual collection. *See id.* ¶ 90. Its employees sat for seven depositions, including its most senior executives – the CEO, COO, CPO (thrice), and General Counsel. *See id.* ¶¶ 23, 26. AutoLoop would have been only one of two class members to testify at trial. *See id.* ¶ 27. All told, AutoLoop employees spent an estimated 1,000 hours fulfilling its role as class representative. *See id.* ¶ 31. Courts regularly grant sizable incentive awards for similar efforts leading to large settlements.[31]

---

[31] *See, e.g.*, *Slaughter v. Wells Fargo Advisors, LLC*, 2017 WL 3128802, at *3 (N.D. Ill. May 4, 2017) (awarding $175,000 each to two class representatives from $35.5 million settlement); *AIG, Inc. v. ACE INA Holdings, Inc.*, 2012 WL 651727, at *16-17 (N.D. Ill. Feb. 28, 2012) (awarding total of $175,000 for seven class representatives from $450 million settlement); *In re Urethane Antitrust Litig.*, No. 04-1616 (D. Kan. July 9, 2016), Dkt. 3274 (Order and Judgment Approving Settlement) at 2, and Dkt. 3276 (Order Awarding Attorneys' Fees) at 2 (awarding $200,000, $150,000, and $150,000 to three class representatives for substantial efforts from $835 million settlement); *Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, No. 07-1078 (E.D. Pa. July 14, 2014), Dkt. 713 (awarding $150,000 to class representative that produced documents and whose employees sat for three depositions in $130 million settlement – with $75,000 to two other class representatives); *Titanium Dioxide Antitrust Litig.*, 2013 WL 6577029, at *1 (awarding $125,000 to one class representative and $25,000 to two others from $163.5 million settlement); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awards of $300,000 to each of four class representatives for "extraordinary contribution" to $103.5 million settlement).

This Court observed in its preliminary approval order that the Dealer Class incentive awards were $230,000 cumulatively but spread among 23 class representatives. *See* Dkt. 253, at 8-9. That observation does not cut against the requested award. It cuts in its favor. AutoLoop shouldered the entire litigation burden that was spread among those 23 class representatives in the Dealer Class. Nor can the difference in outcome – to which AutoLoop contributed – be ignored.

*Assumed Risks.* AutoLoop assumed substantial risks. After CDK began blocking independent data integrators in 2015, AutoLoop depended on CDK's data integration services. *See* Jaye Decl. ¶ 8. AutoLoop's applications could not work without CDK's data integration, and its business would have failed. By serving as the sole class representative, AutoLoop became a target for retaliation. *See id.* ¶¶ 9, 13-15, 20. AutoLoop attempted to persuade other large vendors – those receiving multiple-million-dollar recoveries because of this Settlement Agreement – to join it as class representatives, but each declined. *See id.* ¶¶ 14-15. Accordingly, a substantial award is necessary here to "induce individuals to become named representatives," especially in cases like this against service providers on whom plaintiff's business depends. *Synthroid I*, 264 F.3d at 722-23; *see Castillo*, 2016 WL 7451626, at *2 (incentive award proper for "undertak[ing] the risk of adverse actions").

*Class Benefit.* The benefit to the class is enormous. The average gross recovery to the 243 class members is more than $2.5 million. Many vendors (some of which are AutoLoop's direct competitors, *see* Jaye Decl. ¶ 20) will be receiving multiple-million-dollar payments. These recoveries would not exist if AutoLoop had not been willing to serve as the class representative. All that is a far cry from ordinary class-action litigation where class members receive payments that are insignificant and many go unclaimed.

*Relative Size of Award.*  Courts hesitate to grant large awards that create incentives for a class representative to act in self-interest rather than as a faithful representative of the class.  That is not a concern here.  There is no plausible suggestion that AutoLoop traded an early and insufficient settlement for an incentive award.  AutoLoop did not even discuss the amount of the incentive award with class counsel until after the Settlement Agreement was signed.  *See id.* ¶ 29.

In typical class actions, ordinary class members receive modest sums that are dwarfed by even a $5,000 incentive award.  *See, e.g.*, *In re Cap. One TCPA Litig.*, 80 F. Supp. 3d 781, 809 (N.D. Ill. 2015) (awarding $5,000 to five named plaintiffs where class members received $39.66).  This is the rare case where the average class member payment – nearly $1.7 million after fees and expenses – dwarfs the proposed $250,000 incentive award.  Measured as a size of the total settlement, the proposed incentive award is a tiny fraction (0.04%) – and well below what courts often award.  *See*, *e.g.*, *Chesemore v. All. Holdings, Inc.*, 2014 WL 4415919, at *5 n.6 (W.D. Wis. Sept. 5, 2014) (awarding total of $65,000 in $17.3 million settlement – 0.38%); *see* Theodore Eisenberg & Geoffrey Miller, *Incentive Awards to Class Action Plaintiffs:  An Empirical Study*, 53 UCLA L. Rev. 1303, 1338-39 (2006) (for 374 class actions from 1993 to 2002, average incentive award was 0.16% of class recovery).

## V.    The Court Should Close the Case After Entering Final Judgment

The Court's order granting preliminary approval directed the parties to explain:  (1) whether the Court should "keep the case open until the final payment is made, and, if so, why [that] is necessary and appropriate"; and (2) whether the Court should "enter judgment after finally approving the settlement, and, if so, whether that is consistent with the parties' request for the Court to retain jurisdiction."  Dkt. 253, at 12.

The parties respectfully request that the Court close the case after entering final judgment.  The proposed order and judgment attached hereto resolve all issues regarding the payment of the

Vendor Class and class counsel pursuant to the four settlement installment payments. And CDK and AutoLoop consent to the jurisdiction of this Court to the extent any dispute arises regarding any of the subsequent installment payments. *See* Proposed Order Granting Final Approval, at 5. Therefore, the parties respectfully request that the Court close the case after entering final judgment.

**CONCLUSION**

For all the reasons stated herein, the Vendor Class respectfully requests that the Court grant its motion for final approval of the Proposed Settlement, attorney's fees, reimbursement of expenses, class representative service award, and settlement administrator costs, as reflected in the accompanying Proposed Order.

Dated:  June 10, 2025

Respectfully submitted,

/s/ Michael N. Nemelka

Michael N. Nemelka
Derek T. Ho
Aaron M. Panner
Daniel V. Dorris
Collin R. White
Bethan R. Jones
Ana N. Paul
Matthew J. Wilkins
Daren G. Zhang
Kaleb J. LeGore
**KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax: (202) 326-7999
Email: mnemelka@kellogghansen.com
dho@kellogghansen.com
apanner@kellogghansen.com
ddorris@kellogghansen.com
cwhite@kellogghansen.com
bjones@kellogghansen.com
apaul@kellogghansen.com
mwilkins@kellogghansen.com
dzhang@kellogghansen.com
klegore@kellogghansen.com

Jennifer L. Gregor
**GODFREY & KAHN, S.C.**
One East Main Street, Suite 500
Madison, WI 53703
Phone: 608-257-3911
Fax: 608-257-0609
Email: jgregor@gklaw.com

Samuel Issacharoff
40 Washington Square South
New York, NY 10012
Phone: (212) 998-6580
Email: si13@nyu.edu

*Counsel for Plaintiff Loop, LLC, d/b/a AutoLoop, on
behalf of itself and the Vendor Class*