# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

LOOP, LLC, D/B/A AUTOLOOP, on
behalf of itself and all others similarly
situated,

      Plaintiff,

v.

CDK GLOBAL, LLC,

      Defendant.

Case No. 3:24-cv-00571-jdp

**PUBLIC REDACTED**

---

## DECLARATION OF MICHAEL N. NEMELKA
### IN SUPPORT OF THE VENDOR CLASS'S UNOPPOSED MOTION FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT, AWARD OF ATTORNEY'S FEES AND COSTS, AND PLAINTIFF'S SERVICE AWARD

---

I, Michael N. Nemelka, pursuant to 28 U.S.C. § 1746, declare as follows:

I am a partner with the law firm of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. ("Kellogg Hansen") and counsel for Plaintiff Loop, LLC, d/b/a AutoLoop ("AutoLoop"), class representative of the certified Vendor Class (the "Vendor Class"). Kellogg Hansen is counsel for the Vendor Class ("class counsel"). I submit this Declaration in Support of the Vendor Class's Unopposed Motion for Final Approval of the Proposed Settlement, Award of Attorney's Fees and Costs, and Plaintiff's Service Award. I make this Declaration based on personal knowledge, and if called as a witness, I could and would competently testify to the matters stated herein.

## I.    OVERVIEW OF KELLOGG HANSEN

    1.    Kellogg Hansen is a litigation firm of more than 100 attorneys based in Washington, D.C. Our practice is nationwide. We regularly appear in state and federal courts across the country, at both the trial and appellate levels.

2.      Kellogg Hansen has one of the nation's premier antitrust practices.  The DMS team members specifically have deep antitrust expertise and have had great success.  Among other things, Kellogg Hansen has been lead trial counsel for two antitrust verdicts of more than $1 billion – both affirmed on appeal (which we believe to be unique).  *See In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ($1.2 billion verdict affirmed); *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768 (6th Cir. 2002) ($1.3 billion verdict affirmed).  I was on the *Urethane* trial team.

3.      Recently, in May 2025, Derek Ho – part of the DMS team – was lead trial counsel in an antitrust case where the jury returned a verdict of $147 million before trebling.  *See Innovative Health LLC v. Biosense Webster, Inc.*, No. 19-1984 (C.D. Cal.); Ross Todd, *Litigators of the Week, Runners Up, and Shout Outs*, National Law Journal (May 23, 2025).

4.      In April and May 2025, Kellogg Hansen was lead trial counsel for Meta in a "landmark antitrust trial."  Cecilia Kang, *Meta's Fate Now Rests With a Judge*, NY Times (May 27, 2025), https://www.nytimes.com/2025/05/27/technology/meta-antitrust-trial-concludes.html.  The team included DMS team members, including partners Aaron Panner, Dan Dorris, and Ana Nikolic Paul, and of counsel Collin White.  This was a two-month antitrust trial brought by the Federal Trade Commission seeking divestiture of Instagram and WhatsApp.  *See FTC v. Meta Platforms, Inc.*, No. 20-3590 (D.D.C.).

5.      In January 2024, Aaron Panner – part of the DMS team – was lead trial counsel for Cisco as an antitrust defendant.  That case ended mid-trial when the *plaintiff* dismissed with prejudice, agreed to change its business practices, and agreed to pay Cisco (our client).  *See Dexon Computer, Inc. v. Cisco Sys., Inc.*, No. 22-53 (E.D. Tex. Jan. 27, 2024); Mike Scarcella, *Network Giant Cisco, Reseller Dexon End Legal Fight*, Reuters (Jan. 29, 2024).

6.      Kellogg Hansen briefed, argued, and won most of the major antitrust cases to come before the Supreme Court in the past two decades, including *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Pacific Bell Telephone Co. v. linkLine Communications, Inc.*, 555 U.S. 438 (2009); *American Express Co. v. Italian Colors Restaurant*, 570 U.S. 228 (2013); *Ohio v. American Express Co.*, 585 U.S. 529 (2018); and *Apple Inc. v. Pepper*, 587 U.S. 273 (2019).  Aaron Panner, Derek Ho, and Collin White – members of the DMS team – worked on many of those cases.

7.      Kellogg Hansen is unique in that it has active plaintiff-side and defense-side practices.  On the plaintiff side, we have won two antitrust verdicts of more than $1 billion, as noted above.  We have also won what we believe to be the largest non-punitive judgment ever in federal court – $16 billion – after a bench trial.  *See Petersen Energía Inversora, S.A.U. v. Argentine Republic*, 2023 WL 5827596 (S.D.N.Y. Sept. 8, 2023).  DMS team member Derek Ho was on that trial team.  We have multiple other representations in which we have recovered billions on behalf of our clients.  Those include a $5.1 billion recovery on behalf of a federal agency, the National Credit Union Administration, where several defendants not only settled but offered judgment for the entirety of the claimed damages, and a $3.5 billion recovery on behalf of the State of Florida in opioid litigation.  DMS team member Dan Dorris worked on both those matters.  We have ongoing substantial plaintiff-side antitrust litigation against Apple and Google, with DMS team member Aaron Panner working on the Apple matter.  And on the defense side, we have represented more than a dozen Fortune 50 corporations in a variety of industries and disputes – such as the Meta and Cisco matters discussed above.

8.      Kellogg Hansen takes cases on both a contingency and a billable-hour basis. Presently, and historically, the firm has dozens of clients that pay the firm's standard hourly billing

rates.  We use the same hourly billing rates for all types of litigation matters.  As a matter of firm policy, we do not vary them by type of litigation, subject matter, or otherwise.

9.      Throughout the firm's history – and especially in recent years – demand for the firm's services has been higher than we can meet.  We have declined engagements – including major billable-hour matters – as a result.  Accordingly, when we choose to take a plaintiff-side case on contingency, we are foregoing the certainty of receiving our regular hourly billing rates for the potential of receiving a contingency fee award.  I believe Kellogg Hansen is relatively unique among plaintiff-side firms in this respect.  I do not think most other plaintiff-side firms also have active billable-hour practices that they forgo to take contingency cases.

10.      Plaintiff-side contingency work is a risky investment for the firm.  For a contingency case to make economic sense, there must be the prospect that we will receive a substantial multiple of our regular hourly billing rates.  Beyond the risk that the case is not successful and we receive no payment, plaintiff-side work almost always results in delayed payment by many years compared to billable hour work – here, this settlement comes more than seven years after our efforts began.  Further, we frequently (including here) finance all litigation expenses throughout the course of the litigation – and these almost always are multiple millions. If we lose, those are expenses that we will never recover.

11.      Because of those risks – and the demand for our time from billable matters – Kellogg Hansen is careful about which cases it will take on contingency and requires that the terms of any fee agreement be favorable.  For pure contingency cases, the firm's practice is to seek a percentage of any recovery – almost always one-third or more.  In its thirty-year-plus history, Kellogg Hansen has *never* taken a contingency case with a sliding-scale fee percentage that declines as the recovery becomes larger.  That type of fee agreement sets the wrong incentives for

us with respect to our clients, and we have rejected any such arrangement if presented to us.  Our plaintiff-side work involves high-value and challenging cases in antitrust, antiterrorism, securities, and other areas.  Our clients hire us because the cases are hard, and the damages are large.  They want us to seek the largest recovery possible, even if that requires litigating through trial.  A declining fee scale would therefore create the wrong incentives.  When we deviate from a flat contingency percentage, we do so in the *opposite* direction: *increasing* the fee percentage as the litigation advances.  As a matter of firm policy, we have also never participated in a class counsel auction because they would lead to below-market rate for our services.

12.    The table below shows the monetary terms of our pure contingency agreements since 1998.  Each of these cases were with individual clients (not classes) that agreed to pay us these percentages.  I submit portions of this table under seal (both here and in our brief) because it is proprietary business information that the public should not have access to.  Other than the three engagements in this DMS litigation, this does not include the names of the clients for confidentiality reasons, but I have provided the industry in which many of the cases arose.  We have also never been awarded fees as lead class counsel in the Ninth Circuit and have only played a small role in one Ninth Circuit class action.

| Year | Subject Matter | Contingency Fee Agreement |
|------|----------------|---------------------------|
| 1998 | [REDACTED] | |
| 2000 | [REDACTED] | [REDACTED] |
| 2004 | [REDACTED] | [REDACTED] |
| 2005 | [REDACTED] | |
| 2009 | Securities (banking) | 25% |
| 2010 | | [REDACTED] |
| 2012 | [REDACTED] | [REDACTED] |
| 2014 | | [REDACTED] |
| 2015 | | [REDACTED] |
| 2016 | [REDACTED] | [REDACTED] |
| 2017 | Antitrust (*Authenticom*) | 40% |
| 2017 | Antitrust (*Cox Automotive*) | 33.33% |
| 2018 | Antitrust (*AutoLoop*) | 30% |

| Year | Subject Matter | | | Contingency Fee Agreement | | |
|------|---|---|---|---|---|---|
| 2018 | | ██████████ | | | ████ | |
| 2019 | | ██████████ | | | ████ | |
| 2019 | | ██████████ | | | ███████ | |
| 2021 | | ████████ | | ████████████████████ | | |
| 2023 | | ██████████ | | | ████ | |
| 2024 | | █████████ | | | ████ | |
| 2025 | | ██████████ | | | ████ | |

13.    There are three below one-third.  The 2009 securities case with a 25% fee was on behalf of a federal agency – the National Credit Union Association acting as liquidating agent for several large credit unions – against major banks involved in the 2008 mortgage crisis.  The federal agency *capped* the fees it would agree to pay based on prior precedent where similar financial agencies acting as liquidating agents had paid a 25% contingency fee to outside counsel during the savings-and-loan crisis of the 1980s and 1990s, and the government could have always brought the case itself instead of hiring Kellogg Hansen as outside counsel.

14.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

15.    Finally, as explained in the brief accompanying this declaration, the AutoLoop 30% contingency fee should be considered in conjunction with the Authenticom and Cox Automotive agreements.

## II.    LITIGATION HISTORY

16.    Kellogg Hansen was the first firm to file antitrust litigation relating to the claims in this litigation against Defendant CDK Global, LLC ("CDK") and The Reynolds and Reynolds Company ("Reynolds").  It was also the only firm ever to file such claims on behalf of a data

integrator or vendor. I have learned that multiple national law firms – including Davis Polk, Arnold & Porter, and Goodwin Proctor – were engaged by industry participants (vendors and independent data integrators) at various points during the 2010s to investigate potential claims against CDK and Reynolds. But apparently none of these other law firms developed a plausible legal strategy for any vendor or any data integration provider as none of them ever brought suit.

17.     In October 2016, I received a telephone call from an automotive software vendor called Motor Vehicle Software Corporation ("MVSC") regarding its inability to gain access to the certified data integration programs offered by CDK and Reynolds – the CDK Third Party Access ("3PA") program and the Reynolds Certified Interface ("RCI").

18.     Kellogg Hansen spent hundreds of hours investigating MVSC's potential legal claims and interviewing participants in the industry. We had no other firm helping us and were not aided by a government investigation.

19.     On February 3, 2017, Kellogg Hansen filed a complaint on behalf of MVSC against CDK and Reynolds based primarily on a group boycott claim. *See MVSC v. CDK Global, Inc.*, No. 17-896 (C.D. Cal. filed Feb. 3, 2017).

20.     Fact discovery had not begun in the MVSC litigation prior to creation of the MDL in early 2018 in the Northern District of Illinois that consolidated all antitrust litigation against CDK and Reynolds. That is because CDK and Reynolds had moved to dismiss MVSC's complaint; the district court granted that motion in part (with leave to amend) and denied in part; and we amended the complaint, leading to another motion to dismiss. *See MVSC v. CDK Global, Inc.*, 2017 WL 5643163 (C.D. Cal. Oct. 2, 2017).

21.     In the course of investigating claims on behalf of MVSC, we contacted an independent data integrator, Authenticom. Authenticom also expressed a belief that CDK and

Reynolds were violating the antitrust laws by apparent concerted effort to block independent data integrators like Authenticom.

22.    On January 24, 2017, Authenticom hired us to investigate whether Authenticom also had antitrust claims. We again spent hundreds of hours developing new legal theories and facts for a different type of plaintiff. We again were unaided by other firms or by a government investigation.

23.    On May 1, 2017, Kellogg Hansen and Godfrey & Kahn, S.C. ("Godfrey & Kahn") filed an antitrust complaint in this Court against CDK and Reynolds on behalf of Authenticom. *See Authenticom, Inc. v. CDK Global, LLC*, No. 17-318 (W.D. Wis. filed May 1, 2017). We moved for a preliminary injunction to stop CDK's and Reynolds's blocking of Authenticom.

24.    Kellogg Hansen presented evidence at the preliminary injunction hearing from those affected by CDK's and Reynolds's conduct – including dealers and vendors (AutoLoop and Cox Automotive, among others) – and from two expert witnesses (an antitrust expert and computer security expert). That injunction was granted after a three-day evidentiary hearing. *See Authenticom, Inc. v. CDK Global*, LLC, 2017 WL 3017048 (W.D. Wis. July 14, 2017). On November 6, 2017, the Seventh Circuit vacated the preliminary injunction. *See Authenticom, Inc. v. CDK Global LLC*, 874 F.3d 1019 (7th Cir. 2017).

25.    On September 1, 2017, Cox Automotive – by far the country's largest automotive software vendor – hired us to represent it in potential antitrust litigation against CDK and Reynolds. Cox Automotive is a subsidiary of Cox Enterprises, one of the country's largest private companies with $23 billion in annual revenue. *See* Cox Enterprises, *About Us*, https://www.coxenterprises.com/about-us. On December 11, 2017, we filed a complaint against CDK on behalf of Cox Automotive. *See Cox Automotive, Inc. v. CDK Global, LLC*, No. 17-925

(W.D. Wis. filed Dec. 11, 2017). The complaint was based on and substantially the same as the *Authenticom* complaint. All of the facts and claims in the complaint were based on Kellogg Hansen's work.

26. In early December 2017, we also began working on behalf of AutoLoop to draft a complaint, although we did not enter into a formal engagement letter until March 26, 2018. On April 9, 2018, we filed a complaint on behalf of AutoLoop. *See Loop, LLC v. CDK Global, LLC*, No. 18-2521 (N.D. Ill. filed Apr. 9, 2018). On June 5, 2018, we amended the *AutoLoop* complaint to assert claims on behalf of the Vendor Class with AutoLoop serving as the sole class representative. *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 191 (N.D. Ill. June 5, 2018). The AutoLoop complaints were based on and substantially the same as the *Authenticom* and *Cox Automotive* complaints. Again, all of the facts and claims in the complaints were based on Kellogg Hansen's work.

27. Beginning in the spring of 2017 after filing the *Authenticom* complaint, we made substantial efforts to convince the Federal Trade Commission ("FTC") to bring enforcement actions against CDK and Reynolds. From 2017 through 2020, we met with the FTC more than a dozen times (including with the Director of the Bureau of Competition), made evidentiary presentations, and had our principal antitrust expert – Dr. Mark Israel – meet with FTC staff three times. The FTC never brought an enforcement action against CDK and Reynolds based on the alleged conspiracy we had uncovered. The FTC's only action was to move to enjoin CDK's attempt to acquire another DMS provider – Auto/Mate. Scattered references to the FTC in various documents refer to that matter to enjoin CDK's acquisition of Auto/Mate and not to any FTC investigation that benefitted the antitrust claims we pursued. We also met with multiple state

attorneys general from New York, Ohio, Virginia, Illinois, Wisconsin, and Utah in an attempt to have them investigate wrongdoing, but they too did not act.

28.     Our litigation against CDK and Reynolds – and particularly, the preliminary injunction hearing – spurred many additional lawsuits against CDK and Reynolds by other firms. Between October 2017 and January 2018, seven class actions were filed on behalf of automobile dealers across the country, with complaints that had literally cut-and-pasted from Kellogg Hansen's prior work on behalf of Authenticom and Cox Automotive.  *See Teterboro Automall, Inc. v. CDK Global, LLC*, No. 17-9714 (D.N.J. filed Oct. 19, 2017); *Hartley Buick GMC Truck, Inc. v. CDK Global, LLC*, No. 17-7827 (N.D. Ill. filed Oct. 31, 2017); *John O'Neil Johnson Toyota v. CDK Global, LLC*, No. 17-888 (S.D. Miss. filed Nov. 3, 2017); *Hoover Automotive, LLC v. CDK Global, LLC*, No. 17-864 (W.D. Wis. filed Nov. 14, 2017); *JCF Autos LLC v. CDK Global, LLC*, No. 17-11975 (D.N.J. filed Nov. 22, 2017); *Kenny Thomas Enters. v. CDK Global, LLC*, No. 18-29 (S.D. Ohio filed Jan. 24, 2018); *Massey Chrysler, Center, Inc.*, No. 18-42 (M.D. Ala. filed Jan. 29, 2018).

29.     On November 7, 2017, CDK and Reynolds filed a motion with the Judicial Panel on Multidistrict Litigation to consolidate all antitrust litigation against them into a single district court.  *See In re DMS Antitrust Litig.*, MDL No. 2817, Dkt. 1 (J.P.M.L. Nov. 7, 2017).

30.     During the pendency of that motion, CDK and Reynolds moved to stay the *Authenticom* litigation, which this Court granted pending the outcome of CDK's and Reynolds's request for an MDL.  *See Authenticom, Inc. v. CDK Global, LLC*, No. 17-318, Dkt. 245 (W.D. Wis. Jan. 12, 2018).

31.     On February 1, 2018, the Judicial Panel on Multidistrict Litigation ordered that the DMS antitrust litigation be consolidated in the Northern District of Illinois.  *See In re DMS Antitrust Litig.*, 291 F. Supp. 3d 1367 (J.P.M.L. 2018).  All existing litigation – the *MVSC*,

*Authenticom*, *Cox Automotive*, and the various dealer class actions – was transferred to the Northern District of Illinois.

32.     No meaningful discovery occurred in the DMS litigation until after the formation of the MDL.  The only discovery that had occurred was early curated document productions by CDK and Reynolds.  There were also pending motions to dismiss in the *Authenticom* and *MVSC* actions that the courts did not rule on before the MDL was formed.  This Court had stayed the *Authenticom* litigation.  And the *Cox Automotive* litigation was filed in December 2017 while the MDL proceeding was underway, with CDK having yet to file its motion to dismiss.  The dealer class actions also had not progressed beyond filing of the complaints.

33.     Once the MDL was formed, it took several months – until May 2018 – for the litigation to begin in earnest.  On March 12, 2018, then-presiding Judge St. Eve held an initial scheduling conference to discuss the leadership structure of the MDL and a case schedule.  *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 10 (N.D. Ill. Feb. 15, 2018).  On April 16, 2018, Judge St. Eve appointed Kellogg Hansen to be Co-Lead Counsel of the MDL, with the Milberg firm being the other Co-Lead MDL Counsel and Interim Class Counsel for the Dealer Class.  *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 123 (N.D. Ill. Apr. 16, 2018).  On August 16, 2018, then-presiding Judge Dow appointed Kellogg Hansen to be Interim Class Counsel for the Vendor Class.  *See In re Antitrust Litig.*, No. 18-864, Dkt. 333 (N.D. Ill. Aug. 16, 2018).

34.     On May 7, 2018, the MDL Court entered a scheduling order that began discovery.  *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 166 (N.D. Ill. May 7, 2018).  After amendments, the deadlines were April 30, 2019, for fact discovery and January 31, 2020, for expert discovery.  *See id.*, Dkt. 553 (fact discovery), Dkt. 794 (expert discovery).  Expert discovery bled into February 2020 due to the number of expert depositions that needed to be taken.

35.     From May 2018 through April 2019, we engaged in extensive written discovery. We propounded 344 requests for production and 74 interrogatories on behalf of AutoLoop and other clients to CDK and Reynolds.  We responded to 75 requests for production for AutoLoop and 19 interrogatories for AutoLoop.  We also served third-party subpoenas on dozens of third parties on behalf of AutoLoop and our other clients in the MDL.

36.     CDK and Reynolds produced approximately 1.1 million and 220,000 documents, respectively.  Third parties produced approximately another 130,000 documents.  Other clients produced approximately 260,000 documents combined that also needed to be reviewed to understand the body of evidence for the Vendor Class.  We reviewed these documents without the assistance of other firms or temporary attorneys.

37.     We produced approximately 26,000 documents on behalf of AutoLoop.  We reviewed and produced those documents without the assistance of other firms or temporary attorneys.

38.     From the fall of 2018 through April 2019, we took or defended 86 fact depositions – 67 of party witnesses and 19 of third parties – spread throughout the country.  This often required double- or triple-tracking depositions on the same days, often all in different cities.  This is what our internal deposition calendar looked like for April 2019.  Other months were just as busy.

**April 2019**

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| **APRIL 1** S. Cottrell (Auth) DEPO PREP – DC NEMELKA/JWE | **2** S. Cottrell (Auth) NEMELKA (*DC*) | **3** S. Herbers(CDK/CVR) BONOMO (*Chicago*) — D. Brown (Auth) DEPO PREP – DC NEMELKA/JWE | **4** Cox 30b6 (data) DORRIS (*Atlanta*) — AutoAlert HAFENBRACK (*KC*) | **5** Authenticom 30b6 NEMELKA (*DC*) |
| **8** | **9** Carfax MILLER (*DC*) | **10** S. Anenen (CDK) NEMELKA (*Chicago*) — FTC Meeting w/ Mark Israel | **11** AutoLoop 30b6 MILLER (*Tampa*) — DealerSocket HAFENBRACK(*Irvine*) | **12** AutoLoop 30b6 (data) DSG (*Tampa*) — Auth. 30b6 (data) NEMELKA (*Minnap.*) |
| **15** | **16** N. East (Xtime) DORRIS (*Palo Alto*) | **17** J. Sowers (CDK) SCHWARZ (*Chicago*) — B. Schaefer (Rey) NEMELKA (*Houston*) | **18** Quinlan (CVR) BONOMO (*Detroit*) — B. Schaefer (Rey) NEMELKA (*Houston*) | **19** Stone Eagle, Inc. HAFENBRACK (*TX*) |
| **22** T. Robinson (Auth) Depo PREP – Madison NEMELKA | **23** P. McKinley WHITE (*Peoria, IL*) — T. Robinson (Auth) NEMELKA (*Madison*) — IFM HAFENBRACK (*MI*) | **24** R. Gentry (Auth) Depo PREP – Madison NEMELKA | **25** R. Gentry (Auth) NEMELKA (*Madison*) — Cox 30b6 (Day 1) DORRIS (*SLC*) | **26** Cox 30b6 (Day 2) DORRIS (*SLC*) — T. Graham (CDK) GUARNERA(*Chicago*) |

Legend: CDK   CVR   REYNOLDS   INDIVIDUAL/VENDOR PLFS   DEALER CLASS PLFS   THIRD PARTIES

39.     All of this discovery was hard fought.  The parties exchanged hundreds of discovery letters raising various disagreements and met-and-conferred repeatedly.  There were more than 20 discovery-related motions filed.

40.     From May 2019 through January 2020, we engaged in extensive expert discovery. On behalf of AutoLoop, we engaged six experts:  (1) Dr. Mark Israel, an antitrust and damages expert; (2) Professor Peter Swire, an expert in privacy and security; (3) Allan Stejskal, an industry expert; (4) Brian Halpin, a computer forensics expert; (5) Adam Shostack, a computer security expert; and (6) Eric Kimberling, an expert in Enterprise Resource Planning ("ERP") systems. CDK engaged five experts to provide opinions against AutoLoop:  (1) Michael Whinston, an antitrust expert; (2) Kevin Murphy, a damages expert; (3) Ed Stroz, a computer security expert; (4) Scott Tenaglia, a computer security expert; and (5) Jim Mottern, an ERP expert.

41.     Each of these experts provided at least one report.  Some experts (Dr. Israel, Mr. Tenaglia, and Mr. Stroz) provided an opening and reply report.  Each expert was deposed for a total of 11 expert depositions relating to AutoLoop.

42.     From February 2020 through August 2020, we briefed the many complex legal and factual issues in the case on summary judgment and in *Daubert* motions.  In total, we submitted 284 pages of summary judgment briefing (over six motions); 385 pages of statements of fact; and 112 pages of *Daubert* briefing (over five motions) on behalf of AutoLoop.  In total, that was 781 pages of summary judgment and *Daubert* briefing for AutoLoop – not even including briefing exclusively for other clients and not AutoLoop.

43.     Other than AutoLoop, all of Kellogg Hansen's clients settled their litigation against CDK between July 2019 and October 2020.  Cox Automotive and CDK settled in July 2019. MVSC and CDK settled in October 2019.  And Authenticom and CDK settled in October 2020.

44.     After October 2020, virtually all our litigation efforts were solely for the benefit of the Vendor Class.  Our only remaining litigation was the AutoLoop and Vendor Class suit against CDK; MVSC's suit against Reynolds; and Authenticom's suit against Reynolds.  However, we performed only minimal work on the MVSC and Authenticom suits against Reynolds because summary judgment motions were pending during that time and there was little substantive work to perform on their behalf.  In May 2022, Authenticom and Reynolds settled before summary judgment was decided.  And in November 2023, MVSC and Reynolds settled, a few months after summary judgment was decided in July 2023.

45.     On January 21, 2022, the MDL Court issued a 106-page *Daubert* ruling that mostly rejected challenges to the Vendor Class experts.  *See In re DMS Antitrust Litig.*, 581 F. Supp. 3d 1029 (N.D. Ill. 2022).  The parties submitted briefs regarding the effect of that ruling on the

pending summary judgment motions. *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 1322 (Jan. 21, 2022) (requesting briefing).

46.     On April 7, 2022, CDK announced that it would be acquired by a subsidiary of Brookfield Corporation – a large Canadian investment firm with over $1 trillion in assets under management.  The acquisition was completed on July 6, 2022.

47.     On June 29, 2023, then-presiding Chief Judge Pallmeyer denied in part and granted in part CDK's motion for summary judgment in a 91-page opinion. *See In re DMS Antitrust Litig.*, 680 F. Supp. 3d 919 (N.D. Ill. 2023).  Judge Pallmeyer also granted AutoLoop's motion for summary judgment against CDK's counterclaims.  *See In re DMS Antitrust Litig.*, 2023 WL 4297643 (N.D. Ill. June 29, 2023).

48.     At this time, we believed the Vendor Class would be remanded expeditiously for class certification proceedings and trial in the Western District of Wisconsin.  We had filed the AutoLoop case directly in the MDL court for convenience but had deemed it filed in the Western District of Wisconsin – a common procedure used in MDLs to skip the procedural step of filing in the transferor district and waiting for the suit to be transferred to the MDL court.  But here too, CDK fought.  It objected to the Vendor Class being remanded to the Western District of Wisconsin and instead sought to have a single consolidated trial with the Dealer Class and Vendor Class. CDK apparently perceived a strategic advantage in tying the Vendor Class to the Dealer Class in a consolidated trial rather than having a single trial against the Vendor Class; the Dealer Class also sought a consolidated trial with the Vendor Class. *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 1387, at 4-9, 16-19, 21-23 (N.D. Ill. July 27, 2023).

49.     After another round of briefing on whether to remand the Vendor Class, Judge Pallmeyer ruled that she would decide class certification for the Vendor Class and then remand

any remaining Vendor Class litigation to the Western District of Wisconsin. *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 1427 (N.D. Ill. Nov. 21, 2023).

50.     Around this time, CDK hired Kirkland & Ellis to be its lead counsel to oppose class certification and eventually to be trial counsel in the Western District of Wisconsin.

51.     From August 2023 through March 2024, we engaged in another round of extended fact and expert discovery for class certification for the Vendor Class.

      a.     The parties produced an additional 50,000 pages of documents and refreshed to the present the structured data productions they had previously made in the litigation.

      b.     Dr. Israel submitted four additional expert reports regarding class certification and damages.

      c.     CDK hired another new expert – Dr. Laila Haider – who submitted two additional expert reports against class certification and the Vendor Class's claimed damages.

      d.     We took or defended two expert depositions (Dr. Haider and Dr. Israel), defended one AutoLoop witness deposition, and attended five depositions of dealer witnesses.

      e.     We briefed class certification and a second *Daubert* motion directed at Dr. Israel – with the first already having been mostly rejected.

52.     On July 22, 2024, Judge Pallmeyer, in a 36-page opinion, granted class certification, appointed AutoLoop as the class representative, appointed Kellogg Hansen and Professor Sam Issacharoff as class counsel, and denied the second *Daubert* motion directed at Dr. Israel. *See In re DMS Antitrust Litig.*, 2024 WL 3509668 (N.D. Ill. July 22, 2024).

53.    The same day – July 22, 2024 – Judge Pallmeyer remanded the Vendor Class case to this Court.  Once remanded, CDK sought another period of fact and expert discovery that would delay trial until August 2025.  *See* Dkt. 56 at 18-26 (Sept. 6, 2024).  This Court granted more limited discovery and scheduled trial for January 27, 2025.  *See* Dkt. 74.

54.    From September through November 2024, the parties engaged in an expedited discovery period to refresh prior discovery to the present.  We exchanged tens of thousands of documents, took or defended three Rule 30(b)(6) depositions, and prepared supplemental expert reports from Dr. Israel and Mr. Swire, the Vendor Class's privacy and security expert.

55.    During the fall of 2024 through January 2025, Kellogg Hansen engaged in intense and all-consuming trial preparation.  Godrey & Kahn also engaged in intense trial preparation and was prepared to play a significant role at trial, including conducting multiple direct- and cross-examinations.  Among other things, we prepared witnesses to testify at trial; drafted cross-examination outlines; prepared the opening statement and closing summation; prepared our pretrial disclosures of exhibits, deposition designations, draft jury instructions, and verdict form; and briefed 14 motions *in limine*.  We also moved for sanctions and judicial notice of document destruction.  Even before this period of intense trial preparation, we had already conducted a full-day mock jury exercise in Madison, Wisconsin earlier in 2024 to assess the strength of the case and refine the trial preparation.

## III.    THE PROPOSED SETTLEMENT

56.    In January 2025, CDK reached out regarding a potential settlement before trial.  This led to an in-person meeting of counsel and principals with decision-making authority on January 10, 2025, without any mediator.  After multiple hours of negotiations that day, the parties

reached agreement on the material terms of a proposed settlement.  On January 11, 2025, the parties executed an agreement-in-principal reflecting those material terms.

57.    The parties executed the Settlement Agreement on January 14, 2025.  *See* Dkt. 250-1.  This Settlement Agreement is the only agreement between the parties made in connection with the proposed resolution of this litigation.

58.    The principal considerations motivating Kellogg Hansen's and AutoLoop's decision to enter into the Settlement Agreement were:  (1) the extraordinary and certain relief provided to the Vendor Class, (2) the inherent uncertainty in a trial, (3) the delay in payment that a jury verdict and lengthy appeal would create, and (4) concerns regarding CDK's ability to pay a trebled verdict of nearly $1.5 billion.

59.    I believe the settlement provides extraordinary benefits to the Vendor Class and am proud to seek its approval.  As one illustration, we have prepared the table below comparing key metrics of the Vendor Class settlement to the Dealer Class settlement.

| Metric | Dealer Class | Vendor Class |
|---|---|---|
| **Gross Settlement** | $129,500,000[1] | $630,000,000 |
| **Expenses** | $7,192,133[2] | $12,358,238 |
| **Expenses as % of Fund** | 5.55%[3] | 1.96%[4] |
| **Service Award** | $230,000[5] | $250,000 |
| **Service Award as % of Fund** | 0.18%[6] | 0.04%[7] |

---

[1] *See In re DMS Antitrust Litig.*, No. 18-864, Dkt. 1538 at 7 ("MDL Dkt."); MDL Dkt. 1545 at 8.

[2] MDL Dkt. 1545 at 9.

[3] $7,192,133 / $129,500,000 = 0.0555 = 5.55%

[4] $12,358,238 / $630,000,000 = 0.0196 = 1.96%

[5] MDL Dkt. 1545 at 9.

[6] $230,000 / $129,500,000 = 0.0018 = 0.18%

[7] $250,000 / $630,000,000 = 0.0004 = 0.04%

| Metric | Dealer Class | Vendor Class |
|---|---|---|
| Net Settlement | $121,847,867[8] | $617,191,762[9] |
| Fee Award | $42,735,000[10] | $205,730,587[11] |
| Gross Fee % | 33.00%[12] | 32.66%[13] |
| Net Fee % | 35.07%[14] | 33.33%[15] |
| Class Benefit | $79,112,867[16] | $411,461,175[17] |
| Claimed Damages | ████[18] | $490,426,137 |
| % of Claimed Damages Distributed to the Class | ████[19] | 83.90%[20] |
| Total Class Members | 25,235[21] | 243 |
| Average Payment Per Class Member | $3,123.90[22] | $1,693,255.86[23] |

60.     Since filing the motion for preliminary approval, Kellogg Hansen has fielded numerous calls and emails from members of the Vendor Class to answer any questions that they have about the settlement.  The reaction of those members has been overwhelmingly positive. Kellogg Hansen has also communicated with almost all of the class members with substantial

---

[8] $129,500,000 (Gross Settlement) - $7,192,133 (Expenses) - $230,000 (Service Award) = $122,077,867

[9] $630,000,000 (Gross Settlement) - $12,358,238 (Expenses) - $250,000 (Service Award) - $200,000 (Settlement Administrator Expenses) = $617,191,762

[10] MDL Dkt. 1538 at 7; $129,500,000 (Gross Settlement) x 0.30 = $42,735,000

[11] $617,191,762 (Net Settlement) / 3 = $205,730,587

[12] $42,735,000 (Fee Award) / $129,500,000 (Gross Settlement) = 0.3300 = 33.00%

[13] 205,730,587 (Fee Award) / $630,000,000 (Gross Settlement) = 0.3266 = 32.66%

[14] $42,735,000 (Fee Award) / $121,847,867 (Net Settlement) = 0.3507 = 35.07%

[15] $205,730,587 (Fee Award) / $617,191,762 (Net Settlement) = 0.3333 = 33.33%

[16] $121,847,867 (Net Settlement) - $42,735,000 (Fee Award) = $79,112,867

[17] $617,191,762 (Net Settlement) - $205,730,587 (Fee Award) = $411,461,175

[18] Dkt. 256, ¶ 283.

[19] $79,112,867 (Class Benefit) / ████ (Claimed Damages) = ████ = ████

[20] $411,461,175 (Class Benefit) / $490,426,137 (Claimed Damages) = 0.8397 = 83.90%

[21] MDL Dkt. 1540 at 3.

[22] $79,112,867 (Class Benefit) / 25,235 (Total Class Members) = $3,123.90

[23] $411,461,175 (Class Benefit) / 243 (Total Class Members) = $1,693,255.86

settlement allocations to ensure that we and the Settlement Administrator have the correct points of contact for them.

61.     Kellogg Hansen will continue to support the Settlement Administrator throughout the process of distributing settlement proceeds, which will continue for more than three years after any final approval of the settlement.  If there are any anomalies or disputes regarding entitlement to payment, we will try to resolve those by agreement among the interested parties.  If that is not possible, we will raise the issue with the Court in advance of the final approval hearing (if possible).  We will not allow the disputed settlement amounts to be paid until receipt of a valid legal order directing such distribution.

62.     To date, Kellogg Hansen has been advancing all fees associated with the Settlement Administrator.  The Settlement Administrator previously served as the Notice Administrator for class certification, and Kellogg Hansen advanced those fees too.

## IV.    KELLOGG HANSEN'S FEE AGREEMENTS

63.     We entered into the following fee agreements with five clients for antitrust litigation against CDK.  I have filed the engagement letters under seal to preserve attorney-client and work-product privilege to the greatest extent possible.  In Kellogg Hansen's negotiations of these fee agreements, the clients were represented by their in-house counsels.

64.     **MVSC.**  On November 22, 2016, Kellogg Hansen entered into a billable hour arrangement with MVSC under which MVSC agreed to pay the firm a flat fee to file a complaint and our regular billing rates thereafter.  MVSC also agreed to pay all litigation expenses.  The engagement letter is attached as Exhibit A.

65.     **Authenticom.**  On January 24, 2017, we entered into a contingency fee agreement with Authenticom.  The contingency fee was 35% of the net recovery (after reimbursement of

litigation expenses) if Authenticom settled before the first status conference and 40% of the net recovery if Authenticom settled after the first status conference. Authenticom agreed to pay out-of-pocket expenses for experts, while Kellogg Hansen agreed to pay other litigation expenses (subject to reimbursement from any gross recovery). The engagement letter is attached as Exhibit B.

66. **Cox Automotive.** On September 1, 2017, Kellogg Hansen entered into a contingency fee agreement with Cox Automotive. The contingency fee was one-third of the net recovery (after reimbursement of litigation expenses). Cox Automotive agreed to pay out-of-pocket expenses for experts, while Kellogg Hansen agreed to pay other costs and expenses (subject to reimbursement from any gross recovery). The engagement letter is attached as Exhibit C.

67. **AutoLoop**. Kellogg Hansen negotiated two engagement letters with AutoLoop, one on an individual basis and one for AutoLoop as class representative.

68. On March 26, 2018, Kellogg Hansen entered into a contingency fee agreement to represent AutoLoop in its individual capacity. The contingency fee was 30% of the net recovery. Kellogg Hansen agreed to pay litigation expenses (subject to reimbursement from any gross recovery) except for expert fees. However, Kellogg Hansen actually paid those expert fees notwithstanding the engagement letter. That engagement letter is attached as Exhibit D. On May 1, 2019, Kellogg Hansen and AutoLoop entered into a new engagement letter under which Kellogg Hansen would represent AutoLoop as the class representative for the Vendor Class. Kellogg Hansen agreed that it would recover its attorney's fees and expenses from any class recovery and that it would not seek more than 30% of any such recovery. The intent of that provision was to ensure that AutoLoop would not pay more than the 30% it had agreed to pay in

the initial engagement letter. Kellogg Hansen agreed to pay litigation expenses (subject to reimbursement from any recovery). That engagement letter is attached as Exhibit E.

## V.     KELLOGG HANSEN'S ACCOUNTING

69.     Most of our work is for clients who pay fees that do not depend on the outcome of the litigation – most often by billable hours and occasionally by flat-fee agreements. We follow the same timekeeping practices for all cases regardless of whether the clients pay by billable hours or by contingency fees. These timekeeping practices are necessary for clients that pay billable-hour fees. These practices are also essential for internal accounting for contingency-fee cases.

70.     Our attorneys and staff make contemporaneous billing records in compliance with the firm's customary practice by entering their time entries into our electronic billing system on at least a monthly basis with a description of the task performed. Each entry indicates who performed the work, the matter number for the work performed, the amount of time spent, and gives a description of the task performed.

71.     Our work on the DMS antitrust litigation was on a contingency basis, except for MVSC which was a billable engagement. I instructed everyone on the team to follow the firm's customary timekeeping practices for all DMS antitrust litigation and ensured that they did so throughout the pendency of the litigation.

72.     Because we had multiple clients in the DMS antitrust litigation, Kellogg Hansen established separate matter numbers for each of the clients – one for MVSC, one for Authenticom, one for Cox Automotive, and one for AutoLoop. I instructed every team member to specify in their timekeeping records the matter number (and hence client) for which each task was performed. Because many tasks that we performed on behalf of the Vendor Class also benefited other clients (for example, offensive depositions of common fact witnesses), I also established a matter number

we refer to as the AutoLoop Common Benefit matter number. I instructed team members to use that common benefit matter number for any task that was for AutoLoop and the Vendor Class but which also benefited our other clients in the DMS antitrust litigation.

73.    After October 20, 2020, our only remaining client suing CDK was the Vendor Class. Accordingly, thereafter we billed all hours worked on the Vendor Class case to the AutoLoop-specific matter number.

74.    Below are several examples demonstrating how time was allocated.

    a.    Time spent preparing for and defending depositions of AutoLoop employees was billed to the AutoLoop specific matter number, while time spent taking depositions of CDK and Reynolds employees was billed to the AutoLoop Common Benefit matter number. *Compare* Ex. F-1 (Row 839), *with* Ex. F-2 (Row 2143). Similarly, time spent preparing for and defending depositions of Cox Automotive employees was billed to the Cox Automotive specific matter number; it was the same for Authenticom and MVSC witnesses.

    b.    Time spent collecting, reviewing, and producing documents on behalf of AutoLoop was billed to the AutoLoop specific matter number, while time spent reviewing productions from CDK and Reynolds was billed to the AutoLoop Common Benefit matter number. *Compare* Ex. F-1 (Row 663), *with* Ex. F-2 (Row 8). Similarly, time spent collecting, reviewing, and producing documents on behalf of Cox Automotive was billed to the Cox Automotive specific matter number; it was the same for Authenticom and MVSC documents.

c.      Time spent on expert reports and expert depositions on behalf of only AutoLoop and the Vendor Class was billed to the AutoLoop specific matter number, while time spent on expert reports and depositions that also benefited our other clients was billed to the AutoLoop Common Benefit matter number.  Similarly, time spent on expert reports only on behalf of Cox Automotive was billed to the Cox Automotive matter number; the same for the Authenticom and MVSC-specific expert reports, such as the damages expert reports for these clients.

d.      Time spent responding to summary judgment briefs directed specifically at AutoLoop was billed to the AutoLoop specific matter number, while time spent drafting summary judgment briefs relating to common antitrust legal theories was billed to the AutoLoop Common Benefit matter number. *Compare* Ex. F-1 (Row 1334), *with* Ex. F-2 (Row 9280).

e.      Time spent preparing for and attending court hearings after only the Vendor Class claims remained was billed to the Vendor Class, while time spent preparing for and attending hearings that affected multiple clients was billed to the AutoLoop Common Benefit matter number.  *Compare* Ex. F-1 (Row 2031), *with* Ex. F-2 (Row 5319).

75.    I monitored the timekeeping records on a monthly basis to ensure that team members were accurately recording their time in accordance with my instructions.  I also sent periodic reminders to the team about how to account for their time.  For example, if there was a specific project attributable to a specific client, I would direct the team on how to record their time for that project.

- 24 -

76.     We used the same method of tracking expenses incurred during the course of litigation.  Every expense is assigned to the matter for which the expense was incurred.  I instructed team members to use the same method of attributing expenses to DMS matter numbers as I instructed them to use for their time entries.  Accordingly, expenses that were incurred for specific clients were assigned to that client matter number, and expenses that were for the Vendor Class but also benefited our other clients in the DMS antitrust litigation were assigned to the AutoLoop Common Benefit matter number.  Authenticom, Cox Automotive, and MVSC paid their share of the expenses assigned to the AutoLoop Common Benefit matter number.

## VI.    KELLOGG HANSEN'S LODESTAR

77.     Kellogg Hansen has calculated our lodestar with respect to the Vendor Class to be $66,474,455.  We arrived at this figure using the following process.

78.     First, I directed our firm's accounting department to export all time entries for the DMS antitrust litigation matter numbers into an Excel spreadsheet.  This spreadsheet contained time entries from November 4, 2016, through May 30, 2025.  There were 28,242 entries (all tasks for a single matter by a single timekeeper on a single day are consolidated into a single entry, with the time spent on each task reflected in parentheses); 106,583 hours worked; and $116,160,560 in fees at 2025 rates.

79.     Second, I directed certain categorical exclusions for tasks that should not be attributed to the Vendor Class.  These categorical exclusions removed 37,906 hours worked worth $44,346,508 at 2025 rates.  The categorical exclusions are listed below.

        a.     All time entries that had been assigned to the Authenticom matter;

        b.     All time entries that had been assigned to the MVSC matter; and

        c.     All time entries that had been assigned to the Cox Automotive matter.

80.     I directed that these categorical exclusions be applied even though I knew this would result in an overly conservative calculation of our lodestar.  Had we not performed this work for other clients investigating the antitrust claims at issue, for example, we necessarily would have needed to spend additional time for the Vendor Class.

81.     Third, my team and I reviewed what remained, which were the time entries for the AutoLoop-specific matter number and the AutoLoop Common Benefit matter number.   We reviewed 18,775 time entries one-by-one to ensure that all these time entries represented work that we reasonably needed to perform for the Vendor Class.  In conducting this review, we heeded this Court's guidance that all hours need to be reviewed for reasonableness and that appropriate billing judgment has been exercised.  This review resulted in the exclusion of 5,198 hours and $5,339,597 of fees from the lodestar.  I excluded these time entries because – even though it was almost always properly billed as time on behalf of the Vendor Class – they did not reflect work that reasonably needed to be performed for the Vendor Class.

82.     We undertook this detailed review and audit of our time for the Vendor Class even though I knew that it also would result in an overly conservative calculation of the lodestar.  It took roughly 600 hours over more than a month to conduct that audit.  None of that time is included in the lodestar.

83.     Fourth, we reviewed all time entries since the date of the proposed settlement to exclude all time entries associated with the preparation of class counsel's fee petition.  Although there is authority that such work may be included in a lodestar calculation, I did not think it was appropriate to include this work as time spent for the benefit of the Vendor Class.

84.     Fifth, we included Professor Issacharoff's hours on behalf of the Vendor Class – 0.8% of the lodestar ($549,360) and 0.7% (122) of the time entries.  We also included time spent

by Godfrey & Kahn on behalf of the Vendor Class – 0.2% of the lodestar ($123,178) and 0.9% (152) of the time entries. Kellogg Hansen has paid Godfrey & Kahn's legal fees out-of-pocket on a monthly basis throughout this litigation. Those legal fees are therefore part of our risk. For Professor Issacharoff and Godfrey & Kahn, we have used their standard 2025 billing rates according to the declarations they have submitted accompanying the final approval motion.

85.     I have attached the remaining time entries as Exhibit F-1 (AutoLoop-specific) and Exhibit F-2 (AutoLoop Common Benefit), which appear as two tabs on the concurrently submitted Excel spreadsheet. These entries identify the timekeeper, date, hourly rate, time spent, and task performed. In total, $30,162,091 of the lodestar was billed to the AutoLoop-specific matter number and $36,312,364 was billed to the AutoLoop Common Benefit matter number. I have filed the time entry descriptions for Exhibit F-1 and Exhibit F-2 under seal to preserve attorney-client and work-product privilege to the greatest extent possible. If any member of the Vendor Class would like to review these time entries, we will work with them on a case-by-case basis.

86.     The lodestar calculation uses our 2025 hourly rates that we charge our non-contingency clients. I used these rates because they are the rates that we charge our fee-paying clients. I used the 2025 rates because the lodestar fee includes time spent as far back as 2017. It would severely undercount our investment to use historical rates for this seven-year litigation when the fee will not be received until the second half of 2025, at the earliest. Had we chosen to represent fee-paying clients on a non-contingency basis, we would have received payment as the work was performed on a monthly basis.

87.     Unlike many other firms, Kellogg Hansen does not have a regular practice of discounting its regular hourly rates. The hourly rates used in calculating the lodestar are the hourly rates that we charge to fee-paying clients. █████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

88.     Courts have approved our customary hourly rates in fee petitions.   To my knowledge – and after canvassing the firm's partnership – no court has found that our hourly rates are unreasonable.  Several courts have recently found our hourly rates to be reasonable.

    a.    In 2025, a magistrate judge for the Western District of Kentucky recommended granting our fee petition and found our 2025 hourly rates – from $475 to $545 for paralegals, from $590 to $985 for staff attorneys and associates, and from $1,225 to $1,800 for partners – to be reasonable.  *See United States ex rel. Scott v. Humana, Inc.*, No. 18-61, Dkt. 761 (W.D. Ky. Apr. 30, 2025).

    b.    In 2024, a Florida state court in Tallahassee found our 2024 hourly rates – – $450 for paralegals, up to $1,040 for associates, $1,080 for of counsel, and up to $1,675 for partners – to be reasonable.  *See Emerson v. Florida Department of Revenue*, No. 2021-487 (Fl. Cir. Ct. Hillsborough Cty. 2024).

c.     In 2023, the Bankruptcy Court for the Southern District of Indiana found our 2023 hourly rates – up to $495 for paralegals, up to $940 for associates, $1,025 for of counsel, and up to $1,850 for partners – to be reasonable.  *See In re Aero Technologies LLC*, No. 22-2890 (Bankr. S.D. Ind. 2023).

89.     Seventy-nine employees – 10 partners, 1 of counsel, 19 associates, 19 staff attorneys, 17 paralegals, 9 researchers, and 4 litigation support specialists – of Kellogg Hansen contributed to the lodestar fee during the more than seven years of work on behalf of the Vendor Class.  The 2025 hourly rates for each of those employees are included in Exhibit G.  For individuals who are no longer employed by Kellogg Hansen, the lodestar calculation uses the 2025 hourly rate for the most comparable current employee of the firm.  For individuals who were promoted during the litigation (for example, from associate to partner), the lodestar calculation uses the 2025 rate for the position held by that individual in the year in which work was performed. For example, for an associate that was promoted to partner on January 1, 2020, that individual's 2025 associate hourly rate would apply to work performed before 2020, and that individual's 2025 partner rate would apply to work performed from 2020 to the present.

90.     Godfrey & Kahn made significant contributions to this case.  Godfrey & Kahn sent its bills to Kellogg Hansen on a monthly basis, which Kellogg Hansen paid.  Kellogg Hansen is not seeking reimbursement for the out-of-pocket payment of these bills.  Instead, from the start, Kellogg Hansen intended to include Godrey & Kahn's hours into the lodestar given that Kellogg Hansen was paying – and therefore taking the risk of nonpayment – for these hours, just as Kellogg Hansen was doing with its own hours.

91.     I encouraged lean staffing practices throughout the case.  For the 96 depositions taken or defended for the Vendor Class, we frequently had only a single attorney attend – the

person actually taking or defending the deposition – and, at most, there would be two. For court hearings, we would frequently have between one and three attorneys attend. The massive summary judgment and *Daubert* briefing period involved a core of five to ten attorneys. The trial team was only ten attorneys (four partners, one of counsel, and five associates).

92.    The vast majority of the lodestar (more than 80% of hours and fees) is attributable to a consistent core of 20 Kellogg Hansen individuals (six partners, one counsel, four associates, five staff attorneys, and four paralegals). Their position and 2025 hourly rate are listed below.

| Timekeeper | Position | 2025 Rate |
|---|---|---|
| Aaron Panner | Partner | $1,825 |
| Michael Nemelka | Partner | $1,795 |
| Derek Ho | Partner | $1,795 |
| Daniel Dorris | Associate / Partner | $1,110 / $1,450 |
| Joshua Hafenbrack | Associate / Partner | $1,110 / $1,450 |
| Bethan Jones | Associate / Partner | $1,110 / $1,225 |
| Collin White | Associate / Of Counsel | $1,110 / $1,165 |
| Matthew Wilkins | Associate | $1,110 |
| Daren Zhang | Associate | $920 |
| Dan Guarnera | Associate | $850 |
| Kaleb LeGore | Associate | $770 |
| Andrew Churella | Staff Attorney | $590 |
| Melissa Rodriguez | Staff Attorney | $590 |
| Kimberly Briggs | Staff Attorney | $590 |
| Robert Moore | Staff Attorney | $590 |
| Michael Grody | Staffy Attorney | $590 |
| Susan Cohen | Paralegal | $545 |
| Drew Kizzie | Paralegal | $475 |
| Sean Sullivan | Paralegal | $475 |
| Robyn Sommerfield | Paralegal | $475 |

## VII.    KELLOGG HANSEN'S REIMBURSABLE EXPENSES

93.    Kellogg Hansen has calculated the unreimbursed expenses incurred for the benefit of the Vendor Class to be $12,358,238. This amount significantly understates the amount of expenses that Kellogg Hansen would have incurred to litigate solely on behalf of the Vendor Class

because Kellogg Hansen has already been partially reimbursed by other clients for common-benefit expenses.  We arrived at this figure using the following process.

94.    First, I directed our firm's accounting department to provide all expenses for the AutoLoop-specific and AutoLoop Common Benefit matter numbers that had not been reimbursed.  This amounted to $18,710,342 of actual, unreimbursed litigation expenses paid by us.  No markup was applied.

95.    Second, my team and I reviewed each of these unreimbursed expenses line-by-line to ensure that the expense was both reasonable and was incurred for the benefit of the Vendor Class.  We excluded $6,352,104 of expenses during this process.  These are costs that we will not be reimbursed for by any client.

96.    After these exclusions, we seek reimbursement of $1,489,498 of out-of-pocket expenses and $10,868,740 of expert expenses.  Exhibit H contains an itemization of the out-of-pocket expenses, and Exhibit I contains an itemization of the expert expenses.  I have filed the descriptions for the expenses in Exhibit H under seal to preserve attorney-client and work-product privileges to the greatest extent possible.  If any member of the Vendor Class would like to review these time entries, we will work with them on a case-by-case basis.

97.    Below is an explanation of the out-of-pocket expense categories in Exhibit H.

a.    **Business Meals –** Expenses for meals incurred during travel or late-night work.

b.    **Court Fees** – Filing fees, pro hac vice fees, appearance fees, etc.

c.    **Court Transcripts** – Costs of transcripts of court hearings.

d.    **Delivery/Mail** – FedEx and other delivery expenses.

e.  **Deposition Transcripts –** Court reporter and videographer services for depositions provided by Veritext, LLC.

f.  **Document Vendor** – Outside duplication expenses and expenses for E-Discovery and document review platforms.

g.  **Hotel –** Costs of hotels for work travel.

h.  **Madison Trial Office Expenses** – Expenses incurred to establish a trial office for the trial in January 2025, and a deposit for a block of hotel rooms to be used during the trial (25 rooms for 26 nights at an average rate of $120 per room per night).

i.  **Online Research** – Expenses for legal research on Westlaw, Lexis, and PacerPro, and similar platforms.

j.  **Other Expenses –** Miscellaneous expenses such as subscriptions to industry publications (for example, Automotive News), attending industry events, and book purchases for expert work.

k.  **Photocopies** – In-house copy and printing expenses incurred by Kellogg Hansen prior to February 2019, when Kellogg Hansen stopped charging fee-paying clients for such expenses.

l.  **Process Servers** – Expenses to serve subpoenas.

m.  **Travel / Airfare** – Expenses for transportation, primarily for depositions and court hearings.

98.  Below is a description of the most significant vendors listed in Exhibit H.

a.  **Capitol Process Services, Inc.** – Process server.

b. **The Madison Concourse Hotel Inc.** – Hotel for which Kellogg Hansen booked a block of rooms for trial and incurred cancellation fees.

c. **DigiSource, LLC** – Vendor that provides trial exhibit stamping services.

d. **HaystackID LLC** – Outside discovery vendor used for document hosting and e-discovery services.

e. **Huseby, LLC a/k/a Digital Evidence Group** – Trial presentation and graphic services provider.

f. **Inspired Review, LLC** – E-discovery and document review services firm acquired by HaystackID.

g. **L2 Services, LLC** – Printing vendor used to prepare exhibits for several depositions taken in Chicago, IL.

h. **Orca Al LLC** – Discovery vendor that provides predictive coding services used for review of discovery materials.

i. **TransPerfect Document Management, Inc.** – Printing and delivery services.

j. **Veritext Legal Solutions** – Court reporting and videography company. Due to the large number of depositions, Kellogg Hansen negotiated deferred payment until 2022 – well after most depositions were actually taken – which is why these bills appear in that time period.

k. **West Washington Associates, LLC** – Office space rented for January 2025 trial for which Kellogg Hansen incurred cancellation fees.

99.    Below is a description of the consultants and experts, and the work they performed on behalf of the Vendor Class, listed in Exhibit I.

a.    **Alston & Bird LLP** – This is the firm with which the Vendor Class's privacy and security expert Peter Swire was affiliated.  Mr. Swire offered opinions regarding the reasonableness of CDK's and Reynolds's blocking of independent data integrators from the perspective of an expert in privacy and cybersecurity.  These opinions were essential because one of CDK's main defenses was that the blocking was procompetitive by enhancing privacy and data security.  Mr. Swire charged his standard hourly rate.

b.    **Berkeley Research Group, LLC ("BRG") –** This is a consulting firm that briefly explored certain damages theories – including lost profits – on behalf of the Vendor Class that we decided not to pursue further.  BRG charged its standard hourly rate.

c.    **Capsicum Group, LLC** – This is the consulting firm that the Vendor Class's computer forensics expert Brian Halpin was affiliated.  Mr. Halpin provided opinions regarding the authenticity of a key piece of evidence: Mr. Steve Cottrell's contemporaneous notes of a conversation he had with Mr. Dan McCray in which Mr. McCray all but admitted to the conspiracy. Capsicum charged its standard hourly rate.

d.    **Compass Lexecon** – This is the economic consulting firm with which the Vendor Class's antitrust and damages expert Dr. Mark Israel was affiliated. Dr. Israel is a preeminent antitrust expert and provided opinions regarding the antitrust violations by CDK and Reynolds, the damages suffered by the Vendor Class, and continues to provide services regarding allocation of the settlement proceeds.  Compass Lexecon charged its standard hourly rates.

e.    **DecisionQuest** – This is a trial consulting firm used by Kellogg Hansen to help prepare certain witnesses for their depositions and potential trial testimony.  The firm also conducted the jury exercise as part of Kellogg Hansen's trial preparation.  DecisionQuest charged its standard hourly rate.

f.    **Exiger LLC –** This is a computer forensics consulting firm that was used alongside Mr. Halpin and the Capsicum Group.  Exiger charged its standard hourly rate.

g.    **Fontana Advisors LLC** – This is a consulting firm with which the Vendor Class's industry expert Allan Stejskal was affiliated.  Mr. Stejskal provided opinions regarding the history and uses of data integration.  His testimony would have provided the jury with essential background to understand the complex DMS industry.  Fontana charged its standard hourly rate.

h.    **Nextpoint, Inc.** – This is a trial services firm that prepared trial graphics, presentations, and deposition designation videos to be played at trial.

i.    **Shostack & Associates** – This is the computer security firm with which Vendor Class's computer security expert Adam Shostack was affiliated.  Mr. Shostack provided opinions regarding the security practices of CDK, Reynolds, and independent integrators such as Authenticom.  These opinions were important to rebut CDK's defense that blocking data integrators enhanced data security.  Mr. Shostack charged his standard hourly rate.

j.    **Strut Legal, Inc.** – This is a vendor that provided hyperlinking and e-brief services used by the Vendor Class in its summary judgment briefing.

k.    **Third Stage Consulting Group LLC** – This is an enterprise resource planning ("ERP") consulting firm with which the Vendor Class's ERP expert Eric Kimberling was affiliated.  Mr. Kimberling offered opinions regarding industry practices for allowing automated access to ERP systems. His opinion regarding industry practices rebutted CDK's argument that its blocking of independent integrators enhanced data security.    Mr. Kimberling charged its standard hourly rate.

l.    **MJM Limited** – This is a law firm located in Bermuda used to obtain records relating to Bob Brockman's ownership and control of Reynolds, including the trusts he created and controlled as part of that ownership.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  June 10, 2025

/s/ Michael N. Nemelka

Michael N. Nemelka