UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

LOOP, LLC, d/b/a AUTOLOOP, on behalf of
itself and all others similarly situated,

        Plaintiff,

  -vs-                      Case No. 24-CV-571-JDP

CDK GLOBAL, LLC,              Madison, Wisconsin
                             August 29, 2025
            Defendant.      2:04 p.m.

_____

STENOGRAPHIC TRANSCRIPT OF SETTLEMENT APPROVAL HEARING
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:
For the Plaintiff:

        Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
        BY:  MICHAEL N. NEMELKA
            DEREK T. HO
            DANIEL V. DORRIS
        1615 M Street, NW
        Suite 400
        Washington, D.C.  20036

        Godfrey & Kahn, S.C.
        BY:  JENNIFER L. GREGOR
        One East Main Street, Suite 500
        Madison, Wisconsin  53701

For the Defendant:

        Kirkland & Ellis LLP
        BY:  KEVIN M. JONKE
        333 West Wolf Point Plaza
        Chicago, Illinois  60654


         Jennifer L. Dobbratz, RMR, CRR, CRC
        U.S. District Court Federal Reporter
          United States District Court
        120 North Henry Street, Rm. 410
          Madison, Wisconsin  53703
             (608) 261-5709

```
1              (Proceedings called to order at 2:04 p.m.)

2              THE CLERK:  Case No. 24-CV-571-JDP, Loop, LLC v. CDK

3    Global, LLC, called for a settlement approval hearing.

4         May we have the appearances, please.

5              MS. GREGOR:  Good afternoon.  Jennifer Gregor from

6    Godfrey & Kahn for Loop, LLC, on behalf of the vendor class.

7    And lead counsel with me today is Mike Nemelka from the Kellogg

8    Hansen team.

9         And as a point of order, would you like us to stand when

10   addressing the Court?

11             THE COURT:  You can just stay seated.  It keeps you

12   closer to the microphone, so --

13             MS. GREGOR:  Thank you.

14             THE COURT:  -- I appreciate that.

15             MR. NEMELKA:  Thank you, Your Honor.  Good afternoon.

16   Michael Nemelka from Kellogg Hansen on behalf of the vendor

17   class.

18        May I introduce a few people here with us today?

19             THE COURT:  Please do.

20             MR. NEMELKA:  Okay.  So I have my colleagues Derek Ho

21   and Dan Dorris also from Kellogg Hansen --

22             THE COURT:  Very good.

23             MR. NEMELKA:  -- on behalf of the vendor class.

24        And then with us today are several members of the vendor

25   class, including we have Nathan Jaye, who is the general counsel
```

1    of Autoloop.

2            THE COURT:  Okay.  Good afternoon to you.

3            MR. NEMELKA:  We have Steve Stubitz, the CEO of

4    Affinitiv.

5            MR. STUBITZ:  Good afternoon, Your Honor.

6            THE COURT:  Good afternoon.

7            MR. NEMELKA:  We have David Babin, the general counsel

8    of Solera.

9            MR. BABIN:  Good afternoon, Your Honor.

10           THE COURT:  Good afternoon.

11           MR. NEMELKA:  Jeff Swart, the general counsel of

12   TrueCar.

13           MR. SWART:  Good afternoon, Your Honor.

14           THE COURT:  Good afternoon.

15           MR. NEMELKA:  And then by Zoom joining is Allan

16   Stejskal, the CEO of AutoAlert.

17           THE COURT:  Okay.  Hello.

18           MR. STEJSKAL:  Good afternoon.

19           THE COURT:  Good afternoon.

20           MR. NEMELKA:  And Rusty Friddell, the general counsel

21   of Dominion.

22           MR. FRIDDELL:  Good afternoon.

23           THE COURT:  Good afternoon to you.

24           MR. NEMELKA:  And then I'll let the experts introduce

25   themselves.  But if I could, Your Honor --

```
1              THE COURT:  All right.
2              MR. NEMELKA:  -- I would like to introduce to you our
3     lead paralegal on the case, Drew Kizzie.
4              THE COURT:  Thanks for your work.
5              MR. NEMELKA:  He's been with us from the very start,
6     and everything that we've ever filed in this case, he's been the
7     last eyes on.
8              THE COURT:  All right.  Very good.  Thanks for your
9     contribution.
10             MR. NEMELKA:  And Devon Sherrerd --
11             MS. SHERRERD:  Good afternoon, Your Honor.
12             MR. NEMELKA:  -- who is our lead assistant on the case
13    who has incredibly managed a very complex set of records and
14    cases, and I wanted to recognize her in front of the Court.
15             THE COURT:  I'm glad you did that.  Thank you.
16         And I think I see Nicole in the back.  Thanks for your
17    contributions.  I know how important yours are too, so.  All
18    right.
19             MR. NEMELKA:  Thank you.
20             THE COURT:  Is that it for your side?
21             MR. NEMELKA:  Just the experts.
22             THE COURT:  Okay.
23             MR. NEMELKA:  Professor Rubenstein?
24             UNIDENTIFIED SPEAKER:  (Unintelligible.)  Go ahead,
25    sir.
```

```
1              MR. RUBENSTEIN:  I'm sorry, Judge Scott.  You go first.

2              MR. SCOTT:  Good afternoon, Judge.  Tom Scott.  I'm one

3    of the experts on behalf of the -- Loop.

4              THE COURT:  Thanks very much for your work.  I

5    appreciate it.

6              MR. RUBENSTEIN:  And, Your Honor, I'm Bill Rubenstein.

7    I'm a professor at Harvard Law School.  I'm another expert on

8    behalf of the plaintiffs.  I regret that I can't be there in

9    person because of my responsibilities, so I thank you very much

10   for allowing me to appear via Zoom.

11             THE COURT:  No problem.  It's quite efficient, and

12   thanks for your report as well.

13             MR. RUBENSTEIN:  Thank you.

14             MR. NEMELKA:  That's it.

15             THE COURT:  All right.  Is that it?

16             MR. NEMELKA:  That's it.  Thank you, Your Honor.

17             MR. JONKE:  Good afternoon, Your Honor.

18             THE COURT:  You seem to be undermanned here.

19             MR. JONKE:  Yeah.  Just me here today, Your Honor.

20        Kevin Jonke from Kirkland & Ellis for CDK.

21             THE COURT:  All right.  Very good.  Your job is just to

22   get out of here as fast as you can.  I understand.

23        All right.  I just have a few questions here.  I don't

24   think we'll take a long time here.  Thanks for your submissions

25   and for addressing the Court's concerns in the preliminary
```

1    approval order.  So let me just walk through the things that I

2    have to determine in order to approve the settlement and ask the

3    questions as I go down the list.

4         So the first topic is notice, and I'm generally satisfied

5    with the notice that was provided, and we have a relatively high

6    response.  This is an unusual case in that so many of the class

7    members have such a substantial stake in the outcome and in

8    getting paid, so I want to make sure that we -- that basically

9    we don't miss anyone.  So I think we have six class members who

10    have not received notice, and so I know there are some members

11    of the class that are on the -- kind of on the de minimis end of

12    things, but I want to find out do we know who the six members

13    are, and why didn't they receive notice, and are we making any

14    further efforts to get notice to them?

15         MR. NEMELKA:  We do know who they are, Your Honor.

16    They are on the de minimis, and we have been trying to find out

17    how we can contact them.  Based on our investigations, we think

18    they are companies that no longer exist.  We've looked at state

19    incorporation records.  We're trying to find, even on LinkedIn,

20    former officers of the company, but we -- the BrownGreer

21    settlement administrator and including the researchers at

22    Kellogg Hansen continue to try to find out if there's any

23    continuing vestige of these six.

24         THE COURT:  All right.  I'm satisfied with that.  I

25    think you should try to do that, but in any other case, that

1    would be an extraordinary high notification rate, and so I'm

2    not -- I'm not concerned with it here.  As I said, I looked at

3    the table of class members and their recovery, so I know there

4    are maybe a dozen or so that are really on the de minimis side

5    of things so --

6           MR. NEMELKA:  Your Honor, I forgot to provide one

7    update, if I could.

8           THE COURT:  Sure.

9           MR. NEMELKA:  In our final approval motion, we let you

10   know how many vendors had signed up for --

11          THE COURT:  That's another question, yeah.

12          MR. NEMELKA:  Okay.

13          THE COURT:  And the distribution method, so --

14          MR. NEMELKA:  Yeah.

15          THE COURT:  -- I will get to that.

16          MR. NEMELKA:  Okay.  Great.

17          THE COURT:  Then as far as the substantive approval of

18   the settlement, I have to consider the Rule 23(e)(2) factors,

19   and I'll go through those.

20       I'm quite satisfied that the representation here was, to

21   say the least, adequate.  I think it appears that class counsel

22   did a great job, and so we have reputable firms with track

23   records of substantial quality, and the work here really was

24   very fine.  So I have no qualms about approving the class

25   counsel, and I think the class representative was an adequate

1  class representative as well.  I notice that Autoloop's

2  recovery, I think it's maybe number six or number seven among

3  the class, so I think that the class representative was

4  perfectly appropriate.

5       There's no question that this was no collusion in the

6  settlement.  It was a very, very hard fought case, and the

7  settlement was negotiated at arm's length, so I have no problem

8  there.

9       The adequacy of relief, again, that's not a close call

10  either.  It's unusual in a class action case to get anything

11  like 84 percent of the damages calculated by the class, and so I

12  will note that, of course, the award would have been trebled if

13  you had been successful.  The argument is that, of course, that

14  was all subject to remittitur or appeals and surviving all of

15  that, but that's true of the substantive damages award as well.

16  But I'm satisfied that getting 84 percent of the basic damages

17  to the class is a very adequate result.  My one concern, as I

18  indicated in the preliminary approval order, is the attorney's

19  fees, so we're going to have a more substantial discussion about

20  the attorney's fees when we get to that point.  But I'm

21  satisfied that the relief provided to the class would be

22  adequate.

23       Class members are going to get a pro rata share based on

24  their volume of purchases.  I think that is a perfectly

25  appropriate way of distributing or dividing the settlement among

1    the class members, so I think the settlement agreement treats

2    the class members equitably with respect to each other.

3        On the response of the class members, I had only one

4    opt-out and no objectors to the settlement amount, so that is a

5    very good sign.

6        I am questioning -- I have concerns then about the -- and I

7    understand why you would want to have an account process.

8    There's no claims process, so I think that was very simple, but

9    people have to sign up for this account, and apparently as of

10   the time of -- at the end of July, we had, I think, only about

11   half of the class members had signed up for the account.  So now

12   is the time for your update on that.

13       MR. NEMELKA:  Yeah.  Thank you, Your Honor.

14       We now have 141 of 243 class members that have signed up.

15   That's 58 percent.

16       THE COURT:  Okay.

17       MR. NEMELKA:  But I think, more importantly, those 141

18   vendors reflect 90 percent of the recovered -- recoverable

19   damages.  So almost all of the vendors with material recoveries

20   have signed up --

21       THE COURT:  Okay.

22       MR. NEMELKA:  -- and the remaining 90 that haven't are

23   generally on the much smaller side.

24       THE COURT:  Right.

25       MR. NEMELKA:  It doesn't mean our efforts trying to,

1    you know --

2    THE COURT:  We're talking big numbers here, so even a

3    small percentage is significant.

4    MR. NEMELKA:  Agreed.  And we're working hard to assist

5    vendors to go through the process to sign up.

6    THE COURT:  Okay.  All right.  All right.  So by the

7    time we make the distribution, hopefully we'll get that amount a

8    little bit higher.  So I'm pleased that at least 90 percent of

9    the recovery has been claimed I'll say, that they got their

10   account set.  So all right.

11   The next issue is the attorney's fees, which, honestly, is

12   really the largest point of controversy in the approval here.

13   So let me start with a couple of basic questions.

14   So Mr. Issacharoff and Godfrey & Kahn are included in the

15   lodestar.  How are they going to be compensated?  Are they just

16   going to be paid their hourly rate?  Are they getting a share of

17   the contingency?  How does that work?

18   MR. NEMELKA:  Godfrey & Kahn, we've been paying their

19   hourly rates as we receive their bills, so they -- it's a risk

20   that Kellogg Hansen has been taking on.  We're not seeking

21   reimbursement for those, so they will be paid out of the

22   attorney award --

23   THE COURT:  Okay.

24   MR. NEMELKA:  -- based on the discretion of lead

25   counsel.

```
1            Professor Issacharoff has not been paid.  We have not been
2    paying his bills, and so he will be paid a certain multiplier on
3    his hours based on lead counsel.
4            And I have to deeply apologize.  I forgot to introduce
5    Professor Issacharoff, who has been an absolute key member of
6    our team.  He's right here.
7                    THE COURT:  Oh, there he is.
8                    MR. ISSACHAROFF:  Right here, Your Honor.
9                    THE COURT:  I thought you were going to be here.
10   Thanks for -- did you come all the way from New York just to see
11   us today?
12                   MR. ISSACHAROFF:  I had no other occasion to be here,
13   yes.
14                   THE COURT:  Well, thanks for making the trip.
15                   MR. NEMELKA:  I apologize for forgetting to introduce
16   him.
17                   THE COURT:  All right.  I have a question about the
18   common benefit amount that was part of the lodestar, and let me
19   tell you what I think it means, and then you can answer the
20   other questions about it.
21           So I gather, you know, this case was part of a complex of
22   cases with some overlapping work, and so my understanding is the
23   common benefit time was work that was applicable to multiple
24   cases; is that correct?
25                   MR. NEMELKA:  That's correct.  It's work that had to be
```

```
 1      performed on behalf of the vendor class, but it also benefited
 2      the other clients.
 3           THE COURT:  Yeah.  And so was that time also submitted
 4      to support the awards in the other settlements?
 5           MR. NEMELKA:  Those other settlements were based on
 6      contract.  There was no approval process, so we never submitted
 7      hours in those other cases.
 8           THE COURT:  Okay.  All right.  Because here -- I have
 9      some concerns with the lodestar calculation, and let me just lay
10      them out on the table here, bearing in mind that the -- and I'm
11      trying to follow the Seventh Circuit approach on approving the
12      attorney's fees, which is essentially in this circuit I'm
13      supposed to kind of recreate sort of a hypothetical ex ante
14      negotiation of the fees for the work in this case.  As in a lot
15      of cases, a lot of the information that we have about the case
16      is really ex post facto information about what the recovery was
17      and how much work it took, and so even the Seventh Circuit cases
18      recognize that the lodestar total is a cross-check on the
19      reasonableness of the fee, but I have some concerns about it.
20           One is this common benefit amount that -- I recognize it
21      was necessary for this case, but it also served other cases in
22      which there was a recovery as well.  So to take the lighthouse
23      example, it's like every ship that goes by doesn't have to pay
24      the full cost of the lighthouse.  It gets divvied up amongst the
25      people who end up using it or is funded through some other way.
```

1    So I'm not sure I would think that it's appropriate just to add

2    the entire common benefit time to the lodestar in this case.  So

3    that's one of the -- in fact, the single major concern that I

4    have with the calculation of the lodestar is to take the common

5    benefit amount and just put it all in and count it as the

6    lodestar on this case when it served the others for which you

7    were compensated.

8        MR. NEMELKA:  So a few responses, Your Honor.

9    One is that work had to be performed for the vendor class

10   no matter what.  So even if there were no other plaintiffs --

11       THE COURT:  I get that.

12       MR. NEMELKA:  -- that is all work that had to be

13   performed.

14   The second, I would say, is that, as Your Honor saw, we

15   already categorically excluded all time from our lodestar that

16   was performed on behalf of the other clients.  So none of the

17   time in this lodestar was performed exclusively for other

18   clients.  It's only --

19       THE COURT:  I get that too, yeah.

20       MR. NEMELKA:  And then the third point I would mention

21   is for the -- the common benefit time was more important and

22   more valuable for the vendor class.  We had other burden -- we

23   had burdens to shoulder that the other cases didn't.  We had the

24   Rule 23 factors of commonality and predominance.  The

25   discovery -- the common discovery we took was largely driven by

1    the needs of the vendor class.

2        And then the fourth point I would mention is that the

3    lodestar is a cross-check.  As Professor Rubenstein said in his

4    report, it's important to be as accurate as you can, but it's

5    not something that's supposed to be, like, a precise formula

6    to -- I forget the phrase he uses -- but, like, a titrated

7    process.  It's to make sure that it's an accurate check to make

8    sure it's not -- there's not a windfall.  And I would say, you

9    know, trying to figure out how much to discount of that common

10   time that was performed on behalf of the vendor class would be

11   more like trying to get an absolute precise number instead of

12   making sure that it's a ballpark cross-check on a windfall.

13       THE COURT:  I certainly get that point, right?  We're

14   not achieving accounting perfection in establishing any of this,

15   but it's such a large amount.  I think it ended up being $36

16   million, which is larger than the time that was uniquely billed

17   for the CDK case.  So, I mean, even if I were to, say, give you

18   two-thirds credit for the common benefit fund, it has a big

19   effect on the lodestar multiplier, so I think that's worth

20   discounting some.  I don't know exactly how much.  And, again,

21   it's not a question of achieving accounting perfection here.

22       Let me tell you another thing that I think makes the

23   lodestar quite inflated, and that is that the use of 2025 rates

24   is a concern.  And I understand that the time that was billed in

25   2018, you know, that's been kind of on the books and been

1    financed by your firm for seven years, but the numbers are, it

2    seems to me, quite daunting.  And I'm just going to use you as

3    an example because I don't know the hourly rates of many of the

4    others from 2018.  But in your engagement letter with Autoloop,

5    your rate at the time was $700 an hour, and now you're billing

6    at $1,800 an hour, and so the lodestar is calculated based on an

7    amount that is more than double the rate at the start.  And so I

8    don't know if other people are in that situation, but that

9    increase so far outstrips what would be an interest compensation

10   for the time of that effort being held in inventory.  And so it

11   strikes me that that is -- that has a huge upward pressure on

12   the lodestar amount.

13        MR. NEMELKA:  Thank you for the question.  A few

14   responses to that.

15        My rate at the firm has increased faster, frankly, than the

16   others.  That is the rate I charge my fee-paying clients today.

17        THE COURT:  I get that.  I'm not challenging that at

18   this point.

19        MR. NEMELKA:  But Your Honor is correct that my rate --

20   I was a very junior partner when we got these cases, and I've

21   been able to increase my market rate since then.  The rate of

22   our firm has increased as a percentage basis quite a bit through

23   those years, but mine is, I would say, is more than --

24        THE COURT:  You're the most successful person in the

25   firm.

```
 1              MR. NEMELKA:  No.  It's not that.  It's maybe I started
 2       a little bit lower than others.
 3              And, frankly, for a firm of our caliber, since we're
 4       talking, our 2017 rates were much lower than firms of our
 5       caliber were charging.  It is something that our firm had not
 6       paid as much attention to as it should have, and over the years,
 7       we've made a concerted effort to make sure we're charging the
 8       rates that we're worth, and when you look at our track record,
 9       it's laid out.  A firm of our skill and expertise, we've
10       achieved the largest, second largest antitrust verdicts ever.
11       We've litigated all the leading Supreme Court antitrust --
12              THE COURT:  I'm not challenging the 2025 rates.  I'm
13       just saying that when I look at the example that I have, I see a
14       really dramatic increase.  Maybe some of the other increases
15       aren't quite so dramatic, but I have a strong sense that the
16       increase in the hourly rates of the individuals who worked on
17       this case would far outstrip what the interest compensation for
18       that time was so that if you adjusted them based on the actual
19       rates that were applicable to the time the work was done, that
20       lodestar would come down a lot.
21              MR. NEMELKA:  I haven't done that -- I haven't done
22       that calculation, but I know that we've just calculated the
23       lodestar according to the case law that says that, you know,
24       current rates are what should be used to compensate for the
25       delay in payment.
```

1           THE COURT:  Which gets to another concern I have about

2   lodestars in general, and I will just tell you that my review of

3   the lodestar is far less searching than the review would be if

4   it were truly an adversarial kind of review.  I approve fee

5   awards every week, and if the fee is going to be paid by the

6   defendant, the defendant writes a brief that says -- you know,

7   as long as your brief in support of the settlement, I get a

8   really careful, searching review.  And in cases in which we're

9   reviewing the fees in class action cases, because we don't

10  really have an adversarial presentation, the review is kind of

11  light.  And so because there's not as much at stake in that

12  searching review, I think a lot of times fee awards are

13  approved, market rates are approved without as robust support as

14  there would be otherwise.

15          And, again, this is not one of my main concerns.  My two

16  main concerns are the yearly rates that were used and the common

17  benefit time.  Those are my two main concerns.  But when I look

18  at lodestar approvals in other cases, I know that they're just

19  not as searchingly reviewed as they are in truly adversarial

20  situations.

21          So I appreciated Judge Scott's review, but even that was

22  not as searching as it would have been if it had been done by an

23  adversary.  And I only spot checked the time entries, and I

24  think -- I appreciate Judge Scott's review, but my own review of

25  some of the time entries is that there was a -- there were

1  greater occurrences of vague time entries than Judge Scott

2  indicated, and there were inconsistencies that if somebody were

3  going over it really carefully I think would be -- they would be

4  highlighted.  So if it were subject to a really searching review

5  or even if it were a bill that had been actually presented to a

6  client and the client reviewed, I think there would have been

7  objections to some of the time billings.

8       So that's just kind of a fact of life that in this kind of

9  review there's just not the incentive to kind of do the review

10 that you would get in a fully adversarial system or even in the

11 case of a bill actually paid by a client.  Now, I think that is

12 par for the course, and I don't mean this as criticism of Judge

13 Scott's work at all.  It's just a fact of life here is that I

14 think that number is a little bit higher, as is generally the

15 case in the review of class action fees, because the level of

16 review just isn't as intense as it would be otherwise.

17            MR. NEMELKA:  Can I add one other quality check --

18            THE COURT:  Sure.

19            MR. NEMELKA:  -- apart from Judge Scott's

20 independent --

21            THE COURT:  Yeah.

22            MR. NEMELKA:  -- review is the class members had a

23 vested interest in making sure that we're not --

24            THE COURT:  I'm going to get to them, yes.  But go

25 ahead.  Tell me what you want me to know about them.

1          MR. NEMELKA:  Well, nothing that you don't already

2     know --

3          THE COURT:  Yeah.

4          MR. NEMELKA:  -- is that there are large dollar amounts

5     here.  And as, you know, the Seventh Circuit said in *Silverman*

6     and others, for large institutional investors or with class

7     actions with large claims, it can be worth a complaint, a letter

8     to the Court --

9          THE COURT:  Yes.

10         MR. NEMELKA:  -- and especially when there's tens of

11    millions of dollars at stake for many of these vendors, and not

12    one of them did.  Not only did nobody object, despite, you know,

13    our full disclosure of everything, but, you know, vendors

14    representing over 90 percent of the damages have, through their

15    action, voiced support for the request, and I think that's a

16    collective judgment that should be -- you know, that should be

17    given some weight.

18         THE COURT:  I'm going to give a lot of weight to that

19    because I was really waiting -- I did what I could to lay out my

20    concerns with the attorney's fees in the preliminary approval

21    order.  I wanted the class members to see it.  Some of them have

22    millions at stake, and so I thought they would have an incentive

23    to challenge that fee award.  So that is very important to me.

24         But I also recognize that there are other factors that come

25    into play in making the decision whether you should object to

1    the award.  And so I think that, again, it's not a fully

2    adversarial system, and there may be reasons that class members

3    make the calculation that it's not worth the effort to make the

4    objection because you have to calculate -- it's all about risk

5    calculation here in this case -- that even if you were to

6    object, you'd have to consider whether it would be successful,

7    and the class members are happy with what they got, and so they

8    may not fully object even if they have concerns about it.

9    But -- and I want to make clear, it is a huge factor in my

10   consideration of the fee award that none of the class members

11   objected because, I agree, they had enough incentive to object.

12       But I still have to do my job to check to make sure that

13   the fees are reasonable and fair to all of the absent class

14   members, and so some of them aren't really here, and some of

15   them didn't have enough incentive to really make an objection.

16   So it is a very large factor in my consideration that I did not

17   get objections, so I want to make that clear, but it doesn't end

18   the analysis.

19       The task that I have to do -- and, again, I have to follow

20   the law in the circuit -- is to figure out the *ex ante* position,

21   and I think that when I look at all of the work that Judge Scott

22   did and Professor Rubenstein, very, very helpful.  Some of it I

23   thought sat uncomfortably -- as intelligent as I thought it was,

24   some of it I thought was a little bit uncomfortable with Seventh

25   Circuit precedent.  So Professor Rubenstein made clear that the

1    logic behind the principle that larger awards should get a

2    smaller percentage contingency fee is faulty in that it may

3    provide a disincentive to aggressive lawyering.  Well, that may

4    well be true, but that's just not what the Seventh Circuit says.

5    And so the Seventh Circuit seems to have endorsed the idea that

6    in large contingency fee awards in class action, you should

7    reduce the percentage.  Now, it doesn't say that that's an

8    absolute rule or that there is a cap, but that is a principle

9    that does seem to be fairly well established in Seventh Circuit

10   cases.

11       The Seventh Circuit cases also say pretty unequivocally

12   that I have to consider the point at which the case is resolved,

13   and so there is this idea that there is a check against an

14   unusually lavish recovery that happens as a result -- and the

15   term is used as "windfall," which I take to mean an unfair

16   profit that comes from the contingency fee that exceeds the

17   amount that's necessary to compensate for the risk of failure.

18   That's kind of my interpretation of what a windfall is.  So the

19   Court seemed to think that a windfall can happen if you have a

20   lodestar multiplier that gets into the three, four, five range,

21   and, again, the Seventh Circuit has made it clear that there's

22   no literal cap on the lodestar multiplier, unlike the Ninth

23   Circuit.

24       So as I sort these things out, the major factors that I see

25   are that I think there are the two main and one minor factor

1    that are -- tends to inflate the lodestar.  That's the common

2    fund, that's the use of the 2025 rates, and then the lesser

3    factor was the general sort of upward pressure that comes from

4    less-than-searching review of class action fee reviews.

5        And in this case, I actually have an extremely unusual

6    circumstance, and that is that I have the retainer agreement

7    that you reached with Autoloop at the beginning of the case.  So

8    that is literally the *ex ante* negotiated agreement, and that's

9    30 percent.  So I am strongly inclined to say that 30 percent is

10   the appropriate award.  Now, Professor Rubenstein's work I think

11   provides pretty good support for the idea that we're in the

12   range of reasonableness here so that I don't need to go to a 25

13   percent or do a calculation based on all of the cases that I can

14   find.  So in the *Broiler Chicken* litigation, you know, I think

15   it was Judge Durkin who put together the spreadsheet with all

16   the cases and comes up with the average and the mean.  I don't

17   think I'm inclined to do that here because I think I have

18   better, more tailored information about this case that's based

19   on Professor Rubenstein's work to suggest that being in the

20   realm of a third or 30 percent is -- we're within the zone of

21   reasonableness, but the most telling data point that I have is

22   the agreement that you reached with Autoloop that said that the

23   contingency would be 30 percent.

24       MR. NEMELKA:  I agree that is a key piece of the

25   *ex ante* market evidence.  Three other pieces of *ex ante* market

1      evidence I think are critical.

2          One is our engagement letter with Cox Automotive, who would

3      have been a member of the class except they sued individually.

4               THE COURT:  Yeah.

5               MR. NEMELKA:  And that was a third.

6          And then the other is the engagement letter with

7      Authenticom for this very case, same claim, same defenses, was

8      for 40 percent.  So, you know --

9               THE COURT:  That one though had some deductions

10     depending on how the case settled.  You might come down from

11     that third depending on the way the case was resolved.

12              MR. NEMELKA:  Authenticom actually is the opposite.  It

13     was -- if the case settled before the first status conference,

14     it was 35 percent.

15              THE COURT:  Uh-huh.

16              MR. NEMELKA:  If it settled after or was resolved after

17     the first status conference, it was 40 percent, so it actually

18     ratcheted up.  It was -- and the reason -- the logic for that

19     was if sending the draft complaint to CDK was enough to get them

20     to settle, then it would be 35 percent.

21              THE COURT:  I get that, yeah.

22              MR. NEMELKA:  So it actually ratcheted the other way.

23              THE COURT:  Okay.

24              MR. NEMELKA:  And so *Synthroid* was pretty clear that

25     when you have such strong *ex ante* market evidence like this of

1    actual agreements that were negotiated with sophisticated

2    parties with in-house counsel negotiating it, that sets the

3    market rate.  And so I agree the 30 percent with Autoloop is

4    critical but so is the Authenticom and Cox Automotive engagement

5    agreements, and in *Synthroid* what they did when you had multiple

6    agreements for the same litigation is they averaged them.  In

7    *Synthroid* there were several with 15 percent -- this is the

8    insurer class in *Synthroid* --

9              THE COURT:  Right.

10             MR. NEMELKA:  -- was 15 percent and others with 25

11   percent, and based on the numbers, the average came out was 22

12   percent.  And so the Court didn't enforce the 15 percent.  The

13   Court said, you know, these are data points for what the *ex ante*

14   bargain would have been, which we're reconstructing, and they

15   averaged it and did 22 percent.  We think that's -- that that is

16   the appropriate course here where the average is 34.5.  You

17   know, we're seeking a third.

18             THE COURT:  There are actually two engagement letters

19   with Autoloop, and it was the second one when you decided to

20   litigate it as a class action, that's the one -- that's the one

21   that seems to take pride of place because that was when this

22   became a class action and you said this is the case that we will

23   do at 30 percent.

24             MR. NEMELKA:  There were two engagement letters,

25   correct.  The first one was also 30 percent.

1            THE COURT:  The number was the same.

2            MR. NEMELKA:  Yeah.

3            THE COURT:  It's that a year or so later you engaged

4    when the shape of the case had become a little bit clearer, and

5    that's when you said 30 percent again.

6            MR. NEMELKA:  Right.  It was again.  It was a year

7    later, but that was still before any settlements like -- it's

8    not that the risk had gone down at all.  The rate just stayed

9    the same, and so if you want to, you know, count two engagement

10   letters for Autoloop, there are two 30 percent ones in the

11   average, I guess, and then you have a third for Cox Automotive,

12   which, again, we think is very important because Cox Automotive

13   is not just a vendor.  It is the largest vendor by far, and so

14   that is important evidence of a major, sophisticated company

15   negotiating with class counsel for this very case for these very

16   claims what our market rate is for this case.  And so we do

17   think that's a factor that should be taken into -- that is a

18   percentage that is part of the record evidence that should be

19   taken into account, in addition to the Authenticom 40 percent.

20           THE COURT:  All right.  All right.

21           MR. RUBENSTEIN:  Your Honor, may I speak?  Is it

22   appropriate to add a few thoughts?

23           THE COURT:  Sure.  Go ahead.

24           MR. RUBENSTEIN:  Thank you very much.

25        I have three quick things to say, and I'll be very brief.

1    I won't take up too much of your time.

2         But I would preface them by saying the following:  I go to

3    a lot of these things.  I work on class actions all day every

4    day.  Many of the judges I appear in front of handle class

5    actions a lot and regularly, and I'm just wildly impressed with

6    how on top of all the class action issues you are, although

7    you're a general federal district court judge and handle fewer

8    class actions than judges in California and New York do.  So

9    since the day I read your preliminary approval order, I felt

10   like your thorough command of the record was amazing.  I kind of

11   want you to come talk to my students about this at this point.

12        THE COURT:  All right.  Flattery is always good -- it's

13   always a good intro, so.

14        MR. RUBENSTEIN:  My three quick thoughts are the

15   following:

16        I think the lighthouse is my fault.  I used that as an

17   example, and I think you're correct -- I think the plaintiffs

18   are correct in pointing out that they paid for the full cost of

19   the lighthouse.  They had to build the whole thing, and they

20   can't stop anyone from using it.  I think you're correct, Your

21   Honor, in saying that because it's shared, everybody's costs

22   should go down rather than, if they had to do it themselves,

23   they'd pay a higher cost.

24        When you're looking at the lodestar, what you're asking is

25   what is the cost of the lighthouse, and I don't think it's

1    unfair for them to put all the time in that because that is the

2    cost of the lighthouse.  And when you turn back to say what

3    should the users pay because they're sharing the cost, I think

4    the fact that 33 percent is far below what they would have paid

5    had they had to do this themselves one by one.  So I don't think

6    the lighthouse analogy means they're not allowed to count the

7    full cost of building the lighthouse when they calculate their

8    lodestar.  It really did cost that much.

9         I'd also observe, last thing about the lodestar, I took

10   your point that the 36 million is in the general time and you

11   wanted to suggest take out a third of that.  By my calculations,

12   if you took out more than that, took them down to 50 million in

13   lodestar, they'd still be at a multiplier of four, which, based

14   on the material I submitted, would not be unreasonable in a case

15   of this context.

16        Second thing real quickly on the rates and the rate of

17   inflation.  I've often testified about rates, and I just want to

18   point out that we usually use a Department of Labor statistical

19   analysis of the rates for lawyers because they go up faster than

20   the rate of inflation does, not surprisingly.  So in thinking

21   about what the historic rates compare to the present rates, I

22   don't think the proper analysis is only the interest rate but

23   how much lawyer rates have gone up over time as well.

24        The last thing I'd say is I actually read the Seventh

25   Circuit as being at odds with themselves because they tell you

1    to focus on an *ex ante* bargain that would have been made, and

2    then they also tell you, as you pointed out, Your Honor, that

3    sometimes the *ex ante* bargain has declining percentages as

4    recoveries go up.  But to say that the declining percentage is

5    required implies that all *ex ante* bargains have it, and I don't

6    think that's accurate.  I think in this case there's a lot of

7    evidence of *ex ante* bargaining that didn't necessarily have a

8    declining rate.  So I think you're stuck a little bit in the

9    Seventh Circuit's own contradiction about whether you're

10   supposed to look at *ex ante* rates in reality or also have to use

11   this other factor, which may or may not be part of the *ex ante*

12   facts.

13            THE COURT:  All right.  Thank you.

14            MR. SCOTT:  Judge, can I say one thing also?  Tom

15   Scott.

16            THE COURT:  Sure.

17            MR. SCOTT:  Just take one minute.

18            THE COURT:  Go ahead.

19            MR. SCOTT:  On the issue of the lodestar, I want to

20   tell the Court that I've only testified in the last few years

21   for a plaintiff on two occasions, and in this case, I did -- I

22   usually testify for the defense, so I'm very picky about

23   review -- review of fee bills.  And in this case, I not only

24   reviewed it, but I found problems with it both with one expert

25   and with some of the lawyers, and I pointed them out to the

1    Court.

2         I would also point out to you that as a cross-check I

3    actually had conversations where I had their people go back and

4    check the records to make sure that the information was

5    accurate, that everything had been deducted, and in doing so,

6    after the audit, they found $5.3 million to the already 44

7    million they had deducted.  So the lodestar has already been

8    reduced almost $50 million.  So I think that the Court should

9    take that into consideration.

10             THE COURT:  All right.  Thank you.

11             MR. NEMELKA:  Your Honor, can I add --

12             THE COURT:  Yeah.

13             MR. NEMELKA:  -- two things?

14         One thing I wanted to add on the lodestar is I think Your

15   Honor may have been referring to the *Rohm and Haas* case where

16   the Court said that there is no -- that just like there's no

17   megafund cap in the Seventh Circuit, there's also no lodestar

18   multiplier cap.

19             THE COURT:  Right.

20             MR. NEMELKA:  And so it's -- you know, it's hard to

21   know exactly where the number is, where it becomes unreasonable,

22   and I think the Court articulated its understanding well, but I

23   just wanted to point out there is -- however the Court maybe

24   recalculates the lodestar, it's still -- Seventh Circuit has

25   been very clear that it's still -- there's no, like, upper limit

1    that it sets as a cap.

2         One thing I also want to say is --

3         THE COURT:  Well, and this really reiterates what

4    Professor Rubenstein just said, which is that if I just looked

5    at it purely from the *ex ante* perspective and, you know, the

6    firm makes an agreement that it's going to do the case for 25

7    percent and the complaint itself triggers a settlement, the

8    Seventh Circuit suggests that now I have to review that *ex ante*

9    agreement, which is perfectly legitimate from that perspective,

10   but now I have to review it because the point at which the case

11   settled suggests that it might somehow be unfair, despite the

12   fact that it was exactly what the parties negotiated at the time

13   based on what they knew at the time.

14        MR. NEMELKA:  Right.  And that --

15        THE COURT:  So there is a little tension there.  And

16   the way I resolve it in my own mind is to say that the best

17   evidence is the -- is whatever evidence you have that reflects

18   the *ex ante* understanding of the parties when they negotiated

19   the fee.  But there are certain times when, either it's because

20   the lodestar multiplier gets so far out of whack -- they don't

21   say there's any rule on it, but at some point you can get

22   uncomfortable with the lodestar multiplier, or if the case

23   settles at a very early stage, which, again, I think tends to be

24   one of those occurrences that makes the lodestar multiplier

25   particularly high.

1          MR. NEMELKA:  I agree with those -- both those points.

2     Vendor counsel, class counsel agrees with both those points, and

3     I would say both of those concerns aren't present here.

4          One, this case did not settle early.

5          THE COURT:  It did not.

6          MR. NEMELKA:  This was incredibly hard fought.

7          THE COURT:  Yes.  All right.

8          MR. NEMELKA:  And then the second point is I think it's

9     worth recognizing that this isn't just the typical case.

10          THE COURT:  Definitely not.

11          MR. NEMELKA:  That there is -- you know, trying to

12     compare this to other cases or, you know, applying general

13     principles, I think one thing that should be recognized is the

14     extraordinary nature of this case.  We settled for $630 million

15     with a single damage of the 490 over 7 years with no government

16     investigation, no prior complaint to rely on, fighting tooth and

17     nail through complaint, motion to dismiss, summary judgment,

18     multiple *Daubert* challenges, class certification, fighting to

19     get back to this court on remand, all the pretrial prep, and I

20     think, you know, it is worth recognizing in a certain respect in

21     Your Honor's consideration of the extraordinary nature of this

22     award.  And I'll just -- I don't mean -- I'd just like to quote

23     Professor Rubenstein, who is the author of *Newburg on Class*

24     *Actions*.  He's an expert on this very issue, and I just would

25     want to make sure the Court saw this, that he said, "I have been

1    an expert in more than 125 class action cases this century, and

2    I can say without hesitation that this is one of the most

3    remarkable cases I have ever seen."  And I think that is

4    something that is worth taking into account.

5            THE COURT:  I really -- I agree with it, but let me

6    respond to a couple of points about the lack of government

7    investigation.  I think that had there been a government

8    investigation that would lay the groundwork, it would really

9    militate for a very significant reduction in the percentage of

10   recovery, in the contingency percentage.  So it is a factor, but

11   when I'm looking at the other cases that I see where there is a

12   preliminary government investigation that does a lot of the work

13   that you had to do on your own in this case, it doesn't drive it

14   up above a third.  Those are cases where the number gets a lot

15   lower.

16       There's also in your briefing a lot made of the Court of

17   Appeals decision reversing my decision on the preliminary

18   injunction in this case, and I really don't read the Seventh

19   Circuit opinion as having much at all to say about the merits of

20   the case.  There was a swipe taken at the theory that the

21   agreements were tying agreements, but that was a claim you

22   ultimately lost on a summary judgment anyway.  So -- and the

23   Court really took pains to say that they weren't offering

24   opinions about the merits of the case.

25            MR. NEMELKA:  I'm encouraged to hear the Court's

1    interpretation of that.  That's not how we felt after we read

2    it.

3              THE COURT:  Yeah.

4              MR. NEMELKA:  But we felt like Judge Wood was -- did

5    cast some doubt on the merits of our claims calling, you know,

6    our Section 2 claim not able to provide relief, the tying claim,

7    you're right.  It called the defenses of CDK and Reynolds strong

8    arguments.  It said it was being generous by even assuming the

9    likelihood of success on the merits.

10         And then in terms of the timing point of the case, you

11    know, I think it's interesting that *Synthroid,* where there was

12    negotiated agreements between the insurers, that came after a

13    multi-hundred dollar million settlement.  Those agreements that

14    the Court enforced, the average of 22 percent, those were

15    negotiated with the insurers after the manufacturer of Synthroid

16    had already agreed to multimillion hundred dollar settlements.

17    So for sure there was still risk on the table, but still the

18    Court didn't reduce the average of those agreements just because

19    the defendant had apparently shown a willingness to pay large

20    amounts of money.  It still said, well, at that time of the

21    litigation, that is what the parties agreed to, and that defines

22    the market rate.

23              THE COURT:  All right.  All right.  Let's turn to the

24    other concerns here.  I'm going to take the attorney's fees

25    question under advisement.  You know, part of what I do here is

1   try to get, you know, my questions answered and further

2   information, and so I appreciate that, and so I'll write an

3   opinion about the attorney's fees.  Let's deal with some of the

4   other things though.  And I'll do that expeditiously because I

5   know you want to get this case resolved, and so do I.

6       Let's talk about the litigation expenses.  I find all the

7   litigation expenses are reasonable.  Again, I maybe think that

8   Judge Scott overstated a few things, which he described as

9   necessary, jury consultants and mock trials and things like

10  that.  I don't think it would be fair to describe this as

11  necessary, but I agree they are reasonably incurred, and I think

12  that I would not object to them.  I wouldn't describe them as

13  necessary, but I think they were reasonably incurred, and so all

14  the litigation expenses I think are reasonable.

15      The administrator expenses at $200,000, I have no reason to

16  doubt those, and I'll approve the administrator expenses as

17  reasonable.

18      I don't see many cases that have an incentive award of

19  $250,000 for the named plaintiff, but, then again, I don't see

20  many settlements that are $600 million.  So I think the $250,000

21  settlement award is justified.  There is support for the award,

22  and counsel has itemized the efforts that Autoloop put into the

23  case, and it was quite substantial.  So it's definitely worthy

24  of what is really more of a substantive award and not just a

25  token here.  So the $250,000 incentive award is appropriate.

1      I think the settlement plan is a reasonable one, and so the
2      distribution plan is a reasonable one.  I'll approve that.  The
3      parties have represented that there are no other agreements
4      required to be disclosed, and CDK represents that it has
5      complied with the disclosure requirements in Section 1715(b), so
6      I don't need to hold up the judgment for entering that.
7          Let's talk about the shape of the judgment.  The Seventh
8      Circuit is really picky about retaining jurisdiction, and so
9      what I'm going to -- what I gather you want me to do is to
10     dismiss the case with prejudice but still contain -- still
11     retain control over any disputes about the agreement or the
12     failure to comply with any of the terms of the agreement because
13     we've got some payments that are stretching out into the future.
14         And so I think the solution is that I will enter judgment,
15     dismiss the case with prejudice, but certain substantive
16     provisions of the settlement agreement and the distribution
17     agreement will have to be incorporated into the judgment
18     itself --
19             MR. NEMELKA:  Okay.
20             THE COURT:  -- to give me the authority to actually
21     enforce that so that you don't have to file a new breach of
22     contract case.
23             MR. NEMELKA:  Great.
24             THE COURT:  So what I'm going to do is we've prepared a
25     draft order, and I will -- I will docket that as a proposed

```
 1     order and give you seven days to respond to it.  If there's any
 2     concerns with the way I've crafted it, then you can give me
 3     objections, and I'll take appropriate steps after I hear from
 4     you.
 5               MR. NEMELKA:  Okay.
 6               THE COURT:  I assume that it's not going to be a
 7     concern for the defendant, but if you have any concerns, I'll
 8     want them from you too.
 9               MR. JONKE:  Understood, Your Honor.
10               THE COURT:  Okay.  So, substantively, it will be part
11     of the judgment, so I'll enforce it like a consent judgment, and
12     that will give me the authority to do it.
13          All right.  Those are -- those are my questions, and so I
14     think I have the parties -- well, I haven't had the parties'
15     input.
16          Of all of the things we discussed today here, Mr. Jonke, is
17     there anything that you want to add to or contribute to?
18               MR. JONKE:  Nothing from the defense, Your Honor.
19               THE COURT:  Okay.  All right.  Good.
20          All right.  Last chance:  Is there anything else that you
21     want me to know as I retire to consider the attorney fee issue?
22               MR. NEMELKA:  One fact on the multiple engagement
23     letters --
24               THE COURT:  Uh-huh.
25               MR. NEMELKA:  -- that when we signed those engagement
```

1    letters with Authenticom, with Cox Automotive, and with

2    Autoloop, our representations of the other plaintiffs were known

3    and disclosed and specifically acknowledged by the -- by our

4    clients, and they did not seek any offset based on a percentage

5    that we -- you know, a contingency percentage we were getting

6    from one or the other.  What we're seeking for is the risk we

7    took in this case for Autoloop.

8              THE COURT:  Okay.

9              MR. NEMELKA:  So --

10             THE COURT:  All right.

11             MR. NEMELKA:  -- that's the final thing I'd like to

12    say.

13             THE COURT:  All right.  Thank you all for coming in.

14    Congratulations on getting this matter resolved.  As is often

15    the case, I was a little disappointed that it settled because I

16    thought this looked like it was going to be a really interesting

17    trial, but I was also relieved because it allows me to do the

18    other work in my other cases.  So thank you for your work on

19    this.  It is really an extraordinary case and an extraordinary

20    result and so -- and thanks -- really thanks to both sides for

21    getting it over the finish line.

22             MR. NEMELKA:  Thank you, Your Honor.

23             THE COURT:  All right.  Thank you, all.  Have a good

24    weekend.

25             THE CLERK:  This Honorable Court stands adjourned.

1          (Proceedings concluded at 2:54 p.m.)

2                                ***

3          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

4     Reporter in and for the State of Wisconsin, certify that the

5     foregoing is a true and accurate record of the proceedings held

6     on the 29th day of August, 2025, before the Honorable

7     James D. Peterson, Chief U.S. District Judge for the Western

8     District of Wisconsin, in my presence and reduced to writing in

9     accordance with my stenographic notes made at said time and

10    place.

11         Dated this 1st day of September, 2025.

12

13

14

15

16

17                              ____/s/ Jennifer L. Dobbratz_____

18                         Jennifer L. Dobbratz, RMR, CRR, CRC
                                 Federal Court Reporter
19

20

21

22

23

24         The foregoing certification of this transcript does not
      apply to any reproduction of the same by any means unless under
25    the direct control and/or direction of the certifying reporter.